**No. 26-1364**

# In the United States Court of Appeals for the Tenth Circuit

RESTAURANT LAW CENTER, *et al.*,
*Appellants*

v.

CITY AND COUNTY OF DENVER, *et al.*,
*Appellees*

On Appeal from the U.S. District Court for the District of Colorado
No. 1:24-CV-01862, District Judge Phillip A. Brimmer

## Appellants' Opposed Motion to Abate

Scott Novak
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 639-1316
scott.novak@bakerbotts.com

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Daniel B. Rankin
BAKER BOTTS L.L.P.
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

Pursuant to Federal Rule of Appellate Procedure 27 and Tenth Circuit Rule 27, Appellants American Hotel & Lodging Association, Colorado Restaurant Association, Home Builders Association of Metropolitan Denver, National Apartment Association, National Association of Home Builders of the United States, National Propane Gas Association, and Restaurant Law Center respectfully request that the Court abate this appeal, including all briefing deadlines, pending the Supreme Court's disposition of the petition for a writ of certiorari in *Association of Contracting Plumbers of the City of New York, Inc., et al. v. City of New York* and *Mulhern Gas Co., Inc., et al. v. Walter T. Mosley, New York Secretary of State, et al.*, No. 26-648, and, if the petition is granted, the Supreme Court's disposition of the case on the merits. In support, Appellants state as follows.

1. On September 15, 2026, this case was docketed and the preliminary record was filed. Appellants thereafter timely filed their entry of appearance, disclosure statements, and transcript order form.

2. On September 22, 2026, this Court received notice that the record was complete and issued an order requiring Appellants to file their opening brief on the merits and appendix by November 2, 2026.

3. On September 30, 2026, the Court granted Appellants' first motion for an extension of time to file their opening brief on the merits and appendix, extending the due date to December 2, 2026.

4. On November 10, 2026, the Court granted Appellants' second motion for an extension of time to file their opening brief on the merits and appendix, extending the due date to January 4, 2027.

5. As Appellants explained in their motion for a second extension, the key question in this case is whether the Energy Policy and Conservation Act ("EPCA") preempts certain City and County of Denver ("Denver") laws that restrict or ban the use of certain natural gas appliances. *See Restaurant Law Center v. City & County of Denver*, No. 24-CV-01862-PAB-KAS, 2026 WL 2908083, at *1 (D. Colo. Aug. 7, 2026) ("Plaintiffs claim that Denver's natural gas appliances laws are preempted by federal law"); *id.* at *2 (describing the bans on "fossil-fuel warm air furnaces" and "fossil fuel . . . water heaters").

6. That EPCA preemption question at the heart of this case is the subject of a circuit split between the Ninth and Second Circuits. The Ninth Circuit has held that EPCA preempts state and local efforts to ban gas appliances in buildings: "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings. So Berkeley can't evade preemption by merely moving up one step in the energy chain and banning natural gas piping within those buildings." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th

1094, 1107 (9th Cir. 2024).[1] The Second Circuit disagreed and held that "EPCA does not preempt" "state and local laws which prohibit fossil-fuel-powered appliances." *Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, 180 F.4th 434, 438 (2d Cir. 2026). In doing so, the Second Circuit acknowledged that it was breaking with *Berkeley* and "creat[ing] 'a split among the Circuits'" on the EPCA preemption issue. *Id.* at 451 (quoting *Lamay v. Comm'r*, 562 F.3d 503, 508 (2d Cir. 2009)).

7. Appellants asked the Court to grant their second motion for extension of time to allow time for the petition for a writ of certiorari to be filed in *Association of Contracting Plumbers* so that Appellants could then move to abate this case pending the disposition of that petition. The Court's grant of that motion for a second extension did just that. On November 17, 2026, the Supreme Court docketed the petition for a writ of certiorari in *Association of Contracting Plumbers of the City of New York, Inc. v. City of New York* and *Mulhern Gas Co., Inc. v. Mosley*, No. 26-648 (attached as Exhibit 1).

8. The petition asks the Supreme Court to decide the central question that is presented in this case: "Whether a state or local law that prohibits EPCA-covered

---

[1] In a later case, the Ninth Circuit held that certain kinds of emissions regulations are not preempted by EPCA. *See Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.*, 184 F.4th 1094 (9th Cir. 2026). But neither this case nor the Second Circuit case involves those kinds of emissions regulations.

gas appliances from consuming any energy is a preempted 'regulation concerning the . . . energy use' of those products." Petition for Writ of Certiorari at i, *Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York* and *Mulhern Gas Co., Inc. v. Mosley*, No. 26-648 (Nov. 13, 2026). The petition then details the square circuit split on that EPCA preemption question. *Id.* at 13-19.

9. Given the centrality of that EPCA preemption question to this case and the substantial guidance the Supreme Court may offer on it, Appellants believe that abatement presents a prudent course here. Proceeding ahead now would require the parties to brief, and the Court to decide, a question that the Supreme Court may soon answer, with the attendant risk of supplemental briefing, rehearing, or a remand in light of the Supreme Court's decision. In contrast, abating the appeal now, before the parties and the Court invest substantial resources in briefing and argument that may be rendered obsolete, will conserve judicial and party resources and ensure that this appeal is decided under the governing law as the Supreme Court articulates it.

10. Abatement is further supported by the fact that the costs of delay fall principally, if not wholly, on Appellants. Appellants lost below. The challenged laws remain in effect. Because Appellees will remain free to enforce those laws throughout the abatement period, an abatement would not harm them. Rather, it is Appellants and their members, not Appellees, who are being harmed in the interim. Moreover, the abatement Appellants seek is not indefinite: it is tied to discrete

events—the Supreme Court's disposition of a petition that has already been docketed and, if certiorari is granted, the merits decision in that case.

11. This Court has abated appeals in similar circumstances. *See United States v. Valdez*, No. 22-3025, 2025 WL 4960135, at *1 (10th Cir. Oct. 22, 2025) (noting that the Court "abated this appeal pending the Supreme Court's disposition of [the] petition for writ of certiorari in *United States v. Hohn*, No. 24-1084"); *United States v. Victorio*, 719 F. App'x 857, 858 (10th Cir. 2018) (noting that the Court "abated this matter pending the Supreme Court's resolution of the petition for certiorari in *Harris*"). It should follow that same course here.

12. In accordance with Tenth Circuit Rule 27.1, counsel for Appellants has contacted counsel for Appellees City and County of Denver and Sierra Club regarding this Motion. Counsel indicated that Appellees oppose this Motion.

13. For these reasons, Appellants respectfully request that this Motion be granted and that the Court abate this appeal, including all briefing deadlines, pending the Supreme Court's disposition of the petition for a writ of certiorari in *Association of Contracting Plumbers of the City of New York, Inc., et al. v. City of New York* and *Mulhern Gas Co., Inc., et al. v. Walter T. Mosley, New York Secretary of State, et al.*, No. 26-648, and, if certiorari is granted, the Supreme Court's disposition of the case on the merits.

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ *J. Mark Little*
J. Mark Little
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Scott Novak
700 K Street NW
Washington, D.C. 20001
(202) 639-1316
scott.novak@bakerbotts.com

Daniel B. Rankin
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

*Counsel for Appellants*

**Certificate of Compliance**

1. This Motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 1,236 words.

2. This Motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this Motion has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

*/s/ J. Mark Little*
J. Mark Little

**Certificate of Service**

I certify that on November 20, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ J. Mark Little*
J. Mark Little

# Exhibit 1

No. ____

IN THE

# Supreme Court of the United States

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC. et al.,

*Petitioners*,

v.

CITY OF NEW YORK,

*Respondent*.

MULHERN GAS CO., INC. et al.,

*Petitioners*,

v.

WALTER T. MOSLEY, New York Secretary of State, et al.,

*Respondents*.

On Petition for a Writ of Certiorari to the United States Court of Appeals for the Second Circuit

## PETITION FOR A WRIT OF CERTIORARI

Sarah O. Jorgensen
*Counsel of Record*
Brian C. Baran
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
1899 L. St. NW, Suite 410
Washington, DC 20036
(202) 894-7310
*sjorgensen@reichmanjorgensen.com*

## QUESTION PRESENTED

The Energy Policy and Conservation Act (EPCA) establishes uniform federal standards for a wide range of consumer and industrial appliances. The statute expressly preempts any state or local "regulation concerning the energy efficiency, energy use, or water use" of a covered appliance for which there is a federal "energy conservation standard." 42 U.S.C. §6297(c).

Despite the express preemption provision, a growing number of state and local governments—starting with Berkeley, California in 2019—have banned EPCA-covered gas appliances in new buildings. The Ninth Circuit has held that EPCA preempts effective bans on gas appliances because, by preventing appliances from using any energy, such bans concern covered appliances' energy use. In the decision below, the Second Circuit explicitly rejected that view and openly "create[d] a split among the Circuits." App.36a (cleaned up).

The question presented is:

Whether a state or local law that prohibits EPCA-covered gas appliances from consuming any energy is a preempted "regulation concerning the … energy use" of those products.

## PARTIES TO THE PROCEEDING

*Association of Contracting Plumbers of the City of New York, Inc. v. City of New York:* Petitioners were the plaintiffs-appellants in the court of appeals. Petitioners are the Association of Contracting Plumbers of the City of New York, Inc.; Plumbing-Heating-Cooling Contractors—National Association; Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada; New York State Energy Coalition, Inc.; Plumbing Foundation City of New York, Inc.; Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York; and Building Industry Association of New York City, Inc.

Respondent City of New York was the defendant-appellee in the court of appeals.

*Mulhern Gas Co. v. Mosley*: Petitioners were the plaintiffs-appellants in the court of appeals. Petitioners are Mulhern Gas Co., Inc.; New York State Builders Association; National Association of Home Builders; New York Propane Gas Association; National Propane Gas Association; Northeast Hearth, Patio and Barbecue Association; Plumbing Contractors Association of Long Island; Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York; Holmes Mech. LLC; International Brotherhood of Electrical Workers Local 1049; International Brotherhood of Electrical Workers Local Union 97; Plumbers Local Union No. 200; and Transport Workers Union Local 101, AFL-CIO.

Respondent Walter T. Mosley, in his official capacity as New York Secretary of State and member of the State Fire Prevention and Building Code Council, was the defendant-appellee in the court of appeals. Respondents New York Geothermal Energy Organization and PUSH Buffalo were the intervenor-defendants-appellees.

No party in either case has a stock ticker symbol.

## CORPORATE DISCLOSURE STATEMENT

No petitioner has a parent corporation, and no publicly held corporation owns 10 percent more of any petitioner's stock or otherwise holds a 10 percent or greater ownership interest in any petitioner.

## RELATED PROCEEDINGS

*Association of Contracting Plumbers of the City of New York, Inc. v. City of New York*, No. 25-977 (2d Cir.) (judgment entered June 30, 2026; rehearing denied August 26, 2026)

*Association of Contracting Plumbers of the City of New York, Inc. v. City of New York*, No. 1:23-cv-11292 (S.D.N.Y.) (judgment entered March 18, 2025)

*Mulhern Gas Co. v. Mosley*, No. 25-2041 (2d Cir.) (judgment entered June 30, 2026; rehearing denied August 26, 2026)

*Mulhern Gas Co. v. Mosley*, No. 1:23-cv-01267 (N.D.N.Y.) (judgment entered August 21, 2025)

**TABLE OF CONTENTS**

QUESTION PRESENTED ........................................ i
PARTIES TO THE PROCEEDING ........................... ii
CORPORATE DISCLOSURE STATEMENT .......... iv
RELATED PROCEEDINGS ......................................v
TABLE OF AUTHORITIES .................................. viii
PETITION FOR A WRIT OF CERTIORARI .............1
OPINIONS BELOW ..................................................1
JURISDICTION ........................................................1
STATUTORY PROVISIONS INVOLVED .................2
INTRODUCTION .......................................................2
STATEMENT OF THE CASE ...................................5
A. Legal background ..........................................5
B. Factual and procedural background ...........10
REASONS FOR GRANTING THE WRIT ................13
I. The decision below expressly creates a circuit split and rejects the federal government's interpretation of a federal statute. .....................13
II. The decision below is wrong. .............................20
A. EPCA's plain text preempts state and local bans on covered gas appliances. ..........20
B. Allowing state and local gas bans would frustrate Congress's preemption-related objectives, contrary to this Court's preemption precedents. ...............................26
III. These cases present an ideal vehicle for resolving an exceptionally important question of federal preemption. .......................................34
CONCLUSION .........................................................39

**APPENDICES**

APPENDIX A
Opinion of the United States Court of Appeals for the Second Circuit (June 30, 2026) .......... 1a

APPENDIX B
Order of the United States District Court for the Northern District of New York (August 21, 2025) (*Mulhern*) .......... 44a

APPENDIX C
Decision and Order of the United States District Court for the Northern District of New York (July 23, 2025) (*Mulhern*) .......... 45a

APPENDIX D
Opinion and Order of the United States District Court for the Southern District of New York (March 18, 2025) (*Plumbers*) .......... 89a

APPENDIX E
Denial of Rehearing of the United States Court of Appeals for the Second Circuit (August 26, 2026) (*Plumbers*) .......... 110a

APPENDIX F
Denial of Rehearing of the United States Court of Appeals for the Second Circuit (August 26, 2026) (*Mulhern*) .......... 112a

APPENDIX G
Relevant Statutory Provisions .......... 114a

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005) .......... 5-6

*Am. Gas Ass'n v. U.S. Dep't of Energy*, 157 F.4th 476 (D.C. Cir. 2025), *cert. granted, judgment vacated mem.*, 146 S.Ct. 2705 (2026) .......... 32

*Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641 (2013) .......... 28, 33

*Arizona v. United States*, 567 U.S. 387 (2012) .......... 20

*Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) .......... 4, 11-17, 22-24, 33, 35

*Chevron USA Inc. v. Plaquemines Parish*, 146 S.Ct. 1052 (2026) .......... 22

*Clean Energy Choice Coal. v. Village of Oak Park*, 2026 WL 2205908 (N.D. Ill. July 30, 2026) .......... 19

*Clean Energy Choice Coal. v. Village of Oak Park*, No. 26-2715 (7th Cir.) .......... 18

*Colo. Apartment Ass'n v. Ryan*, 2026 WL 2935963 (D. Colo. Sept. 30, 2026) .......... 37

*Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87 (2017) .......... 21

*Cummings v. Missouri*,
71 U.S. (4 Wall.) 277 (1867) ................................27

*Engine Mfrs. Ass'n v.*
*S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004) ......................................14, 28

*Gobeille v. Liberty Mut. Ins. Co.*,
577 U.S. 312 (2016) ......................................29, 33

*Haywood v. Drown*,
556 U.S. 729 (2009) ............................................27

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) ...................................... 21-22

*Maryland Building Industry Ass'n v. McIlwain*,
828 F. Supp. 3d 617 (D. Md. 2026) .....................34

*Maryland Building Industry Ass'n v. McIlwain*,
No. 26-1552 (4th Cir.) .........................................34

*Mich. Canners & Freezers Ass'n v.*
*Agric. Mktg. & Bargaining Bd.*,
467 U.S. 461 (1984) ...................................... 27-28

*Montgomery v. Caribe Transp. II, LLC*,
146 S.Ct. 1199 (2026) .........................................21

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ............................................21

*Nat. Res. Def. Council v. Abraham*,
355 F.3d 179 (2d Cir. 2004) ..................................6

*Nat'l Ass'n of Home Builders of the U.S. v.*
*District of Columbia*,
2026 WL 837674 (D.D.C. Mar. 26, 2026) ...........19

*Nat'l Ass'n of Home Builders of the U.S. v.*
*District of Columbia*,
No. 26-7050 (D.C. Cir.)........................................18

*Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, 2026 WL 817322 (D. Md. Mar. 25, 2026) ..........19

*Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, No. 26-1449 (4th Cir.) ........................................18

*Nat'l Meat Ass'n v. Harris*, 565 U.S. 452 (2012) ...................................... 27-28

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115 (2016) ............................................20

*Pulsifer v. United States*, 144 S.Ct. 718 (2024) ..........................................25

*Rest. Law Ctr. v. City & County of Denver*, 2026 WL 2908083 (D. Colo. Aug. 7, 2026), *appeal docketed*, No. 26-1364 (10th Cir. Sept. 15, 2026) ....................................................37

*Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.*, 184 F.4th 1094 (9th Cir. 2026), *reh'g en banc denied*, No. 25-5129 (9th Cir. Sept. 9, 2026).........37

*Rivera v. Sami*, 191 F.4th 932 (9th Cir. 2026) ............................37

*Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008) ...................... 24, 28-30, 32-33

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S.Ct. 2141 (2023) .........................................27

*United States v. City of Morgan Hill*, No. 5:26-cv-00056 (N.D. Cal) ..............................17

*United States v. Township of Morris*, No. 2:26-cv-03412 (D.N.J.)............................ 17-18

*Wash. State Dep't of Licensing v. Cougar Den, Inc.*,
586 U.S. 347 (2019) ........................................... 28

*Wos v. E.M.A. ex rel. Johnson*,
568 U.S. 627 (2013) ........................................... 27

*Wyeth v. Levine*,
555 U.S. 555 (2009) ........................................... 17

**Constitutional Provisions**

U.S. Const. art.III ................................................. 35

U.S. Const. art.VI, cl.2 ................................... 2, 20, 27

**Statutes and Ordinances**

28 U.S.C. §1254(1) ..................................................... 1

Energy Policy and Conservation Act of 1975,
42 U.S.C. §§6201-6422

§6291(1) ............................................................... 7

§6291(2) ............................................................... 7

§6291(3) ......................................................... 7, 21

§6291(4) ................................................ 21-22, 24

§6291(6) ............................................................. 12

§6291(6)(A) ......................................................... 22

§6292 .................................................................... 7

§6293 ............................................................ 21, 24

§6293(b)(3) .................................................... 21, 23

§6294(a)(2)(I) ...................................................... 23

§6294(a)(3) .......................................................... 23

§6295 ............................................................ 2, 6, 8

§6295(o)(4) ............................................... 7, 30, 32

§6295(q)(1) .......................................................... 32

§6295(q)(1)(A) ................................................. 7, 31

§6297(a)(2)(A) .............................................21, 32
§6297(c)..................................... i, 2-3, 8, 11, 13-16,
...................................... 20-22, 24-26, 32-33, 37-38
§6297(d) ................................................................9
§6297(d)(1)(A)-(B)..................................................9
§6297(d)(3) ......................................................9, 30
§6297(d)(4) ................................................9, 30, 32
§6297(f)(3)................................................ 8, 24-26
§6297(f)(3)(A).........................................................8
§6297(f)(3)(B)............................................ 8, 25-26
§6297(f)(3)(C).........................................................9
§6297(f)(3)(F) .........................................................9
§6297(g) ..............................................................23
§6311(1)-(2)............................................................7
§6316(b)(2)(A) ........................................................9
Energy Policy and Conservation Act,
Pub. L. No. 94-163, 89 Stat. 871 (1975) ...............5
Energy Policy Act of 1992,
Pub. L. No. 102-486, §123(h)(3),
106 Stat. 2776, 2830.............................................8
Energy Policy Act of 2005,
Pub. L. No. 109-58, §135(d),
119 Stat. 594, 634.................................................8
National Appliance Energy Conservation Act of 1987,
Pub. L. No. 100-12, §7, 101 Stat. 103, 117-22......6
National Energy Conservation Policy Act,
Pub. L. No. 95-619, 92 Stat. 3206 (1978) .............6
N.Y. Energy Law §11-104(6)-(8) ...............................10

N.Y. Exec. Law §378(19) ..........................................10

N.Y.C. Admin. Code §24-177.1.................................10

N.Y.C. Admin. Code §27-2034(e) .............................30

N.Y.C. Admin. Code §28-506.1.................................10

N.Y.C. Local Law No. 154 (2021).............................10

**Rules and Regulations**

10 C.F.R. §430.32(j)(1)(iii) ....................................7, 22

Sup. Ct. R. 12.4...........................................................1

**Other Authorities**

Energy Audits,
42 Fed. Reg. 20,012 (Apr. 15, 1977)
(proposed rule)....................................................24

Energy Audits,
42 Fed. Reg. 33,158 (June 29, 1977)...................24

Brief for Appellee the District of Columbia,
*Nat'l Ass'n of Home Builders of the U.S. v. District of Columbia*, No. 26-7050 (D.C. Cir.),
2026 WL 2111130 ...............................................34

Brief of Amicus Curiae American Gas Ass'n, *Nat'l Ass'n of Home Builders of the U.S. v. District of Columbia*, No. 26-7050 (D.C. Cir.) ................. 36

Brief of Appellee Montgomery County,
*Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, No. 26-1449 (4th Cir.),
Dkt.43, 2026 WL 1910904 ..................................34

Petition for Rehearing En Banc, *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094
(9th Cir. 2024) (No. 21-16278) ............................36

S. Rep. No. 100-6 (1987) ...................................7, 9, 30

## PETITION FOR A WRIT OF CERTIORARI

Petitioners respectfully seek a writ of certiorari to review the judgments of the United States Court of Appeals for the Second Circuit in these cases.

## OPINIONS BELOW

Under this Court's Rule 12.4, petitioners are filing a joint petition covering the judgments in *Plumbers* and *Mulhern* because the cases present identical questions and were resolved by the same court in the same opinion.

The Second Circuit's decision resolving both cases (App.1a-43a) is reported at 180 F.4th 434. The Second Circuit's orders denying rehearing en banc in *Plumbers* (App.110a-111a) and *Mulhern* (App.112a-113a) are unpublished. The Southern District of New York's decision in *Plumbers* (App.89a-109a) is unreported but available at 2025 WL 843619. The Northern District of New York's opinion in *Mulhern* (App.45a-88a) is reported at 798 F.Supp.3d 304; its order entering summary judgment (App.44a) is unpublished.

## JURISDICTION

The Second Circuit entered judgment in both cases on June 30, 2026, App.1a, and denied petitioners' timely petitions for rehearing en banc on August 26, 2026, App.110a-113a. This Court has jurisdiction under 28 U.S.C. §1254(1).

## STATUTORY PROVISIONS INVOLVED

Article VI, clause 2 of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

42 U.S.C. §6297(c) provides in pertinent part:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product * * * .

Other pertinent statutory provisions and local laws are reproduced at App.114a-156a.

## INTRODUCTION

These cases present an acknowledged circuit split over the meaning of an important federal preemption provision. Only this Court can resolve the issue. And given the dispute's significant practical stakes for national energy policy, the national appliance and housing markets, access to good-paying union jobs, and beyond, the time to resolve it is now.

Faced with an oil crisis half a century ago, Congress set out to create a comprehensive energy pol-

icy through the Energy Policy and Conservation Act of 1975. EPCA was designed to promote energy independence and security, including through a federal energy conservation program for appliances. Over time, Congress further developed that policy, amending the statute to establish a system of national energy use or efficiency standards for many common consumer and commercial appliances. To protect that system's uniformity, Congress expressly preempted state or local laws "concerning the energy efficiency, energy use, or water use" of covered appliances. 42 U.S.C. §6297(c).

One way to achieve Congress's energy conservation goals might have been to set the most aggressive efficiency standards the economy and technology could bear, even if that came at the cost of consumer choice. That is not the approach Congress chose. Instead, it opted to protect access to generally available appliance types and features while using standards to incrementally increase energy efficiency (or reduce energy use) for each kind of appliance. And Congress specifically protected fuel choice, requiring different standards for appliances that run on different kinds of energy.

But over the last several years, state and local governments dissatisfied with Congress's approach to energy policy—and, in particular, its commitment to fuel choice—have taken it upon themselves to effectively ban EPCA-covered gas appliances. The question presented here is whether EPCA expressly preempts such bans.

That question has divided the circuits, fracturing Congress's national approach into competing regional

regimes. The Ninth Circuit has held that effectively banning gas appliances by prohibiting gas piping in new buildings is preempted because it concerns covered appliances' energy use. *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). But in the decision below, the Second Circuit disagreed and openly created a circuit split by holding that banning gas appliances, piping, or combustion concerns only the type of energy used, not "energy use" as EPCA defines it. In doing so, the Second Circuit broke with the federal government's own interpretation of EPCA and failed to heed the government's concern that state and local bans interfere with the Department of Energy's ability to administer EPCA's national energy conservation program.

The Ninth Circuit got it right, and the Second Circuit got it wrong. But either way, the divide is untenable: What everyone agrees was supposed to be one nationwide rule of preemption now preempts gas appliance bans on the West Coast while allowing them in New York. And cases now working their way through other circuits will only add to a growing patchwork. It is up to this Court to restore the uniform policy Congress chose.

The Court should do so now. These cases provide the ideal vehicle to resolve the split. The purely legal question has been thoroughly aired in the Ninth Circuit and below, and the cases arrive without complications. There is no point waiting for more percolation; the split is already entrenched, and the various parties, amici, and courts have coalesced around the same two competing interpretations based on the same arguments. What's more, there is serious harm

in delay. Letting the split deepen would further erode Congress's national regulatory scheme while doing real damage on the ground. Petitioners in these cases alone represent tens of thousands of New York residents, workers, and employers who face massive economic consequences, including the loss of their jobs and businesses. For many, the challenged bans present an existential threat. Similar state and local bans across the country will cause still more harm and are already contributing to an oncoming train of litigation.

This Court should grant certiorari to restore uniformity on this important question of federal preemption.

## STATEMENT OF THE CASE

### A. Legal background

1. The statute at the heart of this case emerged in the early 1970s from circumstances familiar today: an oil crisis fueled by conflict in the Middle East. Congress responded by enacting the Energy Policy and Conservation Act, Pub. L. No. 94-163, 89 Stat. 871 (1975) (codified as amended at 42 U.S.C. §§6201-6422). The point of EPCA was to create a "comprehensive energy policy" addressing "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005). As part of that national policy, Congress both encouraged domestic supply and established an energy conservation program for appliances.

At first, EPCA's energy conservation program focused on labeling, on the theory that well-informed consumers would choose more efficient appliances. *Air Conditioning*, 410 F.3d at 498-99. But over time, Congress expanded the federal role while contracting state and local authority. *See id.* at 498-500; *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185-86 (2d Cir. 2004).

In 1978, Congress amended EPCA to require the Department of Energy to prescribe federal standards, while also strengthening federal preemption. National Energy Conservation Policy Act, Pub. L. No. 95-619, 92 Stat. 3206 (1978); *Air Conditioning*, 410 F.3d at 499. The Department refused, instead "initat[ing] a general policy of granting petitions from States requesting waivers from preemption." *Air Conditioning*, 410 F.3d at 499 (attribution omitted).

2. Congress responded by amending EPCA again in 1987, this time prescribing standards for many common household appliances and adopting the expanded preemption provision at issue here. *Air Conditioning*, 410 F.3d at 499-500; *see* National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, §7, 101 Stat. 103, 117-22.

a. On the federal side, Congress directly prescribed an initial set of standards and charged the Department with setting and updating standards for covered products moving forward. 42 U.S.C. §6295.[1] "[C]overed product[s]" include many common household and commercial appliances, such as water heat-

[1] All further statutory references are to 42 U.S.C. unless otherwise noted.

ers, furnaces, dishwashers, dryers, kitchen ranges and ovens, pool heaters, and boilers. *See* §§6291(1)-(2), 6292, 6311(1)-(2).

The Department's authority comes with guardrails designed to protect consumer choice. One ensures continued access to the kinds of appliances already available on the market: The Department cannot impose standards "likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States." §6295(o)(4). Another key guardrail extends that protection to choice among energy sources; the Department must set different standards for products that use "different kind[s] of energy" within any given product type. §6295(q)(1)(A); *see also* §6291(3) (defining "energy" to include "electricity, or fossil fuels"). So, for example, gas cooking tops' energy use is capped at 1,770 kBtu/year, while electric versions are limited to 207 kWh/year. 10 C.F.R. §430.32(j)(1)(iii).

b. On the state and local side, Congress had a problem to solve: By abdicating its standard-setting responsibility and adopting its freewheeling waiver policy, the Department had enabled "a growing patchwork of differing State regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Congress thus expanded preemption and cracked down on the Department's waiver authority. *Id.* at 2.

The preemption provision for consumer products now reads:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [§6295] for any covered product, *no State regulation concerning the energy efficiency, energy use*, or water use *of such covered product* shall be effective with respect to such product … .

§6297(c) (emphasis added).[2]

3. Congress listed several narrow exceptions to preemption. Two are informative here.

First, regulations that would otherwise be preempted are allowed if they are in a building code for new construction that satisfies seven strict requirements. §6297(f)(3). The thrust of these requirements is that the code must set a general energy conservation objective, allow builders the freedom to choose a mix of products to meet that objective, and treat products evenhandedly without requiring them to exceed federal standards. *See, e.g.*, §6297(f)(3)(A) (must "permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective"); §6297(f)(3)(B) (must not require covered products to exceed applicable standards);

[2] The current version of §6297(c) reflects a handful of minor amendments since 1987, none of which are relevant here. *See, e.g.*, Energy Policy Act of 1992, Pub. L. No. 102-486, §123(h)(3), 106 Stat. 2776, 2830 (adding "water use"); Energy Policy Act of 2005, Pub. L. No. 109-58, §135(d), 119 Stat. 594, 634 (exempting certain enumerated California regulations).

§6297(f)(3)(C) (must provide credits "on a one-for-one equivalent energy use or equivalent cost basis" when products exceed applicable standards); §6297(f)(3)(F) (must specify an "energy consumption or conservation objective … in terms of an estimated total consumption of energy"). The idea was to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10-11.

Second, the Department may waive preemption under certain circumstances, but Congress carefully cabined that authority. §6297(d). A regulation that "provides for any energy conservation standard or other requirement with respect to energy use" is eligible for a waiver only if it "is needed to meet unusual and compelling State or local energy … interests." §6297(d)(1)(A)-(B). Even then, waivers are prohibited when the "regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," §6297(d)(3), or is "likely to result in the unavailability" of appliance types, classes, or features that were generally available beforehand. §6297(d)(4).[3]

---

[3] A separate preemption provision governs industrial and commercial equipment. §6316(b)(2)(A). Because all agree the provisions work the same way, App.8a n.3, this petition focuses on the consumer provision.

### B. Factual and procedural background

1. These cases arose when—joining a movement that began in Berkeley, California—both New York City and New York State banned gas appliances in most new buildings, including most residences. App.4a-6a.[4] The City did so by banning combustion in new buildings. *See* N.Y.C. Local Law No. 154 (2021) (codified at N.Y.C. Admin. Code §§24-177.1, 28-506.1 (reproduced at App.153a-156a)). The State, for its part, banned both gas infrastructure and the appliances themselves. N.Y. Energy Law §11-104(6)-(8) (prohibiting "fossil-fuel equipment and building systems"); N.Y. Exec. Law §378(19) (reproduced at App.144a-152a).

The *Plumbers* petitioners challenged the City's ban in the Southern District of New York, while the *Mulhern* petitioners challenged the State's ban in the Northern District of New York. App.5a-6a. Petitioners are small businesses, trade associations, and labor unions that collectively represent or employ tens of thousands of New Yorkers who will be harmed by the bans, which outlaw businesses, jeopardize jobs, and will slash revenues and profits. *Plumbers* C.A.App.16-24; *Mulhern* C.A.App.91-137, 141-50. Both suits contended that EPCA preempts the bans.

The district courts rejected that argument, concluding that EPCA does not preempt the challenged laws. App.95a-109a (*Plumbers*); App.79a-87a

---

[4] Both bans apply to all appliances that combust fossil fuels, including natural gas, propane, and fuel oil. Because the exact fuel makes no legal difference, this petition refers to "gas appliances" for simplicity.

(*Mulhern*). According to the *Plumbers* district court, §6297(c) preempts only "state regulations that act as energy conservation standards, *i.e.*, requirements that bear on the performance of a product as manufactured." App.105a; *see also* App.106a-108a (holding that EPCA does not preempt regulations unless they force manufacturers to redesign appliances in a way that changes their lab-tested and labeled energy use). The court therefore dismissed the *Plumbers* petitioners' complaint. App.109a.

The *Mulhern* district court adopted the *Plumbers* court's interpretation (plus a few similar views), App.79a-82a, and thus granted summary judgment for the defendant, App.44a.

2. The Second Circuit heard the appeals in tandem and affirmed in a single opinion. App.1a-43a. The court acknowledged that the only other court of appeals to have addressed this issue—the Ninth Circuit—had held that EPCA preempts state and local bans on covered gas appliances. App.35a-36a; *see Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1098-99 (9th Cir. 2024). But the Second Circuit disagreed and concluded that it was "necessary to create a split among the Circuits." App.36a (cleaned up).

In the Second Circuit's view, EPCA "does not directly regulate the availability of fossil-fuel-powered appliances," and the challenged bans were too "far beyond its defined regulatory reach" to be preempted. App.7a. The court focused on the statutory term "energy use," concluding that it refers only to a lab-tested, labeled value. App.9a-13a. And it reasoned that because "the challenged laws govern via the type of energy" consumed, not "the amount," they "do not

implicate Congress's objectives in passing EPCA." App.21a-23a. Under the Second Circuit's interpretation, regulations are not preempted unless they at least "apply … significant pressures on manufacturers to produce appliances that exceed federal standards." App.22a.

The Second Circuit rested its disagreement with the Ninth Circuit on the statutory definition of "energy use" and, in particular, the term "point of use" within that definition. App.35a-42a. It had no answer to the Ninth Circuit's textual analysis showing that preemption is not limited to energy conservation standards or their equivalents—an analysis that did not involve "point of use." *Compare id.*, *with Berkeley*, 89 F.4th at 1105. Nor did it attempt to differentiate its interpretation from the one the Ninth Circuit rejected.

The Second Circuit acknowledged that "states cannot circumvent preemption just by shifting their regulatory focus from one angle to another." App.18a n.5 (cleaned up). But the court never explained how expressly setting covered gas appliances' maximum energy use to zero—which undisputedly would be a preempted "energy conservation standard," §6291(6)—is any different from the angles by which the City and State reached the same result here.

3. The Second Circuit denied petitioners' timely petitions for rehearing en banc. App.110a-113a.

## REASONS FOR GRANTING THE WRIT

### I. The decision below expressly creates a circuit split and rejects the federal government's interpretation of a federal statute.

1. The decision below openly "create[s] a split among the Circuits" as to whether EPCA preempts state and local bans on covered gas appliances. App.36a (cleaned up). That alone justifies certiorari.

a. Confronted with the same question, the Ninth Circuit gave the opposite answer. When Berkeley, California adopted its first-in-the-nation gas ban prohibiting gas piping in new construction and thereby "rendering [covered] gas appliances useless," a unanimous Ninth Circuit panel held that §6297(c)'s plain text preempted the ban. *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1098-99 (9th Cir. 2024).

The Ninth Circuit explained that "Congress expressly expanded EPCA's reach" beyond direct regulations of covered appliances to "regulations that 'concern'" those appliances' energy use. *Berkeley*, 89 F.4th at 1103 (cleaned up). And it held that a ban on gas piping "'concerns' the energy use of those products as much as a direct ban on the products themselves." *Id.* That the ban capped appliances' energy use at zero rather than setting a nonzero limit made no difference; "it is well accepted in ordinary usage that 'zero' is a 'quantity.'" *Id.* at 1102. Nor did it make any difference that rather than "directly banning" gas appliances, "Berkeley took a more circuitous route to the same result" by prohibiting the necessary piping. *Id.* at 1098. After all, "States and localities can't skirt the text of broad preemption provisions by doing *indirectly*

what Congress says they can't do *directly*." *Id.* at 1107 (collecting cases).

Statutory context confirmed the Ninth Circuit's interpretation. *Berkeley*, 89 F.4th at 1101-04. "Of critical importance" was the building code exception, which confirms that §6297(c) reaches building code requirements that regulate appliances in the real world and thus is not limited to regulations that operate on the factory floor. *Id.* at 1101-03. The court explained that the waiver provision likewise illustrated §6297(c)'s "extensive scope." *Id.* at 1103-04. By requiring the Department to "consider the complete lifecycle of an appliance[,] from manufacturing to servicing," that provision demonstrates EPCA's concern with regulations that burden any part of the distribution chain—not just design and manufacturing. *Id.*

The Ninth Circuit rejected the argument that §6297(c) preempts only "energy conservation standards" or their "equivalent." *Berkeley*, 89 F.4th at 1105. Among other problems, the court explained, that interpretation would require giving different statutory terms the same meaning, even when used in the same sentence. *Id.* And it would contradict this Court's precedent by "'engraft[ing]' a 'limiting component' onto the statute." *Id.* at 1106-07 (quoting *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004)).

b. The Ninth Circuit denied rehearing en banc, over a dissent by Judge Friedland on behalf of eight active judges (out of twenty-eight). *Berkeley*, 89 F.4th at 1119-26. In the dissent's view, the question presented turned on the definition of "energy use," which is only "a fixed number that measures the efficiency of

an appliance as manufactured." *Id.* at 1121-23. In particular, the dissent contended that "point of use"—an undefined term used in EPCA's definition of "energy use"—was merely a technical instruction to measure "site energy" rather than "source energy," and not a reference to the place where an appliance is used. *Id.* at 1123-25.

Thus, according to Judge Friedland, §6297(c) preempts only regulations that directly or indirectly "set energy efficiency or energy use standards" by requiring manufacturers to design or consumers to use products that exceed federal standards. 89 F.4th at 1125-26. Put differently, Judge Friedland concluded that §6297(c) preempts only energy conservation standards or their equivalent. But the dissent did not address the panel's point that this interpretation conflates differently defined statutory terms.

Judge Friedland also objected to the decision's policy implications, warning that it "needlessly blocks Berkeley's effort to combat climate change, along with the equivalent laws passed by other local governments" and, in doing so, strikes an unwise balance between federal authority and "state and local autonomy." 89 F.4th at 1120.

c. In the decision below, the Second Circuit expressly "depart[ed] from" the Ninth Circuit's view and embraced Judge Friedland's dissent from denial. App.35a-42a. Neither the Second Circuit nor any party before it attempted to distinguish Berkeley's law from the laws challenged here. App.35a (recognizing that *Berkeley* involved "a similar preemption challenge"). Instead, the Second Circuit held that the Ninth Circuit's "interpretation went astray" and thus

found it "necessary to create a split among the Circuits." App.36a-37a (cleaned up).

Driven by Judge Friedland's view of "energy use" as a fixed, lab-tested, labeled value, App.9a-13a, 35a-42a, the Second Circuit confined §6297(c)'s preemptive scope to regulations that at least "apply … significant pressures on manufacturers to produce appliances that exceed federal standards," App.22a; *accord Berkeley*, 89 F.4th at 1126 (Friedland, J., dissenting from the denial of rehearing en banc) ("[Berkeley's] ordinance also gives manufacturers no reason to change the design of their natural gas products to meet standards higher than those prescribed by DOE."); *see* App.25a. The Second Circuit also parted ways with the Ninth Circuit on the significance of §6297(c)'s title, *compare* App.25a-26a, *with Berkeley*, 89 F.4th at 1105 (panel opinion), and the role of the building code exception, *compare* App.27a-29a, *with Berkeley*, 89 F.4th at 1101-02.

d. The Second Circuit declined to revisit the issue en banc. As a result, absent this Court's intervention, "EPCA preempts state and local laws [that] prohibit fossil-fuel-powered appliances" in the Ninth Circuit, but it does not preempt the same laws in the Second Circuit. App.6a-7a.

2. The decision below is also at odds with the federal government's own interpretation of EPCA. As the government explained in *Plumbers*, "text, context, and history all confirm" that "EPCA's broad preemption provision bars state and local measures … that prohibit products subject to a federal energy conservation

standard from using energy." *Plumbers* Gov't.C.A.Br.8-9.[5]

The government cautioned that "a contrary ruling would disrupt the federal administration" of EPCA. *Plumbers* Gov't.C.A.Br.9, 28-31. It explained that allowing "any state or locality" to "categorically outlaw[]" "products authorized for sale pursuant to a federal energy conservation standard … would disrupt the Department [of Energy]'s administration of EPCA's Energy Conservation Program." *Plumbers* Gov't.C.A.Br.28; *cf. Wyeth v. Levine*, 555 U.S. 555, 576 (2009) ("[W]e have attended to an agency's explanation of how state law affects the regulatory scheme.").

"In particular," the government explained, "recognizing such authority to end-run EPCA would run directly counter to the Department's goals of reducing costs and increasing choice for consumers, alongside increasing domestic energy supply and energy conservation." *Plumbers* Gov't.C.A.Br.28. Allowing state and local governments to impose fuel-based bans would also "undermine federal neutrality between energy

---

[5] Although the federal government supported Berkeley in the Ninth Circuit, it explained that it has since been persuaded by the Ninth Circuit's decision. *Plumbers* Gov't.C.A.Br.2 n.1. The government also recognized that its litigating position in *Berkeley* departed from the Department of Energy's longstanding view. *See Plumbers* Gov't.C.A.Br.26-27 & n.11. And it acknowledged that the flood of waiver requests it feared in *Berkeley* had not come to pass. *Plumbers* Gov't.C.A.Br.31. The government has since brought affirmative litigation challenging local gas appliance bans. *United States v. Township of Morris*, No. 2:26-cv-03412 (D.N.J.); *United States v. City of Morgan Hill*, No. 5:26-cv-00056 (N.D. Cal). And it has supported similar challenges in the Fourth, Seventh, and D.C. Circuits. *Infra* p.18.

technologies and energy sources for covered products." *Plumbers* Gov't.C.A.Br.29.

The Second Circuit's rejection of the federal government's view is all the more reason for this Court to step in.

3. Without this Court's intervention, the split will only deepen—further frustrating Congress's objective of national uniformity.

The split has already been cemented by the Second Circuit's considered rejection of the Ninth Circuit's view and both circuits' refusal to take the issue en banc. Pending cases will soon pile on. The same preemption question is now before the Fourth, Seventh, and D.C. Circuits. *Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, No. 26-1449 (4th Cir.) (argument scheduled Dec. 8, 2026); *Clean Energy Choice Coal. v. Village of Oak Park*, No. 26-2715 (7th Cir.); *Nat'l Ass'n of Home Builders of the U.S. v. District of Columbia*, No. 26-7050 (D.C. Cir.) (argued Sept. 8, 2026). And it is likely on its way to the Third Circuit. *United States v. Township of Morris*, No. 2:26-cv-03412 (D.N.J.).

Waiting for further percolation would exacerbate the split's real-world effects without any chance of diminishing the need for this Court's review. No matter where the Fourth, Seventh, and D.C. Circuits (or any others) line up, their decisions can only add to a patchwork of exactly the sort Congress set out to prevent. The practical reality will continue to be that EPCA's preemption provision no longer imposes a uniform national rule. It now means different things in different circuits. Albany, New York can impose regulations that would be preempted in Albany, Califor-

nia—and that won't change no matter which rule Albany, Indiana winds up with. Whichever rule Congress wanted, it did not want this.

Nor is there any reason to think that waiting for more circuits to cast their votes would meaningfully contribute to the debate or aid this Court's review. Courts and litigants have already coalesced around just two positions. District courts rejecting the Ninth Circuit's view have embraced Judge Friedland's dissent, just as the Second Circuit did below. App.36a ("In the end, we think the opinion by Judge Friedland … has the better interpretation."); *see Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, 2026 WL 817322, at *7 (D. Md. Mar. 25, 2026) ("adopting [Judge Friedland's] construction"); *Nat'l Ass'n of Home Builders of the U.S. v. District of Columbia*, 2026 WL 837674, at *7-8 (D.D.C. Mar. 26, 2026) (relying on Judge Friedland's analysis); *Clean Energy Choice Coal. v. Village of Oak Park*, 2026 WL 2205908, at *8 (N.D. Ill. July 30, 2026) ("[T]he Court agrees with the Second Circuit."). And the pending cases raise the same arguments that have already been fully aired in the Ninth Circuit and below. The case for preemption is the same. So is the case against it. And court after court has received essentially the same set of amicus briefs. All that's left for future courts to do is to pick a side.

Only this Court can restore the uniformity Congress undisputedly prescribed on this important issue of national energy policy. There is no reason to allow the patchwork to expand before resolving the already entrenched split.

## II. The decision below is wrong.

The Second Circuit's interpretation of EPCA is wrong. Section 6297(c)'s plain text preempts the challenged gas bans because they effectively impose energy conservation standards that cap covered appliances' energy use at zero. The Second Circuit's contrary decision contradicts the text, context, and purpose alike. And it is irreconcilable with this Court's cases rejecting similar attempts to evade similar preemption provisions.

### A. EPCA's plain text preempts state and local bans on covered gas appliances.

Under the Supremacy Clause, federal law is "the supreme Law of the Land" and is binding on the states, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art.VI, cl.2. "Under this principle, Congress has the power to pre-empt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). One way Congress can do so is "by enacting a statute containing an express preemption provision." *Id.*

Just like any other statute, an express preemption provision must be analyzed by beginning with the text—and ending there when the text is unambiguous. *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016). That is because the statute's plain text "necessarily contains the best evidence of Congress' preemptive intent." *Id.* (attribution omitted). This Court "do[es] not invoke any presumption against preemption" when interpreting express preemption provisions. *Id.*

1. Section 6297(c)'s plain text is the beginning and end of the preemption inquiry here. Because the gas bans effectively impose an energy use limit of zero on all gas appliances, they are preempted "State regulation[s] concerning" covered products' "energy use." §6297(c).

To see why, take the statutory terms step by step. "State regulation" includes any "law, regulation, or other requirement of a State or its political subdivisions." §6297(a)(2)(A). "[E]nergy" includes both "electricity" and "fossil fuels." §6291(3). And "energy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." §6291(4). Those test procedures must be "reasonably designed" to measure energy use "during a representative average use cycle or period of use." §6293(b)(3).

At the heart of §6297(c) is the term "concerning," which carries a well-established meaning in preemption provisions. "'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 716-18 (2018) (attribution omitted) (collecting dictionary definitions and noting the "overlapping and circular" meanings of these terms); *accord Montgomery v. Caribe Transp. II, LLC*, 146 S.Ct. 1199, 1204-05 & n.3 (2026); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992). Those terms "express[] a broad pre-emptive purpose," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-96 (2017) (attribution omitted), "ensuring that the scope of a provision covers not only its subject but also matters relating to that subject," *Lamar*, 584 U.S. at 717-

18. "One thing can relate to another even if the connection is indirect"—so long as it is "not tenuous, remote, or peripheral." *Chevron USA Inc. v. Plaquemines Parish*, 146 S.Ct. 1052, 1060-61 (2026) (cleaned up).

Putting all that together, the gas bans are "regulation[s] concerning" the "quantity of energy" consumed by covered gas appliances because they effectively cap it at zero. §§6291(4), 6297(c). Indeed, the bans are functionally indistinguishable from the strictest "energy conservation standard" possible—one "prescrib[ing]" zero as the "maximum quantity of energy use." §6291(6)(A); *see Berkeley*, 89 F.4th at 1102 & n.4 ("[I]t is well accepted in ordinary usage that 'zero' is a 'quantity.'"). Under the federal standard, a gas cooking top can have any energy use number on its label up to 1,770 kBtu/year. 10 C.F.R. §430.32(j)(1)(iii). But in New York, that labeled number cannot exceed zero. The bans are therefore preempted under a straightforward reading of EPCA's plain text.

2. The purported "technical meaning" of "energy use" cannot save the Second Circuit's contrary reading. The decision below rested on the view that "energy use" refers only to a fixed, lab-tested number printed on a factory label. App.9a-13a, 36a-42a. That is both inconsequential and incorrect.

a. Even accepting the Second Circuit's premise, its conclusion does not follow. The court of appeals acknowledged that §6297(c) reaches not just "energy conservation standards" but also regulations that "operate in a similar manner." App.4a. Or put respondents' way, EPCA preempts regulations that

"effectively impose" energy conservation standards, "whether in form or function." *Plumbers* City.C.A.Br.1; *Mulhern* Mosley.C.A.Br.1-2.

That is precisely what both bans do—even when "energy use" is read the Second Circuit's way. If the fixed number on a gas appliance's label exceeds zero, the challenged laws prohibit installing that appliance. There is no need to ask how much energy it uses "in the hands of consumers." *Contra* App.9a-10a.

b. Regardless, the Ninth Circuit's ordinary-meaning understanding of "point of use" (which informed its view of "energy use") is correct, and the Second Circuit was wrong to reject it. *Contra* App.36a-42a. Understanding "point of use" to mean the place where an appliance is used, *Berkeley*, 89 F.4th at 1101-02, is consistent with EPCA's testing and labeling provisions. Appliances are tested using methods designed to reflect real-world conditions, §6293(b)(3), and the result goes on the label, §6294(a)(2)(I), (a)(3). But there is no guarantee that the "energy use" experienced "under conditions of actual use" will match the label. §6297(g). If "energy use" were only ever a fixed number on a label, that statutory disclaimer would be pointless. *Contra* App.12a.

By contrast, there is no reason to believe that when Congress wrote EPCA's "energy use" definition in 1975, "point of use" had a "well-established technical meaning" that called for measuring only energy "directly consumed by the appliance," not energy consumed in generation or transmission. *Contra Berkeley*, 89 F.4th at 1123 (Friedland, J., dissenting from the denial of rehearing en banc); App.37a-42a. For starters, that reading would make "at point of use"

superfluous. The Second Circuit saw the term as "filling [a] gap" in the statute as to which "scope[] of measurement" to use. App.39a. But there was no gap. Without "point of use," the "energy use" definition answers that question just as well: Measure "the quantity of energy directly consumed by a consumer product"—and do it "in accordance with test procedures under section 6293." §6291(4).

Besides, the supposed evidence of a "technical meaning" winds up proving the Ninth Circuit's point. The few sources from shortly after enactment use "point of use" according to its ordinary meaning—to describe the place where something is used. *See* 42 Fed. Reg. 20,012, 20,013 (Apr. 15, 1977) (proposed rule) (contrasting "trac[ing]" "energy conservation impacts" "back to the original fuel source" with evaluating impacts at "the point of use on site"); 42 Fed. Reg. 33,158, 33,159 (June 29, 1977) ("point of electric power generation" versus "point of use"). The other sources long postdate the statute and, even then, overwhelmingly invoke the term's ordinary meaning. *See Berkeley*, 89 F.4th at 1123-24 (Friedland, J., dissenting from the denial of rehearing en banc) (collecting examples).

3. Context further underscores the Second Circuit's error. The building code exception, §6297(f)(3), is critical to understanding §6297(c)'s scope. As the decision below acknowledged, the exception would not "make any sense" unless "the kind of regulation it describes [is] preempted in the first place." App.27a; *see Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 374 (2008) (when Congress "explicitly lists a set of exceptions" to preemption, those excep-

tions are helpful in determining Congress's intent). But for all the efforts of the various parties and courts, nobody has been able to identify any specific regulation that both would be preempted under the Second Circuit's view of §6297(c) and would satisfy the exception's criteria. That leaves §6297(f)(3) with no work to do. "And that kind of superfluity, in and of itself, refutes [the Second Circuit's] reading." *Pulsifer v. United States*, 144 S.Ct. 718, 731-32 (2024).

The Second Circuit declared that building-wide regulations that satisfy §6297(f)(3)'s exception would otherwise be "preempted under [its] interpretation" of §6297(c). App.28a. But it provided no workable explanation. App.28a-29a. First, it said that "targeting building-wide energy conservation" might improperly "reference appliances' individual energy use." *Id.* (cleaned up). How so? Seemingly because "regulating on a building-wide scale" would "impermissibly" "achiev[e] the goal of regulating the performance of the individual appliances within that building." App.29a. That cannot be true under the Second Circuit's view of §6297(c). If appliances' performance—their energy use or efficiency—is locked in at the factory, App.9a-13a, then a building-wide regulation cannot affect appliances' performance in violation of §6297(c), App.13a, without disqualifying itself from the exception by requiring appliances to exceed applicable federal standards, §6297(f)(3)(B).

Next, the court suggested that "regulations covered by the building code exemption may also" impermissibly interfere with "uniform energy conservation standards." App.29a (cleaned up). The theory seems to be that the exception has work to do because states

could not otherwise do "on an aggregated scale" what they cannot do on a "per-product basis." *Id.* That is just the first theory restated, so it runs right into the same problem: According to the Second Circuit, what states can't do on a per-product basis is impose energy conservation standards. But §6297(f)(3)(B) blocks any attempt to effectively impose stricter standards "on an aggregated scale" either. Once again, what brings the regulation within §6297(c)'s reach (on the Second Circuit's reading) is what disqualifies it from §6297(f)(3)'s exception, leaving the exception with nothing to do.

The reality is that building-wide regulations that satisfy §6297(f)(3) neither change any appliance's tested or labeled "energy use" nor require manufacturers to redesign appliances. As a result, the Second Circuit cannot square its account of §6297(f)(3) with its reading of §6297(c).

**B. Allowing state and local gas bans would frustrate Congress's preemption-related objectives, contrary to this Court's preemption precedents.**

With the text against them, respondents and the decision below resort to a familiar strategy, insisting that what EPCA prohibits respondents from doing directly, it nonetheless lets them do indirectly. For those hoping to escape preemption, that is a well-trodden path to a well-known dead end. A mountain of precedent stands in the way.

1. There is no dispute that the challenged laws' effect is to prohibit covered gas appliances in new buildings. Nor is there any dispute that if respondents had achieved the same result with a regulation

expressly prescribing a maximum energy use of zero, that regulation would be preempted. App.28a n.12 (using "the appliance's 'energy use' as a mechanism for regulating" is preempted).

The decision below did not and could not identify any practical difference between a preempted zero-energy-use standard and the challenged laws. It hinged instead on the notion that lawmakers can escape preemption by writing around any "direct[] reference[]" to energy use in favor of a different "mechanism for regulating." App.28a n.12. Here, that different mechanism meant "govern[ing] via the type," not "the amount," "of energy an appliance consumes." App.22a. But allowing that shift in "framing" to avoid preemption of rules with the same practical effect would "make a mockery of [EPCA's] preemption provision" and this Court's preemption precedents. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012).

2. The principle that "[w]hat cannot be done directly cannot be done indirectly" runs deep. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S.Ct. 2141, 2176 (2023) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867)). And "the Supremacy Clause cannot be evaded by formalism." *Haywood v. Drown*, 556 U.S. 729, 742 (2009).

Likewise, preemption turns not on "semantics," but on "what the state law in fact does." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636-37 (2013). Contrary to the decision below, then, writing around "energy use"—whether by banning combustion, infrastructure, or appliances—to achieve the same "practical effect" cannot circumvent preemption. *See Mich.*

*Canners & Freezers Ass'n v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 478 (1984); *see also Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. 347, 358 (2019) (plurality opinion) ("[I]t is the practical effect of the state law that we have said makes the difference.").

Time and again, this Court has stopped states and localities from evading preemption "by shifting their regulatory focus." *Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652 (2013). When a state "select[s] an indirect but wholly effective means" to a prohibited end, the result is still preemption. *Id.*; *accord Nat'l Meat*, 565 U.S. at 463-64; *Engine Mfrs.*, 541 U.S. at 253-55.

This Court's decision in *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364 (2008), is right on point. The preemption provision at issue there used "related to," which means the same thing as "concerning." *Id.* at 367; *supra* pp.21-22. The Court held that such a provision at the least preempts laws with "a significant impact related to Congress' deregulatory and pre-emption-related objectives." 552 U.S. at 370-71 (cleaned up). Applying that rule, the Court concluded that a state law was impermissibly "related to" motor carriers' prices because, although it did not directly regulate trucking companies, it accomplished the same result by prohibiting retailers from accepting deliveries from trucking companies that did not follow certain rules. *See id.* at 368-69, 372. That the state law was "less 'direct' than it might be" was no excuse; the problem was that it "produce[d] the very effect that the federal law sought to avoid." *Id.* at 372. Allowing the law (and others like it) "could easily

lead to a patchwork of state" laws, contrary to Congress's chosen policy. *Id.* at 373.

Put another way, *Rowe* establishes that state and local governments cannot evade a "related to" or "concerning" preemption provision just by taking an indirect route to a destination they are blocked from reaching directly.

That principle leads to preemption here. All agree that a zero-energy-use standard for gas appliances is preempted. So accomplishing the same result by framing the same standard as a ban is equally preempted. Neither skipping a "direct[] reference[]" to energy use nor choosing another "mechanism for regulating," App.28a n.12, is any different from the tactics this Court has repeatedly rejected.

3. The "connection with or reference to" test used for similar preemption provisions confirms the point. *See* App.14a-15a (agreeing that the test applies).

That test finds preemption when a state law has either "a reference to" or "an impermissible connection with" the preempted subject matter. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-20 (2016) (cleaned up). The "reference to" prong asks whether the challenged law "acts immediately and exclusively upon" the preempted subject matter or makes that subject matter's existence "essential to the law's operation." *See id.* (attribution omitted). The "connection with" prong is broader and considers "the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive," as well as "the nature of the effect of the state law on" the preempted subject matter. *Id.* at 320 (attribution omitted); *accord Rowe*, 552 U.S. at 370-72.

The challenged bans easily satisfy at least the "connection with" prong. They would "have a significant impact" on—indeed, are inextricably intertwined with—covered appliances' energy use. *See Rowe*, 552 U.S. at 371 (cleaned up). And they would "produce[] the very effect that [EPCA] sought to avoid," *id.* at 372, by making a type of appliance unavailable at the state or local level and fraying Congress's national approach into a patchwork.

Make no mistake: Allowing appliance bans would fracture Congress's carefully calibrated statutory scheme. Congress did not want a "patchwork" of regulations interfering with an efficient national marketplace. S. Rep. No. 100-6, at 4; *see* §6297(d)(3). Nor did it pursue conservation at the cost of consumer choice. *See* §§6295(o)(4), §6297(d)(4).

Yet the decision below would lead to just that by making EPCA trivially easy to evade. The decision's upshot is that EPCA has nothing to say about banning any particular covered appliance—as long as the ban's drafters steer clear of the wrong words. That would let states end-run EPCA preemption entirely. Here's how: If a state or city wanted to impose a nonzero standard, all it would need to do is ban all unapproved appliances and then approve only those meeting its desired standard, so long as it refrained from writing down the standard. *Cf.* N.Y.C. Admin. Code §27-2034(e) (prohibiting gas space or water heaters unless approved by two City departments). That approach is both fair game under the Second Circuit's interpretation and indistinguishable from the bans at issue here. So although these cases illustrate how bans can be used

to impose zero-energy-use standards, nothing turns on the choice of zero.

Allowing the challenged bans and others like them to avoid preemption would mean allowing the types of appliances available to consumers to change every time they cross a state or municipal line. Manufacturers would need to adjust their design and production strategies based on what they can sell where. To be sure, once a manufacturer decides to make a gas appliance, the challenged laws say nothing more about its design. But the gas bans kick in a step earlier, when manufacturers are deciding what kind(s) of energy their appliances should use. In short, a patchwork of banned products is just as disruptive to Congress's objectives as a patchwork of standards. *Contra* App.21a-22a & n.8.

Forced to admit the "regulatory disruption" its interpretation enables, the decision below tried to brush it off as no big deal. App.21a n.8. Congress, it said, cared about "a patchwork of *conservation standards specifically*," not "the binary choice between electric and fossil-fuel-powered appliances." *Id.* Not so. Congress specifically protected the choice among "kind[s] of energy" by requiring separate standards. §6295(q)(1)(A). And as just explained, the decision below enables far more than a binary choice. Nor could even a binary choice be so easily dismissed when it could vary across tens of thousands of local governments.

4. In the end, the Second Circuit's only answer to this Court's preemption precedents is to declare that here, Congress did not intend to protect appliance availability or prohibit bans. App.18a n.5; App.22a; *see*

*also* App.19a-20a (recognizing the "role" of "consumer choice and market stability" but discounting these concerns on the ground that Congress did not "affirmatively protect" them). That is wrong once again.

EPCA's concern with consumer choice—including fuel type—is written in black and white. *E.g.*, §6295(o)(4), (q)(1); §6297(d)(4); *supra* p.7; *see also Am. Gas Ass'n v. U.S. Dep't of Energy*, 157 F.4th 476, 500-01 (D.C. Cir. 2025) (Rao, J., dissenting) (discussing EPCA's protections for "consumer choice"), *cert. granted, judgment vacated mem.*, 146 S.Ct. 2705 (2026). Outright banning types of appliances clashes with that objective just as much as does setting standards that "result in the[ir] unavailability," §6295(o)(4).

Also mistaken is the notion that EPCA's silence on "protecting public health and addressing climate change" suggests that the challenged laws are beyond its concern. *Contra* App.20a-21a. EPCA expressly reaches any state or local "law, regulation, or other requirement," §6297(a)(2)(A), "concerning" the preempted subject matter, §6297(c). And "[d]espite the importance" of health, safety, and climate objectives, EPCA does not "create[] an exception on that basis." *Rowe*, 552 U.S. at 373-75; *see also* App.20a n.7 (admitting that a law's "purpose" cannot excuse it from preemption). All EPCA's silence signals is the absence of an exception.

Regardless, the Second Circuit's answer misses the point. Congress undisputedly preempted energy use standards, but the court did not and could not explain how the practical effect of the challenged laws differs from the effect of a standard capping energy use at zero. "Slice it or dice it any which way," the chal-

lenged laws' effect intrudes on EPCA's preempted domain, *Am. Trucking*, 569 U.S. at 652.

***

Enforcing §6297(c) as written won't make the sky fall. The Second Circuit feared that anything beyond a narrow reading would produce "absurd results" endangering run-of-the-mill health and safety regulations. App.33a-35a. That fear is misplaced.

As with similarly broad preemption provisions, Congress's intent—as understood through the statute it wrote—provides a suitable limiting principle. *See Gobeille*, 577 U.S. at 319-20; *Rowe*, 552 U.S. at 370-76. Recognizing that EPCA preempts gas bans would not endanger regulations that have long coexisted with EPCA. EPCA is "unlikely" to preempt the "host of state and local regulations" that only "incidentally impact" covered products' energy consumption. *Berkeley*, 89 F.4th at 1117 (Baker, J., concurring). After all, "tenuous, remote, or peripheral" effects do not trigger preemption. *Rowe*, 552 U.S. at 375 (attribution omitted).

The need for line drawing is a feature of "concerning" and "related to" preemption provisions, not a bug. Given states' longstanding creativity in trying to evade preemption, Congress understandably chose breadth over specificity in EPCA.

## III. These cases present an ideal vehicle for resolving an exceptionally important question of federal preemption.

1. These cases are an excellent vehicle for resolving the question presented. The preemption question is outcome determinative in both cases. And it is a purely legal one that arrives without any underlying disputes about the facts or how the challenged laws work.

Other cases in the pipeline may come with complications not present here. For example, the D.C. Circuit is considering whether the plaintiffs forfeited any challenge to a facial-challenge issue that ostensibly was an alternative ground for the district court's decision. *See* Brief for Appellee the District of Columbia at 25-26, *Home Builders*, No. 26-7050 (D.C. Cir.), 2026 WL 2111130 (arguing that the plaintiffs failed to challenge the purported alternative ruling, amounting to "a dispositive forfeiture"). And the Fourth Circuit must consider standing and ripeness objections. *See* Brief of Appellee Montgomery County at 10-11, 17-23, *Home Builders*, No. 26-1449 (4th Cir.), Dkt.43, 2026 WL 1910904 (contending that the case is unripe and the plaintiffs lack standing because the challenged law is unenforceable without implementing regulations).[6]

---

[6] The Fourth Circuit is also considering a related case, *Maryland Building Industry Ass'n v. McIlwain*, No. 26-1552 (4th Cir.), but that case might end up presenting a different question. The district court found that the challenged state regulations allow building owners to "comply in other ways" so that they "need not replace their appliances at all." *Md. Bldg. Indus. Ass'n v. McIlwain*, 828 F. Supp. 3d 617, 638 (D. Md. 2026).

By contrast, *Plumbers* has always lacked these potential obstacles. The City never took issue with the scope of petitioners' challenge or questioned Article III jurisdiction, which in any event is beyond dispute. *See* App.90a-93a & n.3. And although objections similar to those noted above were raised in *Mulhern*, they were meritless and have long since been put to rest. The district court rejected Article III objections, concluding that there was no need to wait for implementing regulations, and respondent Mosley abandoned the objections on appeal after the regulations were adopted as scheduled. App.69a-79a; *Mulhern* Mosley.C.A.Br.20-21. And Mosley's facial-challenge argument took issue with what was, if anything, an easily fixable pleading technicality—which is presumably why neither court below thought it worth addressing. *See Mulhern* Pet'rs.C.A.Reply.Br.32-35.

2. This issue is important—and important to resolve now.

a. Courts, litigants, and amici on both sides of the issue have recognized its exceptional significance. Take, for example, Judge Friedland, who thought it important enough to write her first-ever dissent from a denial of rehearing en banc—despite having "never previously" even joined one "[i]n nearly a decade on the bench." *Berkeley*, 89 F.4th at 1119.

On petitioners' side, the federal government warned that an important federal program is at stake. *Supra* pp.17-18. Appliance manufacturers emphasized the importance of protecting Congress's "uniform regulatory regime" for appliances. *Mulhern* Air-Conditioning, Heating & Refrigeration Inst. C.A.Br.2. And the American Gas Association explained how

decisions like the one below threaten to "upset the careful balance" underlying the "comprehensive framework" for utility regulation—and, in turn, endanger "[t]he public's interest in safe and efficient access to energy at reasonable cost." Brief of Amicus Curiae American Gas Ass'n at 2-5, *Home Builders*, No. 26-7050 (D.C. Cir.).

Those on respondents' side agree that the issue is critically important. Berkeley insisted that the Ninth Circuit's decision would have "immediate and wide-ranging practical significance" for energy policy and beyond. Petition for Rehearing En Banc at 2, 19-21, *Berkeley*, 89 F.4th 1094 (No. 21-16278). Respondent New York City invoked its "acute interest in improving air quality for its residents." *Plumbers* City.C.A.Br.9-10. The National League of Cities emphasized the issue's "far-reaching consequences" and that getting the scope of preemption right "is critical both to" local governments "and to the efficient and coordinated operation of law across all levels of government." *Plumbers* Nat'l League of Cities C.A.Br.20-22. Other amici sounded similar notes. *See, e.g.*, *Plumbers* NRDC.C.A.Br.2 (warning of "dramatic intrusions on state and local police powers"); *Plumbers* Guarini.C.A.Br.1-2 (arguing that EPCA's "important role in shaping states' and localities' initiatives to reduce buildings' energy-related impacts" makes it important to "properly define[] the scope of preemption").

To be clear, it is not just that a favorable result will help whichever side wins that makes this question worth resolving. As several states pointed out, settling the question is valuable in its own right: States and localities need to know "the metes and bounds" of

preemption rather than being "left to stumble in the dark." *See Plumbers* States.C.A.Br.26-27.

b. The question presented is recurring, as evidenced by the pending cases on this and closely related issues. Other jurisdictions' similar laws have already put the same issue before the Fourth, Seventh, and D.C. Circuits. *Supra* p.18. And the federal government has challenged other local gas bans. *Supra* note 5. The proper interpretation of §6297(c) also bears on cases involving building performance standards alleged to effectively ban gas appliances[7] and air quality regulators' attempts to use zero-emission standards to the same end.[8] Settling the question here would provide critical guidance on these important issues and eliminate the need to continue litigating state and local appliance bans across the country.

c. There is no good reason to wait to decide this issue—and serious harm in doing so. Gas appliance bans affect workers, consumers, housing markets, small businesses, and industry alike. Leaving them in

---

[7] *See supra* note 6; *Rivera v. Sami*, 191 F.4th 932, 935 (9th Cir. 2026) (dismissing on sovereign immunity grounds an EPCA challenge to Washington's energy code); *Rest. Law Ctr. v. City & County of Denver*, 2026 WL 2908083, at *1-2 (D. Colo. Aug. 7, 2026), *appeal docketed*, No. 26-1364 (10th Cir. Sept. 15, 2026); *Colo. Apartment Ass'n v. Ryan*, 2026 WL 2935963, at *1-3 (D. Colo. Sept. 30, 2026).

[8] *Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.*, 184 F.4th 1094, 1102-06 (9th Cir. 2026) (creating an unwritten exception to EPCA preemption for regulations "pursuant to" the Clean Air Act), *reh'g en banc denied*, No. 25-5129 (9th Cir. Sept. 9, 2026).

place or allowing them to take effect will have lasting repercussions that cannot just be unwound later.

Those effects are already on display in New York City, where the ban took effect in January 2024, harming the *Plumbers* petitioners' businesses and jobs. *See Plumbers* C.A.App.16-24. And although New York State's ban is stayed pending this Court's final disposition, *Mulhern* D.Ct.Dkt.75, declining review would unleash its consequences on New Yorkers, including the *Mulhern* petitioners. *Mulhern* C.A.App.91-137, 141-50. Even having the ban on the horizon is causing harm, including by jeopardizing jobs, disrupting long-term business strategy and asset planning, and hampering the development of industry labor pools. *See id.* There is no reason to let respondents outlaw entire businesses now while waiting to decide in some future case whether doing so is preempted.

Anyhow, this is not the kind of circuit split that can safely be left for another day. Allowing the split to fester would interfere with the policy Congress adopted. No matter whose reading of §6297(c) is right, all agree that the provision's point is to secure national uniformity. Leaving competing interpretations in place is necessarily at odds with that objective. *Supra* pp.18-19. Congress's undisputed desire to avoid a regulatory patchwork is all the more reason to resolve this split now and restore uniformity on this important matter of national energy policy.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

Sarah O. Jorgensen
*Counsel of Record*
Brian C. Baran
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
1899 L St. NW, Suite 410
Washington, DC 20036
(202) 894-7310
*sjorgensen@reichmanjorgensen.com*

November 13, 2026

# APPENDIX

**TABLE OF APPENDICES**

*Page*

APPENDIX A — OPINION OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, FILED JUNE 30, 2026 . . . . . 1a

APPENDIX B — ORDER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK, FILED AUGUST 21, 2025 . . . . . 44a

APPENDIX C — DECISION AND ORDER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK, FILED JULY 23, 2025 . . . . . 45a

APPENDIX D — OPINION AND ORDER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, FILED MARCH 18, 2025 . . . . . 89a

APPENDIX E — DENIAL OF REHEARING OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, DATED AUGUST 26, 2026 . . . . . 110a

APPENDIX F — DENIAL OF REHEARING OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, DATED AUGUST 26, 2026 . . . . . 112a

*Table of Appendices*

*Page*

APPENDIX G — RELEVANT STATUTORY PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114a

42 U.S.C. §6291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114a

42 U.S.C. §6292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117a

42 U.S.C. §6293 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120a

42 U.S.C. §6295 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121a

42 U.S.C. §6297 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127a

N.Y. Energy §11-104 . . . . . . . . . . . . . . . . . . . . . . . . . 144a

N.Y. Exec. §378 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149a

N.Y.C. Admin. Code §24-177.1 . . . . . . . . . . . . . . . . . 153a

N.Y.C. Admin. Code §28-506.1 . . . . . . . . . . . . . . . . . 154a

**APPENDIX A — OPINION OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, FILED JUNE 30, 2026**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

No. 25-977; 25-2041

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC., PLUMBING-HEATING-COOLING CONTRACTORS-NATIONAL ASSOCIATION, PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, NEW YORK STATE ENERGY COALITION, INC., PLUMBING FOUNDATION CITY OF NEW YORK, INC., LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., DBA MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK, BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC.,

*Plaintiffs-Appellants,*

v.

CITY OF NEW YORK,

*Defendant-Appellee.*

Filed June 30, 2026

Appeal from the United States District Court
for the Southern District of New York
No. 23-cv-11292, Ronnie Abrams,
District Judge.

---

MULHERN GAS CO., INC., NEW YORK STATE BUILDERS ASSOCIATION, NATIONAL ASSOCIATION OF HOME BUILDERS, NEW YORK PROPANE GAS ASSOCIATION, NATIONAL PROPANE GAS ASSOCIATION, NORTHEAST HEARTH, PATIO AND BARBECUE ASSOCIATION, PLUMBING CONTRACTORS ASSOCIATION OF LONG ISLAND, LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., DBA MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK, HOLMES MECH. LLC, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1049, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 97, PLUMBERS LOCAL UNION NO. 200, TRANSPORT WORKERS UNION LOCAL 101, AFL-CIO,

*Plaintiffs-Appellants,*

v.

WALTER T. MOSLEY, IN HIS OFFICIAL CAPACITY AS NEW YORK SECRETARY OF STATE AND MEMBER OF THE STATE FIRE PREVENTION AND BUILDING CODE COUNCIL, FORMERLY KNOWN AS ROBERT J. RODRIGUEZ,

*Defendant-Appellee,*

NEW YORK GEOTHERMAL ENERGY ORGANIZATION, PUSH BUFFALO,

*Intervenor-Defendants-Appellees.**

* The Clerk of Court is respectfully directed to amend the caption accordingly.

*Appendix A*

Filed June 30, 2026

Appeal from the United States District Court
for the Northern District of New York
No. 23-cv-1267, Glenn T. Suddaby,
District Court Judge.

August Term 2025
Argued: January 30, 2026
Decided: June 30, 2026

Before: SACK and PÉREZ, *Circuit Judges*, and PRESKA, *District Judge*.[†]

New York City and New York State enacted laws which effectively prohibit the use of fossil-fuel-powered appliances in new buildings. Various trade associations and unions sued to stop the laws from going into effect, arguing that they are preempted under the Energy Policy and Conservation Act's express preemption provision. But the text of the preemption provision cannot support Appellants' expansive construction. At most, EPCA preempts energy conservation standards for covered appliances and a fairly limited realm of additional regulations that operate in a similar manner. The challenged laws fall outside of that realm. Therefore, we **AFFIRM** the judgments of the District Courts.

MYRNA PÉREZ, *Circuit Judge*:

New York City and New York State enacted laws which effectively prohibit the use of fossil-fuel-powered

† Judge Loretta A. Preska, of the United States District Court for the Southern District of New York, sitting by designation.

appliances in new buildings. Various trade associations and unions sued in two separate cases to stop the laws from going into effect, arguing that they are preempted under the Energy Policy and Conservation Act's ("EPCA") express preemption provision. But the text of the preemption provision cannot support Appellants' expansive construction. EPCA preempts energy conservation standards for covered appliances and a fairly limited realm of additional regulations which operate in a similar manner. The challenged laws fall outside of that realm. Therefore, we **AFFIRM** the judgments of the District Courts.

## BACKGROUND

Some city and state governments have imposed limits on the use of fossil-fuel-powered appliances in response to research suggesting such appliances are a significant source of pollution and greenhouse gas emissions.[1] New

1. *See, e.g.*, *Commercial and Residential Sector Emission*, U.S. Env't Prot. Agency (Mar. 10, 2026), https://www.epa.gov/ghgemissions/commercial-and-residential-sector-emissions ("Combustion of natural gas and petroleum products for heating and cooking emits carbon dioxide (CO2), methane (CH4), and nitrous oxide (N2O)."); *Carbon Monoxide's Impact on Indoor Air Quality*, U.S. Env't Prot. Agency (Oct. 7, 2025), https://www.epa.gov/indoor-air-quality-iaq/carbon-monoxides-impact-indoor-air-quality (listing "gas stoves" and other sources of carbon monoxide and explaining health effects); *Facts About Formaldehyde*, U.S. Env't Prot. Agency (July 7, 2025), https://www.epa.gov/formaldehyde/facts-about-formaldehyde (noting formaldehyde is found in "[e]missions from un-vented, fuel burning appliances, like gas stoves or kerosene space heaters" and that "[h]igh levels of exposure may cause some types of

York City (the "City") and New York State (the "State") were among those to act.

The City enacted Local Law 154 (the "Local Law"), which provides that "[n]o person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy" in new residential buildings. N.Y.C. Local Law No. 154 (2021); N.Y.C. Admin. Code § 24-177.1. In effect, the Local Law prohibits the use of appliances that run on natural gas, heating fuel, and other fossil fuels.[2]

A group of trade associations and a union ("City Appellants") sued in the Southern District of New York on the theory that the Local Law is expressly preempted by EPCA, a federal statute that imposes energy conservation performance standards on certain appliances. City Appellants sought a declaratory judgment and permanent injunction preventing the Local Law from going into effect. Instead, Judge Abrams granted the City's motion to dismiss pursuant to Fed. R. Civ. P. 12 (b)(6), concluding that EPCA does not preempt the Local Law. City Appellants appealed.

Separately, the State enacted a law directing the State Fire Prevention and Building Code Council, a body within

---

cancers"); *see generally* Anna Belova, et al., *Literature Review on the Impacts of Residential Combustion, Final Report*, American Lung Ass'n (July 10, 2022), https://www.lung.org/policy-advocacy/healthy-air-campaign/healthy-efficient-homes/residential-combustion.

2. The law has applied to new buildings under seven stories since January 1, 2024. It will expand its coverage to taller buildings in July 2027. *See* N.Y.C. Admin. Code § 28-506.1(1)-(2).

New York's Department of State, to adopt regulations prohibiting the installation of appliances that burn fossil fuels in new buildings. *See* N.Y. Energy L. § 11-104(6)-(8); N.Y. Exec. L. § 378(19) (the "State Law") (together with the Local Law, the "challenged laws"). A different group of companies, trade associations, and unions whose members would be impacted by the State Law ("State Appellants") sued in the Northern District of New York and argued that the State Law is expressly preempted by EPCA. After dismissing claims against several defendants as barred by the Eleventh Amendment, Judge Suddaby granted summary judgment to the remaining Defendant, the Secretary of State, similarly concluding that EPCA's preemption provision does not apply to the State Law. State Appellants also appealed.

We heard the appeals in tandem. We review the two District Courts' decisions de novo. *See Kellogg v. Nichols*, 170 F.4th 20, 24 (2d Cir. 2026) (motion to dismiss); *Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 363 (2d Cir. 2025) (summary judgment); *cf. Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008) ("A district court's determination as to preemption is a conclusion of law, which we review *de novo*.").

## DISCUSSION

These appeals concern whether EPCA preempts state and local laws which prohibit fossil-fuel-powered appliances. EPCA, in relevant part, imposes energy conservation standards on covered appliances, and its preemptive text closely aligns with its affirmative regulatory scope.

The statute does not directly regulate the availability of fossil-fuel-powered appliances, and its express preemption provision does not extend to laws far beyond its defined regulatory reach. Thus, for the reasons explained below, EPCA does not preempt the challenged laws.

## I. Preemption Framework and EPCA's Preemption Provision

Federal law is "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012). "Federal preemption of a state statute can be express or implied, and generally occurs: '[1] where Congress has expressly preempted state law, [2] where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or [3] where federal law conflicts with state law.'" *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 188 (2d Cir. 2007) (alterations in original) (quoting *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005)).

Here, we confront the first category, express preemption. "There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona*, 567 U.S. at 399. However, "if 'a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the

substance and scope of Congress' displacement of state law still remains.'" *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495-96 (2d Cir. 2023) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76, 129 S. Ct. 538, 172 L. Ed. 2d 398 (2008)). "[W]hen 'a federal law contains an express preemption clause, we focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.'" *Id.* at 495 (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594, 131 S. Ct. 1968, 179 L. Ed. 2d 1031 (2011)). At the end of the day, "[p]reemption is 'a matter of statutory interpretation,'" and therefore, we must "ascertain the intent of Congress." *Id.* (first quoting *Cantero v. Bank of America, N.A.*, 49 F.4th 121, 130 (2d Cir. 2022); then quoting *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 107 S. Ct. 683, 93 L. Ed. 2d 613 (1987)).

Our conclusion, therefore, must be rooted in the relevant preemptive text in EPCA:

> [O]n the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product.

42 U.S.C. § 6297(c).[3] The parties focus on the provision's inclusion of "energy use," and therefore, our task is to

---

3. EPCA governs both consumer and industrial appliances. *See* 42 U.S.C. §§ 6291-6309 (consumer); *id.* §§ 6311-6317 (industrial).

determine whether the challenged laws "concern[] the . . . energy use" of covered appliances.

To accomplish this task, we must first ascertain the meaning of "energy use" as it is used in EPCA. As discussed below, our interpretation of "energy use" alone undercuts Appellants' primary argument for preemption from the start. Next, with that interpretation of "energy use" in mind, we must determine whether the challenged laws are nevertheless included in the scope of preemption through the statute's broadening use of "concerning." Per the below, we conclude that "concerning" does not save Appellants' case. Finally, we turn to additional interpretative tools to confirm the soundness of our interpretation.

## II. Interpreting "Energy Use" Undercuts Appellants' Case for Preemption

To ascertain the scope of EPCA's preemption provision, we first must uncover the meaning of the term "energy use."

Appellants contend the challenged laws are preempted by framing the challenged laws as "effectively set[ting] covered gas appliances' maximum energy use to zero" by prohibiting their use by consumers in new residential buildings. *See* City Appellants' Br. at 17; State Appellants' Br. at 23. In essence, Appellants primarily argue that

---

The parties agree that the relevant provisions are substantially the same for both kinds of appliances, and therefore, this opinion will cite the provisions that govern consumer products for ease of reference.

"energy use" refers to the amount of energy consumed by covered products in the hands of consumers. *See* City Appellants' Br. at 28; State Appellants' Br. at 30, 34.

However, as explained below, we are not at liberty to ignore that the statute defines "energy use" differently, nor that the statutory context precludes Appellants' reading.

**A. Statutory Definition**

"When 'a statute includes an explicit definition' of a term, 'we must follow that definition, even if it varies from a term's ordinary meaning.'" *Van Buren v. United States*, 593 U.S. 374, 387, 141 S. Ct. 1648, 210 L. Ed. 2d 26 (2021) (quoting *Tanzin v. Tanvir*, 592 U.S. 43, 47, 141 S. Ct. 486, 208 L. Ed. 2d 295 (2020)). EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." 42 U.S.C. § 6291(4). In addition, the statute dictates that the referenced test procedures must "be reasonably designed to produce test results which measure . . . energy use . . . during a representative average use cycle or period of use." *Id.* § 6293(b)(3).

It is plain then that a product's "energy use" is a standardized, fixed measure assigned to a product before it reaches consumers. Manufacturers ascertain an appliance's "energy use" by using "test procedures"; indeed, the results of those test procedures are "determin[ative]." *Id.* § 6291(4). And those test procedures are designed to

*replicate* the appliance's average use, meaning the tests are performed in a controlled setting, not at the appliance's ultimate destination in the hands of consumers. In all, once an appliance has been sold, nothing a consumer does with the appliance changes that appliance's "energy use."

Therefore, a regulation that effectively bars the use of a covered appliance by certain consumers, like the challenged laws, has little to do with that appliance's "energy use." The statutory definition all but confirms that the preemption provision does not directly implicate the energy an appliance consumes in the hands of consumers, contrary to Appellants' view.

**B. Context**

The statutory context surrounding "energy use" confirms what the definition already makes plain.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Giovinco v. Pullen*, 118 F.4th 527, 531 (2d Cir. 2024) (quoting *West Virginia v. EPA*, 597 U.S. 697, 721, 142 S. Ct. 2587, 213 L. Ed. 2d 896 (2022)). While "we begin . . . with the text of the provision in question," we may also consider, "the structure and purpose of the Act in which it occurs." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995)). Here, several components of EPCA are helpful.

First, EPCA provides that a manufacturer's "disclosure with respect to [the] energy use" of a covered product required by the statute, "shall not create an express or implied warranty . . . that such energy use . . . will not be exceeded under conditions of actual use." 42 U.S.C. § 6297(g). For the statute's warranty provision to make any sense, a covered product's "energy use" must be fixed and determined by the manufacturer, as no express or implied warranty could attach to a shifting value arising from a product's use by consumers. At the very least, the warranty provision unmistakably suggests that an appliance's "energy use" and the energy an appliance consumes "under conditions of actual use," are separate values.

Second, EPCA provides that manufacturers must disclose a covered product's "operating cost" on the product's label. *Id.* § 6294(c)(1)(A). The statute directs that those costs be determined in accordance with testing procedures explained in § 6293. *Id.* And per § 6293, a covered product's operating cost "shall be calculated from measurements of energy use." *Id.* § 6293(b)(4). Thus, an appliance's "energy use" must be determined *before* a label is created and the product is passed along to consumers. Moreover, if "energy use" referred to the fluctuating energy used by an appliance at its ultimate destination, it would hardly be possible for manufacturers to determine a fixed operating cost.

Third, EPCA requires that manufacturers "submit information or reports . . . with respect to . . . energy use" of a covered product to the Secretary of Energy under certain circumstances. *See id.* § 6296(d)(1). Necessarily

then, a product's "energy use" must be a pre-determined, fixed measurement that does not rely upon a product's real-world use. After all, manufacturers can hardly be expected to track and report on the performance of their products after they leave their control and are placed in the hands of consumers.

Fourth and finally, EPCA bars manufacturers and distributors, among others, from

> mak[ing] any representation in writing . . . or in any broadcast advertisement, with respect to the energy use or efficiency . . . of a covered product to which a test procedure is applicable . . . unless such product has been tested in accordance with such test procedure and such representation fairly discloses the results of such testing.

*Id.* § 6293(c)(1). Accordingly, the statute expressly ties a product's "energy use" to the results of test procedures conducted in the pre-marketing (and by extension, pre-consumer) context.

If any doubt remained after examining the statute's definition for "energy use," these provisions make abundantly clear that the term refers to a metric determined before an appliance ever reaches consumers, not the energy that appliance uses in the hands of consumers. Thus, Appellants' primary argument that the challenged laws are preempted because they "set" appliances "energy use" to zero by barring their use by consumers falls flat.

**III. "Concerning" Does Not Save Appellants' Case**

But our interpretation of "energy use" does not end the preemption inquiry. The preemption provision covers regulations "*concerning* the . . . energy use" of covered appliances. *See* 42 U.S.C. § 6297(c) (emphasis added). And Appellants argue that even if the interpretation of "energy use" we hereby adopt is correct, the challenged laws nevertheless "concern" appliances' "energy use." *See* City Appellants' Br. at 33-35; State Appellants' Br. at 39-42. Ultimately, for the reasons set forth below, the provision's use of "concerning" cannot carry the weight Appellants assign to it.

**A. Interpreting "Concerning" Along the Lines of "Related To"**

The parties agree that for our purposes, we can treat EPCA's deployment of "concerning" as synonymous with "related to," a term courts have regularly interpreted in other preemption contexts. *See* City of New York Br. at 41; Mosley Br. at 55. Indeed, courts have often grouped these terms together. *See Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717, 138 S. Ct. 1752, 201 L. Ed. 2d 102 (2018) (concluding, in the bankruptcy context, that "related to" and "concerning" are indistinguishable); *Chevron USA, Inc. v. Plaquemines Parish*, 608 U.S. ----, 146 S. Ct. 1052, 1060, 224 L. Ed. 2d 535 (2026) (reaching a similar conclusion in the federal officer removal context).[4]

---

4. In *Lamar*, the Supreme Court's characterization of the terms as synonymous was expressly limited to the particular bankruptcy context the Court was facing. *See Lamar, Archer & Cofrin, LLP*

Drawing on longstanding precedent interpreting "related to" in the preemption context, we read "concerning" to cover regulations that have one of two features: "'a connection with, or reference to,' the topics the statute enumerates." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96, 137 S. Ct. 1190, 197 L. Ed. 2d 572 (2017) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992)) (interpreting "relate to" in the ERISA context); *see also Taxicab*, 615 F.3d at 156, 157 n.4 (interpreting "related to" similarly in another EPCA context).

First, whether a regulation is impermissibly "connected" to the forbidden subject matter (here, a product's "energy use") hinges on two inquiries: the *purpose of EPCA* and the *effect of the challenged laws*. We first use the federal statute's "objectives . . . as a guide to the scope of the state law that Congress understood would survive" and then also consider "the nature of the effect

---

*v. Appling*, 584 U.S. 709, 717, 138 S. Ct. 1752, 201 L. Ed. 2d 102 (2018) ("The Court finds no basis to conclude, however, *at least in this context* . . . ." (emphasis added)). Indeed, the Supreme Court has already warned against over-reading *Lamar*'s discussion of another broadening term, "with respect to." *See United States v. Miller*, 604 U.S. 518, 520, 533, 145 S. Ct. 839, 221 L. Ed. 2d 373 (2025) ("Respondent's reliance on . . . cases that adopt capacious readings of phrases similar to 'with respect to' cannot support his argument, as those authorities all examine those terms in very different statutory contexts."). Moreover, EPCA uses "related to" in a different preemption provision, which may suggest the terms have divergent meanings at least within the statute. *See* 49 U.S.C. § 32919(a). But we need not reach the issue because we conclude there is no preemption even if the two terms are synonymous.

of the state law" on the federal statute's subject matter. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320, 136 S. Ct. 936, 194 L. Ed. 2d 20 (2016) (first quoting *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148, 121 S. Ct. 1322, 149 L. Ed. 2d 264 (2001); then quoting *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325, 117 S. Ct. 832, 136 L. Ed. 2d 791 (1997)).

Second, whether the challenged laws "reference" the preempted matter (again, a product's "energy use") relies on their operation and terms. A local regulation will be preempted by a preemption provision that bars laws "related to" a subject if it contains a direct reference to that subject matter, "or makes the existence of preempted subject matter essential to the law's operation." *Taxicab*, 615 F.3d at 156. A local regulation cannot avoid preemption merely by using a "proxy" for, rather than a direct reference to, the preempted subject matter. *Id.* at 158.

Despite the amorphous nature of these inquiries, phrases such as "related to," and "concerning" do not endlessly stretch the scope of preemption provisions. *See Dubin v. United States*, 599 U.S. 110, 119, 143 S. Ct. 1557, 216 L. Ed. 2d 136 (2023) ("[R]elate[d] to" should not be "taken to extend to the furthest stretch of its indeterminacy." (quoting *Travelers*, 514 U.S. at 655)). Indeed, the Supreme Court has "cautioned against an 'uncritical literalism' that would make pre-emption turn on 'infinite connections.'" *Egelhoff*, 532 U.S. at 147 (quoting *Travelers*, 514 U.S. at 656).

Per the below, we conclude the challenged laws have "neither of th[e] impermissible relationships," and thus,

are not covered by EPCA's use of "concern." *See Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86, 141 S. Ct. 474, 208 L. Ed. 2d 327 (2020).

**B. The Challenged Laws Are Not Connected to "Energy Use"**

First, the challenged laws lack an impermissible connection with EPCA's regulation of appliances' "energy use." As explained above, we turn to *EPCA's objectives* and also to the *challenged laws' effect* on the preempted subject matter to determine whether an impermissible connection exists. *See Gobeille*, 577 U.S. at 320.

**1. EPCA's Objectives**

To determine the relevant statutory objectives for purposes of assessing for "connections," we must consider EPCA's purpose. *See Rutledge*, 592 U.S. at 86.

> EPCA was passed following the oil embargo imposed by the Organization of Oil Producing and Exporting Countries ("OPEC") in 1973. It was designed as a direct, comprehensive response to the energy crisis precipitated by the embargo . . . and among its stated purposes was the reduction of demand for energy through such measures as conservation plans and improved energy efficiency of consumer products.

*Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004) (citations omitted). After experimenting

with a "voluntary market-based approach," and setting "targets," EPCA was updated to require the Department of Energy ("DOE") to "establish[] mandatory efficiency standards for covered home appliances that would achieve the maximum improvement in energy efficiency that was technologically feasible and economically justified." *Id.* at 185-86. When DOE proved incapable of promulgating such standards, Congress again updated the statute to "set . . . specific efficiency standards and testing methods for covered products" itself, which DOE could later amend through rulemaking. *Id.* at 186-87. In doing so, Congress was concerned both with meeting energy demands and combatting a "'growing patchwork' of state efficiency standards that had developed as the result of the absence of national standards." *Id.* at 186 n.3 (quoting S. Rep. No. 100-6, at 4 (1987)).[5]

5. We agree with Appellants that "[s]tates cannot circumvent preemption just by 'shifting their regulatory focus' from one angle to another." State Appellants' Reply Br. at 5 (quoting *American Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652, 133 S. Ct. 2096, 186 L. Ed. 2d 177 (2013)); *see also* City Appellants' Reply Br. at 6 (same). If a regulation's practical effect is "at odds with the statute's intended operation and effect" then the regulation is likely preempted. *See Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636, 133 S. Ct. 1391, 185 L. Ed. 2d 471 (2013); *see also Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371-72, 128 S. Ct. 989, 169 L. Ed. 2d 933 (2008) (emphasizing the need to look at whether the regulation "produces the very effect that the federal law sought to avoid"). But we disagree that EPCA's "intended operation and effect," *see Wos*, 568 U.S. at 636, was to ensure access to all covered products, or that Congress, through EPCA, "sought to avoid" bans entirely, *see Rowe*, 552 U.S. at 371.

Appellants point to two provisions to support their view that Congress's objectives include protecting "consumer choice." *See, e.g.*, City Appellants' Br. at 43; State Appellants' Br. at 47.

First, Appellants make much of the statutory waiver provision which authorizes the DOE to reject waiver applications if DOE "finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing" of a covered product on a national basis or "is likely to result in the unavailability in the State of any covered product type." 42 U.S.C. § 6297(d)(3)-(4).

Second, and similarly, Appellants point to text dictating that DOE cannot prescribe new standards, or amend old ones, if the revised standard "is likely to result in the unavailability in the United States in any covered product type." *Id.* § 6295(o)(4).

But these two provisions do not evince Congress's "objective" for purposes of preemption.[6] EPCA, at its core, sets energy conservation standards. It contains no provisions which affirmatively protect consumers' ability to access covered products, nor does it include language affirmatively preserving manufacturers' ability to operate

6. We recognize that the Ninth Circuit believed these provisions to indicate that Congress intended to preempt a broader swath of regulations. *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1103-04 (9th Cir. 2024). For the reasons explained herein, we disagree.

in static markets. Indeed, on a fundamental level, the statute operates to *confine* the choices of consumers and manufacturers by setting standards. We cannot conclude that Congress pursued an "objective" of consumer choice through the passage of a statute that says so little on the subject.

Moreover, "[e]xceptions to a general rule" such as DOE's ability to promulgate standards and grant waivers, "while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the rule." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 264, 133 S. Ct. 1769, 185 L. Ed. 2d 909 (2013). Put differently, it is hard to draw conclusions about Congress's objective through the exceptions of a statute. At the very most, the two provisions identified by Appellants show that Congress thought energy conservation interests need not *always* be the only priority in setting energy conservation standards, and that consumer choice and market stability have a role to play in implementing that kind of regulation. But they say nothing about Congress's view of other interests, like protecting public health and addressing climate change, let alone whether those varying interests support imposing a totally different kind of regulation (i.e., a prohibition on types of energy rather than a standard for the amount of energy consumed). [7]

---

7. To be clear, we should not be read as suggesting that Appellee's reasons for enacting the challenged laws bring those laws outside of EPCA's preemptive scope. *See Rowe*, 552 U.S. at 373-74. The Supreme Court has clarified that, absent clear language to the contrary, the purpose of a potentially preempted law cannot "exempt[] state laws that . . . would otherwise [be] pre-empt[ed]." *Id.* at 374. Instead, we reference the interests of public health and

In all, we think it is clear that EPCA's "objectives" were to establish a standardized set of performance standards for covered appliances to promote energy conservation. Those objectives serve "as a guide to the scope of the state law that Congress understood would survive." *Rutledge*, 592 U.S. at 86 (quoting *Dillingham Constr., N.A., Inc.*, 519 U.S. at 325). Since the challenged laws do not impose standards of their own, EPCA's objectives weigh against finding an impermissible connection.

### 2. The Challenged Laws' Effect

It is similarly difficult to establish that the challenged laws are impermissibly "connected" to appliances' "energy use" because the challenged laws do not affect the statute's subject matter. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370, 128 S. Ct. 989, 169 L. Ed. 2d 933 (2008).[8]

---

combatting climate change solely to illustrate the lack of evidence supporting Appellants' view of Congress's intent. Our holding that the challenged laws are not preempted is not premised, in any way, on the purpose of the challenged laws.

8. Of course, the challenged laws represent a certain kind of regulatory disruption, which Appellants argue "affects" Congress's concern with uniformity. But Congress was concerned with a patchwork of *conservation standards specifically*, not a patchwork of any kind of regulation, because they could "complicate [manufacturers'] design, production and marketing plans." S. Rep. 100-6, at 4. We do not think this specific concern can be extrapolated to cover all regulations which might impact the choices of manufacturers. Regardless, we think the binary choice between electric and fossil-fuel-powered appliances does not represent the same risk of complication of the market as the potential for fifty different energy conservation standards.

The same energy conservation standards will apply before and after the challenged laws are implemented. The challenged laws will not dictate, or even incentivize, manufacturing or consumer choices along the lines of energy consumption and conservation. Instead, the challenged laws govern via the type of energy an appliance consumes by barring the use of fossil-fuel-powered appliances, not the amount of energy it consumes (unlike, for example, a local law which significantly incentivizes the use of appliances that exceed federal energy conservation standards). These distinctions ensure the challenged laws will not "produce[] the very effect that the federal law sought to avoid," because they will not apply any significant pressures on manufacturers to produce appliances that exceed federal standards. *See id.* at 372.

We do not mean to minimize the overall impact of the challenged laws. They will undoubtedly have an effect on the market for, and availability of, certain covered products. But that is irrelevant to the question at hand because the preemption provision targets regulations concerning appliances' "energy use," not, as Appellants sometimes seem to suggest, regulations concerning the covered appliances themselves. *Cf. Taxicab*, 615 F.3d at 157 (treating "fuel economy standards" as the preempted subject matter, not the covered automobiles).

Indeed, "federal regulation of certain activities," like the energy conservation standards of covered appliances, "does not mean that States must authorize activities antecedent to those federally regulated," like the production and sale of covered appliances, in the first

place. *See Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 793, 139 S. Ct. 1894, 204 L. Ed. 2d 377 (2019) (Ginsburg, J., concurring); *cf. Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007); *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333-34 (5th Cir. 2007); *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1149-51 (9th Cir. 2017). As a particularly instructive example, it is plain that a federal statute that sets standards for the construction and safety of manufactured homes (i.e., mobile homes) does not preempt zoning regulations that "exclude mobile homes" from certain areas altogether. *See Scurlock v. City of Lynn Haven*, 858 F.2d 1521, 1524-25 (11th Cir. 1988).[9]

The same holds true here; a regulatory bar on the use of covered appliances altogether is not the kind of effect capable of creating an impermissible connection for preemption purposes.

Because the challenged laws do not implicate Congress's objectives in passing EPCA, and absent an effect on the statute's subject matter, the challenged laws are not preempted through impermissible "connections."

---

9. The preemption provisions at issue in each of the cited cases apply to "requirements . . . with respect to" or "standards regarding" the statutes' subject matter. *See Cavel*, 500 F.3d at 553 (citing 21 U.S.C. § 678); *Curry*, 476 F.3d at 333 (citing 21 U.S.C. § 678); *Becerra*, 870 F.3d at 1145 (citing 21 U.S.C. § 467e); *Scurlock*, 858 F.2d at 1525 (citing 42 U.S.C. § 5403(d)). Appellants appear to agree that at least "with respect to" and "concerning" can be treated similarly. *See* City Appellants' Br. at 54. Thus, we think these cases are relevant for our purposes.

### C. The Challenged Laws Do Not Reference "Energy Use"

Having concluded there are no impermissible "connections," we next turn to whether the challenged laws "reference" or rely upon an appliance's "energy use," and thus, may still be preempted. They do not.

As discussed, the challenged laws govern by the type of energy consumed by an appliance, not the amount of energy an appliance consumes under standardized testing procedures. Put differently, an appliance's "energy use," as that term is used in the preemption provision, has no effect whatsoever on that appliance's coverage under the challenged laws. To enforce the challenged laws, regulators could very well remain blind to an appliance's "energy use."

Nor do the challenged laws operate as a "proxy" for "energy use." A "proxy" requires an "equivalency," but there is no "equivalency" between the type of energy an appliance uses and that appliance's "energy use." *Contra Taxicab*, 615 F.3d at 157-58. In fact, "some gas appliances are more efficient than electric appliances, so [the challenged laws] may have the indirect effect of *increasing* energy consumption in new buildings in some circumstances." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1126 (9th Cir. 2024) (Friedland, J., dissenting) (citing 10 C.F.R. § 430.32(e)(1)(ii)). Thus, this case is not like *Taxicab*, where we concluded a regulation that privileged hybrid taxis ran afoul of an express preemption provision barring "a law or regulation related to fuel economy standards." 615 F.3d at 156 (quoting 49 U.S.C.

§ 32919(a)). Unlike in *Taxicab*, here there are "plausible alternative reason[s] for the imposition of [the challenged laws]" beyond the desire to regulate along the lines of appliances' "energy use." *Id.* at 157.[10]

## IV. Other Interpretative Inquiries Confirm Our View of Preemption

We need not venture further. To summarize, the preemption provision is best understood as preempting 1) state and local energy conservation standards that interfere with Congress's objectives in passing EPCA, 2) regulations that reference or rely upon those standards in their operation, and 3) regulations that otherwise impermissibly affect appliances' "energy use." Because the challenged laws do not fall into these categories, they are not preempted.

Nevertheless, we proceed to check our work against Appellants' remaining arguments, using additional interpretative aids at our disposal.

### A. Preemption Provision Title

First and most obviously, the preemption provision is titled: "General rule of preemption for energy

---

10. Even if there is some kind of correlation between the use of fossil fuel power and an appliance's "energy use," we think such an indirect relationship is not enough. Otherwise, regulating an appliance by size or weight might be preempted, since common sense would suggest a correlation between the size of an appliance and its "energy use." *Contra* 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982) ("Prohibition against placing oversized furnaces and air conditioners in new buildings, would not be subject to preemption.").

conservation standards when Federal standard becomes effective for product." 42 U.S.C. § 6297(c). From the start, Congress made clear that it largely intended to preempt state and local energy conservation standards on covered products. Again, the challenged laws are decidedly not energy conservation standards, so the title supports our conclusion.

### B. Definition of "Energy Conservation Standard"

Second, the preemption provision's structure closely mirrors the statute's definition of "energy conservation standard." "Energy conservation standard" is defined in part as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or, in the case of showerheads, faucets, water closets, and urinals, water use, for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title." *See id.* § 6291(6)(A). Thus, an "energy conservation standard" is a standard governing a product's energy efficiency, energy use, or water use, depending on the type of product at issue.

That same formulation reappears in the text of the statute's preemption provision, which again, preempts state regulations "concerning the energy efficiency, energy use, or water use of . . . covered product[s]." *Id.* § 6297(c). The symmetry between the statute's definition of an "energy conservation standard" and the text it uses in its preemption provision confirms that Congress's driving concern was to preempt state and local energy

conservation standards, not prohibitions on types of energy like the challenged laws.

### C. Building Code Exemption

Third, our interpretation is consistent with EPCA's exemption for certain regulations in building codes.

EPCA provides that state laws that would otherwise be preempted are permitted if they exist "in a building code for new construction" and meet certain criteria. *Id.* § 6297(c)(3), (f)(3).[11] The criteria for triggering the exemption provide that the regulation must "allow builders the freedom to choose a mix of products to meet" a "general energy conservation objective . . . without requiring" that builders use covered products which "exceed federal standards." *See* State Appellants' Br. at 6-7 (citing 42 U.S.C. § 6297(f)(3)(A)-(C), (F)).

Of course, for the exemption to make any sense, the kind of regulation it describes must be preempted in the first place; otherwise, the exemption would do no work. And the building code regulations covered by the exemption look different from the kind of energy conservation standards that primarily concerned Congress; energy conservation standards are specific to a certain appliance and mandatory, whereas the regulations that are covered by the building code exemption operate

---

11. Appellees do not assert that the challenged laws fall under the building code exemption, so we need not decide whether the challenged laws meet the relevant criteria.

on a building-wide basis through incentives. Therefore, the kind of regulations covered by the building code exemption provide a useful "check" for the viability of our interpretation of the preemption provision. If our interpretation were to exclude such regulations, we may have reason to pause.

Our interpretation of the preemption provision, however, is consistent with the building code exemption. Though they are not the kind of performance standards that Congress was most directly concerned with, the regulations covered by the building code exemption nevertheless have an "impermissible relationship[]" to EPCA's subject matter, and thus, are preempted under the interpretation we adopt in this opinion. *See Rutledge*, 592 U.S. at 86.[12]

By targeting building-wide energy conservation, such regulations arguably "reference" appliances' individual

12. For similar reasons, we think DOE's prior understanding that a "[p]rohibition of hook-ups for appliances with less than a certain efficiency would be subject to preemption" is consistent with our interpretation of the statute. *See Cal. Rest. Ass'n*, 89 F.4th at 1104 n.6 (quoting 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982)). Such a regulation directly references and operates upon the preempted subject matter, the appliances' "energy use," but the same is not true of the challenged laws. Indeed, the very same regulation asserts that "[p]rohibitions against placing oversized furnaces and air conditioners in new buildings, would not be subject to preemption." *See* 47 Fed. Reg. at 57,215. These two examples illustrate the conclusion we reach today: it is not the prohibitive nature of a regulation governing covered products that triggers preemption; it is the law's use of the appliance's "energy use" as a mechanism for regulating.

"energy use." Indeed, regulating on a building-wide scale simultaneously (and impermissibly) achieves the goal of regulating the performance of the individual appliances within that building. *See Taxicab*, 615 F.3d at 158 (pointing out the lack of a "plausible alternative reason for imposition" of a regulation).

Separately, the regulations covered by the building code exemption may also have an impermissible "connection" with products'" energy use" because they directly implicate Congress's objectives in maintaining uniform energy conservation standards. If states were permitted to regulate energy conservation on an aggregated scale (rather than the per-product basis employed by EPCA), states could easily escape the preemption provision's reach by a simple refashioning of their regulations.

Therefore, our interpretation of the preemption provision is internally consistent with the building code exemption. Rather than undermining our interpretation, the exemption provision further supports it.[13]

---

13. In *Building Industry Association of Washington v. Washington State Building Code Council*, the Ninth Circuit addressed the relevant exemption. 683 F.3d 1144 (9th Cir. 2012). There, the relevant building code did not *require* the use of covered products that exceeded the standards imposed under EPCA, but instead, provided several options for meeting building-wide energy consumption goals, one of which was using more efficient products. The Ninth Circuit did not question that the regulation would be preempted, seemingly based on the regulation's "call for higher efficiency covered products." *See id.* at 1151. Instead, it focused squarely on whether the regulation would fall under the exemption. Its analysis squares with our interpretation.

### D. EPCA's Changes Over Time

Fourth, the preemption provision's history reaffirms our interpretation.

In 1975, EPCA's preemption provision precluded "any energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered product." *See* Energy Policy and Conservation Act, Pub. L. No. 94-163, § 327(a)(2), 89 Stat. 871, 926-27 (1975). And in 1978, "similar requirement" was switched to "other requirement." *See* National Energy Conservation Policy Act, Pub. L. No. 95-619, § 424(b), 92 Stat. 3206, 3264 (1978).

Appellants concede that, as written, the 1975 and 1978 versions of the preemption provision illustrate that "Congress meant to preempt only 'energy conservation standards' and the like." City Appellants' Br. at 17; State Appellants' Br. at 24; *see also* City Appellants' Br. at 31 ("The preemption provision used to say almost exactly what the district court concluded that it means now."). DOE seemingly agreed with that interpretation; in 1982, in a proposed rule addressing state waiver applications, it explained that it would "review only State regulations that are appliance efficiency standards," not "State or local regulations that have only a peripheral effect on the energy efficiency of a covered product." Energy of Conservation Program for Consumer Products; Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters,

Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces, 47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982). DOE made that distinction because, in its view, state laws "whose purpose is other than energy efficiency such as a law on fire safety, would not appear to be preempted by the Federal rule, even if it has a secondary and incidental effect of improving the efficiency of a covered product." *Id.*

Thus, we think it is clear that the challenged laws would not be preempted under the prior versions of the preemption provision. The question then becomes whether further amendments change that conclusion.

Undoubtedly, Congress varied the structure of the preemption provision in the relevant version enacted in 1987. First, it changed the operative connecting phrase from "with respect to" to "concerning." Again, Appellants appear to agree that this change alone does not indicate that Congress intended to broaden the provision's scope. *See* City Appellants' Br. at 54 (noting that in *Dan's City*, the Supreme Court used "concern" and "with respect to" interchangeably). Second, rather than specifically list "energy efficiency standard[s]" and "other requirements," Congress targeted "regulations" concerning energy efficiency, energy use, or water use. *See* National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, § 7, 101 Stat. 103, 118.

That 1987 amendment coincided with a broader, statute-wide change in the way EPCA described the standards it promulgated. Instead of "energy efficiency

standard," 42 U.S.C. § 6297(a)(2) (1982), the 1987 version of EPCA used the term "energy conservation standard," *see* § 2(a), 101 Stat. at 103. And while the prior "energy efficiency standard" was defined to include "performance standard[s]," *see* § 321(a)(6), 89 Stat. at 917, the new term "energy conservation standard" was defined to include those standards *and* certain "design requirement[s]" for covered products, *see* § 2(a), 101 Stat. at 103. Thus, "energy conservation standard" under the modern EPCA is a broader term than "energy efficiency standard" from the prior versions.

With this context, Congress's motivation for rewording the preemption provision emerges clearly. Had it simply swapped "energy efficiency standard" for "energy conservation standard," the preemption provision would have covered a *new* kind of state law: design requirements. Instead, Congress's decision to list three of the component parts of the term "energy conservation standard" (i.e., energy efficiency, energy use, and water use) without listing the fourth (design requirements) indicates a conscious effort to avoid that outcome.

The legislative and administrative record supports this understanding of Congress's intent regarding the 1987 amendment. In describing the 1987 amendments, the House Committee on Energy and Commerce stated that the preemption provision "[i]n overall form . . . follows substantially the preemption requirements in current EPCA," including "continu[ing] the basic concept of preempting State energy efficiency standards." H. Rep. No. 100-11, at 23-24 (1987). The Senate

Committee on Energy and Natural Resources shared that understanding; it explained that "[i]n general, [EPCA's] national standards would preempt all State standards" and that the "new" provision "preempts State regulation, *as provided under current law*." S. Rep. No. 100-6, at 2, 9 (1987) (emphasis added). And many years later, DOE continued to interpret the preemption provision in much the same way as it did before the 1987 amendments. In 2010, in another notice of proposed rulemaking, it expressly "interpret[ed] 'regulation concerning energy use' to be equivalent to 'energy conservation standard,'" and thus read the preemption provision to preclude state and local "performance-based standard[s]." Energy Conservation Program: Energy Conservation Standards for Residential Refrigerators, Refrigerator-Freezers, and Freezers, 75 Fed. Reg. 59,470, 59,530 (Sep. 27, 2010) (quoting 42 U.S.C. § 6297(c)).

In all, a holistic view of the 1987 amendments illustrates that Congress's revisions to the preemption provision were intended to reinforce the limits of its scope, not broaden them.

**E. Absurdity**

Finally, our interpretation avoids absurd results. *See Cuthill v. Blinken*, 990 F.3d 272, 281 (2d Cir. 2021) (noting that in interpreting ambiguous statutes, "we are mindful of the well-established rule that 'absurd results are to be avoided'" (quoting *McNeill v. United States*, 563 U.S. 816, 822, 131 S. Ct. 2218, 180 L. Ed. 2d 35 (2011))); *In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 145 (2d Cir. 2023) (similar).

Take, for example, indoor kerosene heaters, which appear to be covered products under EPCA. *See* 42 U.S.C. § 6292(a)(9) (listing "direct heating equipment"). New York City has, quite understandably, long banned their use because of fire safety concerns. *See* N.Y.C. Admin. Code § 313.3(1). After all, a fire in a New York City apartment complex can quite quickly escalate into a devastating event. Were we to interpret the preemption provision to preclude state and local prohibitions on covered products, as Appellants ask us to do, EPCA could preempt New York City's ban. We think it far-fetched to conclude that Congress imagined such consequences, let alone *intended* those consequences, when it drafted a preemption provision in a statute that by-and-large imposes energy conservation standards. [14]

Indeed, if the preemption provision covered the challenged laws, we see little reason why it would not also preclude a whole slate of seemingly standard regulations. Zoning laws that bar the use of certain appliances, like furnaces, in residential neighborhoods would be

---

14. Appellants point out that no federal standard has been imposed on indoor kerosene heaters, and thus, as of now, New York City's law would not be preempted under its interpretation. City Appellants' Br. at 27. That is beside the point. The canon against absurd results does not solely consider whether an absurd result will come about the day after a court issues its decision. *See, e.g.*, *In re Brandt-Airflex Corp.*, 843 F.2d 90, 96 (2d Cir. 1988) (invoking the absurd results canon where a proffered interpretation would have "empower[ed]" a bankruptcy court to act). DOE could impose a standard for kerosene heaters at any point if it chose to do so, and, on Appellants' account, such a standard would preempt New York City's longstanding ban.

preempted because they bar the use of certain covered products, and thus, in Appellants' view, set their "energy use" to zero. *See* 42 U.S.C. § 6292(a)(5) (listing furnaces as a covered appliance). Noise ordinances prohibiting the use of industrial fans could similarly fall by the wayside. *See generally* Energy Conservation Program: Test Procedure for Fans and Blowers, 88 Fed. Reg. 27,312 (establishing standard for fans and blowers). Though our holding does not rely on the absurdity of these outcomes, they nevertheless buttress our conclusion.

## V. The Ninth Circuit's Contrary Holding and Defining "Point of Use"

Before concluding, we acknowledge that the Ninth Circuit disagrees with our interpretation of the preemption provision.[15] In *California Restaurant Association v. City of Berkeley*, the Ninth Circuit faced a similar preemption challenge to a local law which effectively barred the installation of natural gas piping in newly constructed buildings. 89 F.4th 1094 (9th Cir. 2024). After the district court dismissed the preemption claim, the Ninth Circuit reversed and held that the local law was preempted by

---

15. Beyond the two district court decisions relevant to this appeal, there is a growing consensus amongst district courts outside of the Ninth Circuit that EPCA does not preempt laws that effectively ban gas-powered appliances. *See Nat'l Ass'n of Home Builders of the U.S. v. Montgomery Cnty.*, No. 8:24-cv-03024, 2026 U.S. Dist. LEXIS 62725, 2026 WL 817322, at *7 (D. Md. Mar. 25, 2026); *Nat'l Ass'n of Home Builders of the U.S. v. Dist. of Columbia*, No. 24-cv-02942, 2026 U.S. Dist. LEXIS 64829, 2026 WL 837674, at *12 (D.D.C. Mar. 26, 2026).

EPCA under its interpretation of the relevant preemption provision. The Ninth Circuit reasoned that "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations" based largely on the phrase "point of use" in the statutory definition of "energy use." *Id.* at 1101-02. The Ninth Circuit denied the ensuing petition for rehearing en banc, with eight active judges dissenting from the denial of rehearing en banc.

Of course, we afford the decisions of other circuits respectful consideration, and often, their decisions are "persuasive." *See Charles W. v. Maul*, 214 F.3d 350, 357 (2d Cir. 2000). After much consideration of the statute's text and relevant precedent, however, we conclude that the reasons for divergence are too compelling and reluctantly believe it necessary to create "a split among the Circuits." *See Lamay v. Comm'r*, 562 F.3d 503, 508 (2d Cir. 2009). In the end, we think the opinion by Judge Friedland, dissenting from denial of rehearing en banc, has the better interpretation.

**A. The Ninth Circuit's Interpretation Halves the Statutory Definition**

In choosing to emphasize "point of use," our view is that the Ninth Circuit ignored the second half of the statutory definition. The statute defines energy use as "the quantity of energy directly consumed by a consumer product at point of use, *determined in accordance with test procedures under section 6293*." 42 U.S.C. § 6291(4) (emphasis added). But the Ninth Circuit cut off the

definition after "point of use," *see Cal. Rest. Ass'n*, 89 F.4th at 1101, and from there, its interpretation went astray.

As we have already discussed, the statutory definition and its reliance on "test procedures" is simply incompatible with the idea that "energy use" refers to the energy an appliance consumes at its "intended final destination[]." *Id.* at 1102. Thus, the Ninth Circuit not only ignored crucial text; its reading would "render[] meaningless" part of the statute's definition, "mak[ing] the statute incoherent." *See Coon ex rel. Coon v. Willet Dairy, LP*, 536 F.3d 171, 175 (2d Cir. 2008).

**B. The Ninth Circuit's Interpretation Overlooks Technical Meaning**

Of course, the Ninth Circuit was correct that "point of use" must mean *something*. The statute's specialized context provides the answer: "[W]hen a statute, like this one, is 'addressing a . . . technical subject, a specialized meaning is to be expected.'" *See Van Buren*, 593 U.S. at 388 n.7 (quoting Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012)); *see Cal. Rest. Ass'n*, 89 F.4th at 1121 (Friedland, J., dissenting from the denial of rehearing en banc). In interpreting the statute's plain text, it is "reasonable to assume that Congress relied on the accepted" use of the language in its particular context. *See United States v. Hill*, 506 U.S. 546, 553, 113 S. Ct. 941, 122 L. Ed. 2d 330 (1993); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 201, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974) ("[W]here Congress has used technical words or terms of art, 'it [is]

proper to explain them by reference to the art or science to which they [are] appropriate.'" (quoting *Greenleaf v. Goodrich*, 101 U.S. 278, 284, 25 L. Ed. 845 (1880))).

Informed by its context, the "point of use" language unmistakably indicates the statute's chosen *scope* for regulating an appliance's consumption of energy.

There are two ways to measure an appliance's energy consumption: site energy and source energy. Site energy, in the words of DOE, "is the amount of energy consumed at the point of sale (e.g., that enters the home, building, or establishment) without adjustment for any energy loss in the generation, transmission, and distribution of that energy." *Energy Intensity Indicators: Terminology and Definitions*, U.S. Dep't of Energy (last visited Apr. 12, 2026), https://www.energy.gov/eere/analysis/energy-intensity-indicators-terminology-and-definitions. In other words, site energy is the energy consumed at an appliance's "point of use." In contrast, "source energy" is the site energy "plus the energy losses associated with the production of electricity by the utility sector (i.e., losses that occur in the generation, transmission, and distribution)." *Id.* Simply put, source energy casts a wider net.

As an illustrative example, "energy as measured at the 'point of use' would include only the natural gas needed to operate a gas stove, whereas 'source energy' would also include the energy consumed in extracting that natural gas, removing its impurities, and transporting it to the location of the stove." *See Cal. Rest. Ass'n*, 89 F.4th at 1123 (Friedland, J., dissenting).

Congress needed to instruct regulators and manufacturers as to which of these scopes of measurement it was regulating and imposing standards upon. Without such instruction, the statute would not achieve its goals of standardization. The statute's inclusion of "point of use" is most naturally read as a way of filling that gap.

### C. Available Sources Support Our Reading of "Point of Use"

This technical interpretation of the work done by "point of use" not only makes sense but is also in lockstep with the interpretation pressed by DOE on multiple occasions. In a 2004 notice of proposed rulemaking, DOE explained that "EPCA . . . do[es] not permit the regulation of source energy" because it "specif[ies] that efficiency must be based on the energy consumption at the point of use." Energy Conservation Program for Consumer Products: Energy Conservation Standards for Residential Furnaces and Boilers, 69 Fed. Reg. 45420, 45426 (July 29, 2004) (citing 42 U.S.C. § 6291(4)). And in a separate 2010 notice of proposed rulemaking, DOE stated that "existing law . . . requires" measures of a covered product's energy consumption "to be based solely on the energy consumed at the point of use" rather than "the energy consumed in extracting, processing, and transporting primary fuels and energy losses associated with generation, transmission, and distribution of electricity." Energy Conservation Program for Consumer Products and Certain Commercial and Industrial Equipment: Public Meeting and Availability of Statement of Policy for Adopting Full-Fuel-Cycle Analyses into Energy

Conservation Standards Program, 75 Fed. Reg. 51423, 51424 (Aug. 20, 2010) (citing 42 U.S.C. § 6291(4)).[16]

A consistent stream of congressional and legislative sources similarly supports reading "point of use" as a technical term. In 1978, in the lead up to legislation that would amend parts of EPCA, the Congressional Research Service ("CRS") prepared reports for the House Subcommittee on Energy and Power addressing national energy needs. Notably, those reports drew distinctions between energy consumed by an appliance "at the point of use" and the energy expended "by conversion and transmission." *See* CRS, Energy and the Economy, 4339 (Apr. 1978); *see also* CRS, The National Energy Plan, 4541 n.1 (Apr. 1978) (noting that "in arriving at [a certain figure] [CRS] considered the energy lost to convert fossil fuels to electricity at power plants, as well as the energy loss in transmitting electricity from the power plant to the point of use"). Thus, there is evidence that "point of use" has been used to indicate the scope of energy consumption measured by a given figure since the seventies, around the time the "point of use" language was introduced.

Later, in 1998, a Senate Appropriations Committee report recommending the passage of an appropriations bill funding DOE activities acknowledged that the standards implemented by DOE "presently reflect only the energy consumed at the point of use," and "ignore[]

16. Judge Friedland's opinion dissenting from the denial of rehearing en banc in *California Restaurant Association* helpfully lists additional examples illustrating the technical meaning of "point of use." 89 F.4th at 1123-24.

the total energy consumed over the full fuel cycle." S. Rep. 105-227, at 100 (1998). In response to the report's criticism of site energy, or point of use, methodology, the Chairman of the Senate Committee on Energy and Natural Resources and seven colleagues asserted that EPCA's definition of "energy use" settled the debate over whether the statute should implement standards based on site or source energy. *See* 144 Cong. Rec. S12706 (1998) (asserting that in passing EPCA, Congress opted for "determining the energy use of an appliance at its point-of-use" rather than a more "expansive definition of energy use . . . that included exogenous factors like 'total fuel cycle' costs, emissions and externalities"). Senator Murkowski went on to explain that "the majority of Congress determined that energy consumed at the point of use can be measured . . . with greater accuracy than . . . 'source energy,'" and that Congress's "determination is clearly reflected in the authorizing statute." *Id.* (citing 42 U.S.C. § 6291). Underlying this debate is not only an apparent understanding of the technical meaning of "point of use," but also, a shared belief that EPCA governs along those lines.[17]

---

17. We recognize that these sources post-date the original enactment of the language at issue, though some precede Congress's later amendments. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242, 131 S. Ct. 1068, 179 L. Ed. 2d 1 (2011) (criticizing the use of "post-enactment legislative history"). However, given that the alternate interpretation advanced by the Appellants and adopted by the Ninth Circuit would render part of the statute meaningless, and given the abundance of consistent evidence of the technical meaning of "point of use" over time, we think the technical interpretation is plainly the better one. Regardless, the Supreme Court has sometimes relied on post-enactment evidence of a term's technical meaning to interpret

More recently, Congress commissioned a study by the National Academy of Sciences which explained that "[c]urrent DOE standards for the energy consumed by operating individual appliances call for measurement at the site (point of use) of the appliance." Nat'l Rsch. Council, *Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report* 3-4, 6 (2009). Just last year, Congress began to consider a bill "to amend [EPCA] to modify standards for water heaters, furnaces, boilers, and kitchen cooktops, ranges, and ovens." H.R. 1281, 119th Cong. (2025). That bill directly refers to the National Academy of Sciences report and proposes incorporating the "full fuel cycle analysis for energy efficiency standards" described in that report into the statute. *Id.* These sources provide further evidence that "point of use" has long carried a technical meaning within this context.

We thus depart from our sister circuit's perspective.

**VI. Conclusion**

We hold that the challenged laws are not preempted under EPCA. Interpreting preemption provisions in federal statutes requires ascertaining Congress's intent. EPCA, a statute that at its heart promotes national energy conservation goals, does not preclude these particular

---

a statute. *See Van Buren v. United States*, 593 U.S. 374, 388 n.6, 141 S. Ct. 1648, 210 L. Ed. 2d 26 (2023) (citing sources dated after the relevant statute's 1986 enactment).

state and local efforts to regulate the use of fossil fuels. For the foregoing reasons, the District Courts' judgments are **AFFIRMED**.

## APPENDIX B — ORDER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK, FILED AUGUST 21, 2025

U.S. District Court

Northern District of New York - Main Office (Syracuse)
[NextGen CM/ECF Release 1.8
(Revision 1.8.3)]

Notice of Electronic Filing

The following transaction was entered on 8/21/2025 at 10:04 AM EDT and filed on 8/21/2025
Case Name: Mulhern Gas Co., Inc. et al v. Mosley, et al
Case Number: 1:23-cv-01267-GTS-PJE
Filer:
Document Number: 66(No document attached)

Docket Text:

TEXT ORDER granting judgment as a matter of law to Defendant on Plaintiffs' sole claim of preemption, and dismissing Plaintiffs' Complaint (Dkt. No. [1]), for the reasons stated in the Court's Decision and Order of July 23, 2025, and Plaintiffs response to the Court's Order to Show Cause at the end of that Decision and Order (Dkt. No. [64]). The Court adds only that its finding that (as a matter of law) the EPCA does not preempt the relevant New York laws challenged in this case warrants such a disposition despite the fact that Defendant did not move for summary judgment, because Plaintiffs moved for summary judgment on the issue in question (and thus had notice and a reasonable opportunity to respond regarding it). Fed. R. Civ. P. 56(f). SO ORDERED by U.S. District Judge Glenn T Suddaby on 8/21/2025. (sal )

**APPENDIX C — DECISION AND ORDER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK, FILED JULY 23, 2025**

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK

1:23-CV-1267 (GTS/PJE)

MULHERN GAS CO., INC.; NEW YORK STATE BUILDERS ASSOCIATION; NATIONAL ASSOCIATION OF HOME BUILDERS; NEW YORK PROPANE GAS ASSOCIATION; NATIONAL PROPANE GAS ASSOCIATION; NORTHEAST HEARTH, PATIO, AND BARBEQUE ASSOCIATION; PLUMBING CONTRACTORS ASSOCIATION OF LONG ISLAND; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., DOING BUSINESS AS MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; HOLMES MECH. LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1049; PLUMBERS LOCAL UNION NO. 200; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 97; AND TRANSPORT WORKERS LOCAL 101, AFL-CIO,

*Plaintiffs,*

v.

WALTER T. MOSLEY IN HIS OFFICIAL CAPACITY AS NEW YORK SECRETARY OF STATE AND MEMBER OF THE STATE FIRE PREVENTION AND BUILDING CODE COUNCIL,

*Defendant,*

*Appendix C*

NEW YORK GEOTHERMAL ENERGY ORGANIZATION; AND PUSH BUFFALO,

*Intervenor Defendants.*

July 23, 2025, Decided; July 23, 2025, Filed

GLENN T. SUDDABY, United States District Judge.

**DECISION and ORDER**

Currently before the Court, in this preemption action filed by Mulhern Gas Co., Inc., New York State Builders Association, National Association of Home Builders, New York Propane Gas Association, National Propane Gas Association, Northeast Hearth, Patio and Barbeque Association, Plumbing Contractors Association of Long Island, Licensed Plumbing Association of New York City, Inc., Holmes Mech. LLC, International Brotherhood of Electrical Workers Local 1049, Plumbers Local Union No. 200, International Brotherhood of Electrical Workers Local Union 97, and Transport Workers Union Local 101 AFL-CIO ("Plaintiffs") against Walter T. Mosley in his official capacity as New York Secretary of State ("Defendant"), are the following: (1) Defendant's motion for judgment on the pleadings based on lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(c);[1] and

1. The Court notes that, generally, a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is treated in the same manner as a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). However, where (as here), a motion for judgment on the

(2) Plaintiffs' motion for summary judgment pursuant to Fed. R. Civ. P. 56, issuing both a declaratory judgment pursuant to 28 U.S.C. § 2201(a), and a permanent injunction. (Dkt. Nos. 37, 38.) New York Geothermal Energy Organization and PUSH Buffalo were granted permission to join this suit as Intervenor Defendants for the purpose of opposing Plaintiffs' motion for summary judgment. (Dkt. Nos. 42, 49.) Air Conditioning, Heating and Refrigeration Institute ("AHRI"), Sierra Club, and Guarini Center on Environmental, Energy and Land Use Law ("Guarini Center") were all granted permission to file amicus curiae briefs related to Plaintiffs' motion for summary judgment. (Dkt. Nos. 43, 57, 59.) For the reasons set forth below, Defendant's motion for judgment on the pleadings is denied, and Plaintiffs' motion for summary judgment (seeking both a declaratory judgment and permanent injunction) is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiffs' Complaint

Generally, in their Complaint, Plaintiffs allege that certain amendments to the New York Energy Law and New York Executive Law (found at N.Y. Energy L. § 11-104[6]-[8] and N.Y. Exec. L. § 378[19]) that require provisions to be adopted into the Energy Conservation

---

pleadings pursuant to Fed. R. Civ. P. 12(c) is based upon a lack of subject-matter jurisdiction, such a motion is generally a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). *See, e.g., U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F.Supp.2d 443, 448-49 (S.D.N.Y.2001).

Construction Code ("Energy Code") and Uniform Fire Prevention and Building Code ("Building Code") prohibiting "the installation of fossil-fuel equipment and building systems" in certain new buildings are preempted by the Energy Policy and Conservation Act ("EPCA") because such statutes impose what amounts to a regulation on the energy use of fossil-fuel equipment, including for appliances that are covered by the EPCA, and do not qualify for any of the enumerated waiver conditions outlined in the EPCA. (*See generally*, Dkt. No. 1.) As relief for their claims, Plaintiffs request (a) declaratory judgment that the relevant statutory provisions are preempted by the EPCA, (b) a permanent injunction enjoining enforcement of the statutory fossil-fuel equipment prohibition, (c) costs and attorneys' fees, and (d) any other relief that may be just and proper. (*Id.* at ¶ 91.)

**B. Procedural History**

On October 12, 2023, Plaintiffs filed the Complaint in this action. (Dkt. No. 1.) On December 18, 2023, Defendants filed a motion to dismiss for lack of subject-matter jurisdiction. (Dkt. No. 19.) The Court granted that motion in part and denied it in part on August 29, 2024, finding that former defendants New York Department of State, the New York State Fire Prevention and Building Code Council ("Code Council"), and all individual members of the Code Council with the exception of the New York Secretary of State (who was, at that time, Robert Rodriguez), needed to be dismissed because the Eleventh Amendment barred the claims asserted against them. (Dkt. No. 28.)

Plaintiffs and Defendant filed the currently pending motions on November 5, 2024. (Dkt. No. 37, 38.) During the briefing of those motions, New York Geothermal Energy Organization and PUSH Buffalo were granted permission to intervene as defendants related to Plaintiffs' motion for summary judgment; and AHRI, Sierra Club, and Guarini Center were granted permission to file amicus curiae briefs also related to that motion. (Dkt. Nos. 43, 49, 57, 59.) The parties have additionally filed supplemental authority and a factual update regarding the progress that the Code Council has made in formulating the code provisions in accordance with the challenged statutes. (Dkt. Nos. 61, 62, 63.)

### C. Parties' Arguments on Defendant's Motion for Judgment on the Pleadings

#### 1. Defendant's Memorandum of Law

Generally, in his motion for judgment on the pleadings, Defendant argues that the Court lacks subject-matter jurisdiction over Plaintiffs' sole claim in this action (seeking relief based on preemption) because (a) Plaintiffs lack standing to bring such a claim in that they have not suffered any injury, nor have they alleged that any injury is actually imminent, and (b) such a claim is not yet ripe for review because the Code Council has not promulgated or adopted any amendments to the Codes that have made the fossil-fuel equipment prohibition enforceable against any Plaintiff. (Dkt. No. 38, Attach. 1.)

More specifically, as to standing, Defendant argues that (a) the statutes that Plaintiffs challenge do not

themselves cause any injury because they do not actually impose any enforceable requirement or restriction against Plaintiffs, but rather merely direct the Code Council to develop and promulgate amendments to the Codes, (b) the Code Council is required to follow a certain rulemaking procedure and comply with other requirements in formulating the amendments required by the statutes and thus Plaintiffs have nothing but speculation regarding what the Code amendments might eventually contain, (c) there is uncertainty as to when the Code amendments will be enacted, so, again, the claims of imminent future injury are merely speculative at this point, (d) even if Plaintiffs can show an injury, they have not shown that any such injury is fairly traceable to an action by Defendant specifically, given that it was the Legislature, not the New York Secretary of State, who adopted the relevant statutes that Plaintiff challenges here, and (e) there is also no redressability because a court cannot enjoin enforcement of a statute that cannot actually be enforced. (*Id.* at 12-18.)

Finally, as to ripeness, Defendant argues that Plaintiffs' claim is not ripe for review because the statutes do not impose any enforceable legal requirement on Plaintiffs, but rather any enforcement is contingent on the unknown outcome of the rulemaking procedure being undertaken by the Code Council, and any future enforcement would not take effect before 2026 at the earliest. (*Id.* at 18-21.)

**2. Plaintiffs' Opposition Memorandum of Law**

Generally, in opposition to Defendant's motion, Plaintiffs make two arguments. (Dkt. No. 50.) First, Plaintiffs argue that they have standing to challenge the mandated future prohibition of use of fossil-fuel equipment because (a) they have suffered, and will suffer, actual economic harms as a result of the statutes given that they are already experiencing "compliance costs" related to ensuring they are prepared for when the Code amendments are enacted, as well as lost sales, work opportunities and revenue that will only be exacerbated, (b) the harm alleged is imminent and actual in that, even if the statutes are not themselves directly enforceable, they *require* the Code Council to codify the prohibition into the Codes (i.e., the Code Council could not choose to refrain from implementing the prohibition without violating state law), and the statutes require that the Code amendments implementing the prohibition take effect by December 31, 2025, and (c) the injuries alleged are traceable to Defendant's approval and enforcement authority of the impending Code amendments (which are, again, mandated by the statutes), and redressable because an injunction would bar Defendant from enforcing those Code amendments against Plaintiffs. (*Id.* at 16-28.)

Second, Plaintiffs argue that this purely legal dispute over whether the statutes are preempted by federal law is ripe for all the same reasons it has suffered a sufficient injury for standing purposes. (*Id.* at 29-30.) Plaintiff also argues that Defendant has forfeited his prudential ripeness objection by not raising it in his original motion to dismiss

pursuant to Fed. R. Civ. P. 12(b)(1) (wherein he and former defendants challenged whether the Eleventh Amendment barred claims against those former defendants), but, nevertheless, if the Court were to consider the merits of his arguments, the issue of preemption raised here is a purely legal one, because, regardless of what the final content of the Code amendments might be, they will inevitably need to contain, as required by the statutes, the prohibition on fossil-fuel equipment. (*Id.* at 30-33.)

### 3. Defendant's Reply Memorandum of Law

Generally, in reply, Defendant makes two arguments. (Dkt. No. 53.) First, Defendant argues that Plaintiffs have not established standing because (a) Plaintiffs have not shown a sufficient injury given that the statutes themselves do give any legal effect to a prohibition on fossil-fuel equipment, and the harms they allege are, at this time, speculative at best and based on hearsay and conclusory statements, (b) the alleged harm is not imminent because the Code amendments do not become effective on December 31, 2025, as Plaintiffs argue, but rather only after they are finally adopted, the timing of which is not certain, (c) Plaintiffs have not shown that the alleged injury is traceable to Defendant because Defendant played no role in the enactment of the statutes they challenge here, and (d) there is no redressability in enjoining enforcement of the statutes because it is enforcement of the yet-to-be-adopted Code amendments that would actually cause the harm Plaintiffs allege, not the statutes themselves. (*Id.* at 7-12.)

Second, Defendant argues that (a) Plaintiffs have not presented a ripe case or controversy because the statutes impose no legal requirements on Plaintiffs and any enforcement of a fossil-fuel prohibition against Plaintiffs is contingent upon uncertain future events, (b) Defendant has not waived prudential ripeness because his Answer contains such a defense, and he was not required to raise it in the previous motion to dismiss, and (c) again, the challenged statutes do not themselves impose any legal requirements on Plaintiffs. (*Id.* at 12-15.)

### D. Undisputed Material Facts on Plaintiffs' Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b). This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 525 F. Supp. 3d 305, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating

responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'" *LaFever*, 525 F. Supp. 3d 305, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 U.S. Dist. LEXIS 182845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 56.1(b).

Applying this legal standard here, the following facts have been asserted and supported by record citations by Plaintiffs, and either expressly admitted or denied without a supporting record citation by Defendant.[2]

1. In May 2023, New York passed N.Y. Energy L. § 11-104(6)-(8) and N.Y. Exec. L. § 378(19), which state that

> [T]o support the goal of zero on-site greenhouse gas emissions and help achieve the state's clean energy and climate agenda, including but not limited to greenhouse gas reduction

---

2. In their Statement of Undisputed Material Facts, Plaintiffs have included a host of facts about the individual or organizational Plaintiffs, all of which are related to the issue of whether those Plaintiffs have suffered a harm related to the standing inquiry. However, the Court finds that such asserted facts are either not sufficiently material to the relevant issues to merit inclusion here, or properly disputed by Defendant, specifically as to the issue of whether it is the statutory amendment that is the cause of those alleged injuries. (*Compare* Dkt. No. 37. Attach. 2, at ¶¶ 7-31, *with* Dkt. No. 48, Attach. 1, at ¶¶ 7-31.)

> requirements set forth within chapter one hundred six of the laws of two thousand nineteen . . . the code shall prohibit the installation of fossil-fuel equipment and building systems, in any new building not more than seven stories in height, except for new commercial or industrial buildings greater than one hundred thousand square feet in conditioned floor area, on or after December thirty-first, two thousand twenty-five, and the code shall prohibit the installation of fossil-fuel equipment and building systems, in all new buildings after December thirty-first, two thousand twenty-eight.[3]

2. Those statutory amendments were passed by the New York legislature, signed by the Governor into law, and are effective now.[4]

---

3. The Court agrees with Defendant that the text of the statute speaks for itself and has therefore used the specific language of the statutes here rather than Plaintiffs' summary of what the statute says. The language cited is from N.Y. Energy L. § 11-104, which the Court notes deviates from the almost identical language in N.Y. Exec. L. § 378(19) in small and immaterial ways.

4. Defendant admits that the statutes were passed by the legislature and signed by the Governor, but argues, without citation to any evidence, that these statutes are not "effective" because the Court has previously found that the statutes are not, themselves, enforceable against Plaintiffs. (Dkt. No. 48, Attach. 1, at ¶ 2.) However, whether the statutes are effective and whether they can be enforced against Plaintiffs are two different questions. There seems to be no dispute that the statutes are effective, given that Defendant acknowledges that the Code Council now

3. The Code Council has already begun to comply with its statutory duty to amend the Building Code and Energy Code.[5]

4. In June 2024, the Code Council published a Notice of Rule in Development that included draft amendments to the Codes.

5. The Code Council's minutes from its meeting of June 28, 2024, report that it discussed "the draft regulation for the implementation of the prohibition on the installation and use of fossil-fuel equipment and building systems in certain new structures and buildings," and that the Code Council members were "encouraged to submit any comments as soon as possible, particularly within the next couple months, so that the Department can revise the

---

has a responsibility to amend the Codes in accordance with these statutes. Defendant's response is little more than an attempt to make a legal argument that is not appropriate in the context of responding to a Statement of Material Facts.

5. Defendant admits that the Code Council has begun the process to adopt amendments to the Codes, but denies the remainder of the asserted fact because it is merely an improper characterization of the legal effect of the statutory amendments. (Dkt. No. 48, Attach. 1, at ¶ 3.) However, the evidence provided by Plaintiffs documents that the Code Council has indeed begun the process of amending the Codes to specifically include the prohibition of the installation of fossil-fuel equipment and building systems that is clearly outlined in and required by the statutes. (Dkt. No. 26, Attachs. 2-4.) Because the Court disagrees that this asserted fact involves any unwarranted characterization of the statute, and because Defendant has not provided any other basis for denial, the Court has deemed this fact to be admitted.

language as necessary to stay on target with our timeline to update the Uniform Code and Energy Code."

6. The Code Council's published minutes from its meeting on July 26, 2024, confirm that, at its June 2024 meeting, "[t]he Code Council was presented with the provision for fossil-fuel prohibition, which [is] codified in Article 11 of the State Energy Law and Section 378 of the Executive Law and will be set forth expressly in Part 1240 of Title 19," and that a "[Notice of Rule in Development] document for those proposed changes was published on the Division's website."

### E. Parties' Arguments on Plaintiffs' Motion for Summary Judgment

#### 1. Plaintiffs' Memorandum of Law

Generally, in their motion for summary judgment, Plaintiffs make three arguments. (Dkt. No. 37, Attach. 1.) First, Plaintiffs argue that the prohibition on fossil-fuel equipment mandated by the challenged statutes is preempted by the EPCA. (*Id.* at 12-20.) More specifically, Plaintiffs argue that the statutory prohibition is a regulation concerning the energy use of appliances covered under the plain text of the preemption provision of the EPCA because the challenged statutes indirectly regulate energy use through a prohibition on fossil-fuel equipment, which necessarily means that the energy use of any fossil-fuel equipment will be zero. (*Id.* at 13-14.) Plaintiffs further argue that other aspects of the EPCA preemption provision support a finding that

preemption applies in this case, including (a) an exemption to preemption like the one related to meeting certain conditions for local building codes shows that preemption ordinarily extends to local building codes, and (b) a ban on covered appliances that use a certain type of fuel would be at odds with the history and purpose of the EPCA. (*Id.* at 14-19.) They also argue that the challenged statutes do not qualify for any exception to preemption outlined in the EPCA. (*Id.* at 19-20.)

Second, Plaintiffs argue that they are entitled to declaratory judgment because New York's prohibition on fossil-fuel equipment in certain new buildings is preempted by the EPCA. (*Id.* at 21.)

Third, Plaintiffs argue that they are also entitled to permanent injunctive relief because (a) the prohibition on fossil-fuel equipment will cause irreparable harm once implemented and enforced, (b) Plaintiffs would be unable to recover monetary damages from New York even if their damages could be quantified in monetary terms, (c) the balance of harms is greater to Plaintiffs than to Defendant, and (d) it is in the public interest to not enforce a state law that is preempted by federal law. (*Id.* at 21-23.)

**2. Defendant's Opposition Memorandum of Law**

Generally, in his opposition to Plaintiffs' motion, Defendant makes three arguments. (Dkt. No. 48.) First, Defendant argues that Plaintiffs' facial challenge to the New York statutes must fail because it is overbroad

given that the relevant amendments to those statutes are not limited to "covered products" under the EPCA, and therefore Plaintiffs cannot show that the statutes would be unconstitutional in all applications as required for a facial challenge. (*Id.* at 17-18.)

Second, Defendant argues that the EPCA does not, in any event, preempt the relevant statutes or proposed Code amendments. (*Id.* at 18-32.) Specifically, Defendant argues that Plaintiffs have misinterpreted the EPCA in determining that it would preempt the relevant New York statutes because (a) they attempt to apply definitions other than the highly technical ones that Congress intended in order to extend the reach of the EPCA beyond regulation of energy conservation standards, particularly as to the term "energy use," (b) they conflate the EPCA's purpose of ensuring uniform energy conservation standards in the design and manufacture of covered equipment with the availability of a certain type of fuel to use that equipment (the latter of which, Defendant argues, the EPCA does not cover), and (c) they attempt to stretch the term "concerning" beyond its logical bounds but, regardless, no interpretation of that term would bring the challenged statutes within the purview of the EPCA. (*Id.*). Defendant further argues that the Court should decline to follow the Ninth Circuit's decision in *California Restaurant Assoc. v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), because that court erred in applying the same incomplete and erroneous definition of "energy use" advanced here by Plaintiffs, and by inappropriately relying on a colloquial definition of the term "point of use" rather than the technical definition that should have been applied. (*Id.*

at 27-29.) Defendant also argues that it does not matter whether any exceptions listed in the EPCA would apply to the challenged statutes because Plaintiffs have not, and cannot, show that those statutes regulate the energy use of any covered product, and thus the statutes are not covered by the EPCA's preemption provision in the first place. (*Id.* at 31-32.)

Third, Defendant argues that Plaintiffs are not entitled to declaratory or injunctive relief, both because the challenged statutes are not preempted, and because there are outstanding questions related to whether Plaintiffs have sufficient standing to justify those forms of relief. (*Id.* at 33-36.)

### 3. Intervenor Defendants' Opposition Memorandum of Law

Generally, in their opposition memorandum of law, the Intervenor Defendants make three arguments. (Dkt. No. 49.) First, the Intervenor Defendants argue that the EPCA does not preempt all regulations related to the use of certain equipment, but rather only those that concern energy use or energy efficiency, and therefore it does not preempt regulations that, like the ones at issue here, do not address conservation standards, but rather health and safety concerns. (*Id.* at 6-11.) The Intervenor Defendants also argue that the exceptions listed in the EPCA do not suggest that the statutes are preempted, but rather support the argument that regulations not related to restricting or addressing energy consumption are not covered by the EPCA at all. (*Id.* at 8.)

Second, the Intervenor Defendants argue that the challenged statutes do not concern the energy use of covered appliances, but rather constitute health-and-welfare legislation aimed at addressing the threats posed by climate change and the public health consequences of air pollution. (*Id.* at 11-15.)

Third, the Intervenor Defendants argue that Plaintiffs' proposed interpretation of the EPCA's preemption clause produces absurd and expansive results such as prohibiting a state from ever preventing the use of any covered product for any reason, even if such products pose a significant risk to the health of state residents in certain locations or applications. (*Id.* at 15-19.)

**4. Plaintiffs' Reply Memorandum of Law**

Generally, in their reply memorandum of law, Plaintiffs make six arguments. (Dkt. No. 54.) First, Plaintiffs argue that, in assessing a case where, like here, there is an express preemption statute, there is no presumption against preemption that should be applied. (*Id.* at 7-8.)

Second, Plaintiffs argue that Defendants' arguments regarding interpretation of the EPCA are incorrect because (a) Defendants conflate the term "energy conservation standard" with the terms "energy use" or "energy efficiency," (b) their reliance on headings in the relevant section of the EPCA is misplaced because those headings cannot override the actual text of the statute, (c) their interpretations and arguments ignore the use of the word "concerning" in the preemption provision,

(d) regardless of how "point of use" is defined, the EPCA does not cover only regulations that directly affect energy use, but also those that *concern* energy use, and such can include the actual use of energy as the covered product operates in practice as opposed to during laboratory testing, and (e) Defendants' attempt to limit "energy use" to only laboratory testing values is irreconcilable with the building code exemption contained in the EPCA preemption clause. (*Id.* at 8-17.)

Third, Plaintiffs argue that the structure and purpose of the EPCA indicate that the challenged statutes are preempted. (*Id.* at 17-22.) More specifically, Plaintiffs argue that (a) the preemption provision does not apply only to design and manufacturing of covered equipment, but also distribution, sale, and servicing, and, regardless, the challenged statutes affect the design and manufacture of covered equipment because manufacturers will now have to design and manufacture non-fossil-fuel products if they want to be able to have their products installed in new buildings in New York, (b) in adopting amendments to the EPCA in 1987, Congress rejected the Department of Energy's previous interpretation of the preemption provision contrary to what Defendants assert, and in fact changed the scope of preemption based on their dissatisfaction with that interpretation, and (c) accepting Defendants' arguments would make the EPCA easy to evade because states could simply ban any specific lower efficiency products they disagree with based on fuel type, even if such products meet federal energy efficiency or energy use standards. (*Id.*)

Fourth, Plaintiffs argue that their claim of preemption is not based on whether there is an unrestrained right to use certain products or fuel types, but rather the fact that the challenged statutes indirectly attempt to regulate the energy use of those products. (*Id.* at 22-23.)

Fifth, Plaintiffs argue that their facial challenge is not overbroad because the requirement to show no constitutional application regarding a facial challenge applies only to the type of applications that are contemplated by their claim (i.e., related to what is covered by the challenged statutes), not every conceivable way in which the state could possibly regulate energy equipment, and Plaintiffs have in fact shown that there is no constitutional application of the fossil-fuel equipment prohibition. (*Id.* at 23-25.) Plaintiffs further argue that any concerns about the breadth of their claim would be more appropriately considered when determining the scope of the remedy, not the validity of the claim itself. (*Id.* at 25.)

Sixth, in response to Defendant's argument about the appropriate remedy, Plaintiffs argue that they have standing sufficient to be entitled to declaratory and injunctive relief because they have already begun to suffer costs of complying with the impending code amendments. (*Id.* at 25-26.)

**5. Amicus Curiae Briefs**

**i. AHRI**

In its amicus curiae brief, AHRI argues that this Court should find New York State's prohibition on fossil-

fuel equipment in certain new buildings to be preempted by the EPCA, and discusses some of the relevant history of the EPCA, related legislation, and the rulemaking process applicable to adopting standards under the EPCA to show that Congress granted the federal government the exclusive authority to regulate energy conservation standards. (Dkt. No. 43, Attach. 1.) It also urges the Court to follow the Ninth Circuit's holding and reasoning in *California Restaurant Assoc.* (*Id.*)

**ii. Sierra Club**

In its amicus curiae brief, Sierra Club discusses the harmful effect that natural gas appliances and the pollutants formed from the burning of natural gas have on both indoor and outdoor air quality and the resulting negative effects on human health, including increased rates of respiratory and cardiovascular illnesses. (Dkt. No. 57.)

**iii. Guarini Center**

In its amicus curiae brief, Guarini Center argues that the EPCA does not guarantee that manufacturers of covered appliances will be protected from laws that are unrelated to the scope of the EPCA, which is limited in relevant part to establishing energy conservation standards and labeling requirements for covered products. (Dkt. No. 59.)

## II. GOVERNING LEGAL STANDARDS

### A. Standards Governing a Motion to Dismiss for Lack of Subject-Matter Jurisdiction

"It is a fundamental precept that federal courts are courts of limited jurisdiction." *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S. Ct. 2396, 57 L. Ed. 2d 274 (1978). Generally, a claim may be properly dismissed for lack of subject-matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it. *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). A district court may look to evidence outside of the pleadings when resolving a motion to dismiss for lack of subject-matter jurisdiction. *Makarova*, 201 F.3d at 113. The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. *Makarova*, 201 F.3d at 113 (citing *Malik v. Meissner*, 82 F.3d 560, 562 [2d Cir. 1996]). When a court evaluates a motion to dismiss for lack of subject-matter jurisdiction, all ambiguities must be resolved and inferences drawn in favor of the plaintiff. *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing *Makarova*, 201 F.3d at 113).

### B. Standards Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).[6] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).[7]

---

6. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

7. Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[8]

---

in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

8. Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[9] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 U.S. Dist. LEXIS 101160, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 U.S. Dist.

---

assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

9. *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *DeVito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 U.S. Dist. LEXIS 27374, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

LEXIS 69054, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III. ANALYSIS

### A. Whether Plaintiff's Complaint Should Be Dismissed for Lack of Standing and Lack of Ripeness

After careful consideration, the Court answers this question in the negative for the reasons stated in Plaintiffs' opposition memorandum of law. *See, supra*, Part I.C.2 of this Decision and Order. To those reasons, the Court adds the following analysis.

To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016). An injury in fact "must be concrete and particularized, as well as actual or imminent," rather than "conjectural or hypothetical." *Carney v. Adams*, 592 U.S. 53, 58, 141 S. Ct. 493, 208 L. Ed. 2d 305 (2020). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 578 U.S. at 338.

As an initial matter, Defendant again, as he did in the prior Fed. R. Civ. P. 12(b)(1) motion, repeatedly highlights the fact that, although Plaintiffs have alleged that N.Y. Energy L. § 11-104(6)-(8) and N.Y. Exec. L. § 378(19) are

preempted, it is the yet-to-be-adopted Code amendments that would be the actual source of their alleged injury. However, the Court finds that fact to be less material to the issue of standing than it was when the Court previously determined whether certain former defendants were shielded from suit by the Eleventh Amendment. During that previous determination, the Court found that those individuals were not proper defendants under *Ex Parte Young* because, although they were tasked with enacting the Code amendments mandated by the relevant statutes, they did not have any role in enforcing the statutes themselves. (Dkt. No. 28, at 10-12.) The Court also found, as Defendant quotes, that the statutes have "little or no practical effect in terms of enforcement against the Plaintiffs until it is implemented as directed through the Codes." (*Id.* at 12.) The question of what was being enforced, and by whom, was directly dispositive to the issue being decided on that motion.

That is not, however, the case in assessing standing. Although it is still true that the challenged statutes do not themselves impose an enforceable prohibition on fossil-fuel equipment, the fact that they direct the Code Council to implement that prohibition through amendment of the Codes has the potential to cause the type of harm that could create standing. Despite all of Defendant's objections that the lack of an enforcement mechanism in the statutes themselves renders them incapable of causing Plaintiffs' alleged injury, it is an inescapable fact that the Code Council would not be amending the Codes to include the relevant fossil-fuel equipment prohibition had it not been directed to do so by the Legislature through the

statutes. Defendant is therefore correct in asserting that final adoption of the Code amendments is required before the prohibition will be enforceable against Plaintiffs, but that fact does not inevitably lead to Defendant's conclusion that the challenged statutes cannot be considered a source of any legal injury, or that any injury flowing from them is too remote or speculative to confer standing. In other words, even if the injury will not come to be fully felt until the Code amendments are adopted and enforceable, that future injury flows directly from the statutes themselves.

Next, although Defendant takes great pains to convince the Court that it is entirely unknowable when the Code Council will adopt the Code amendments or what the content of those amendments will be, those arguments are contradicted by the statutes themselves and the evidence presented. As to Defendant's argument that it is uncertain when the Code amendments will be adopted, the relevant text of N.Y. Energy L. § 11-104(6)(b) directs that "the code shall prohibit the installation of fossil-fuel equipment and building systems" in certain types of new buildings "*on or after* December thirty-first, two thousand twenty-five," and in all new buildings "after December thirty-first, two thousand twenty-eight." N.Y. Energy L. § 11-104(6)(b) (emphasis added). Under the plain language of the statute, it is therefore clear that the Legislature has directed that the Code amendments must be in place by December 31, 2025, or January 1, 2026 (as to the first phase of the prohibition) and January 1, 2029 (as to the second phase), because the amendments being enacted by then is the only way in which the codes will prohibit such activity "on or after" the specified

dates. Defendant does not address this language, but instead argues that it is simply not certain that the Code Council will implement the amendments by any certain date because "the schedule for adoption is subject to the constraints of a governmental body that meets quarterly with a large docket, as well as the possibility of a need to amend and repropose the regulations based on comments received during the administrative process." (Dkt. No. 53, at 10.) However, none of these hypothetical possibilities of delay change the fact that the statute directs that the code shall prohibit the installation of fossil-fuel equipment and building systems on or after December 31, 2025. The Code Council may indeed not meet the deadline set by the Legislature if certain circumstances arise, but such speculative possibility is not sufficient to override the fact that the statutes set a concrete date by when the prohibition is supposed to be in the Codes. The Court therefore finds that the timing of when the relevant prohibition will become enforceable is not so speculative as to prevent it from being considered an imminent future injury.

The Court is likewise unpersuaded by Defendant's similar assertion that injury is still speculative at this point because there is no clear indication as to what the content of the Codes will be. As an initial matter, although it is true that the full extent of what the Code amendments would ultimately include cannot be not known before they are drafted, put through the rulemaking process, and adopted, there is at least one thing the amendments are certain to include: a prohibition of the installation of fossil-fuel equipment and building systems in certain new

buildings. That prohibition is mandated by the relevant statutes, which means any Code amendment would necessarily have to include at least that basic element. As the Court has already found, the Code Council has no discretion to not include that prohibition because it has been specifically directed by the Legislature to include it in the Codes. (Dkt. No. 28, at 13.) Given that it is this prohibition that Plaintiffs challenge as being preempted by the EPCA, there is no reason why uncertainty as to what else the Code amendments might ultimately include would be detrimental to Plaintiffs' showing of a concrete, imminent injury. Moreover, while the motions have been pending, Plaintiffs have provided supplemental evidence in the form of a copy of the draft Code amendments formulated by the Code Council, which include the fossilfuel equipment prohibition and provide an indication of the types of other amendments that are likely to be in the final version of the Codes. (*See generally* Dkt. No. 62, Attach. 2; Dkt. No. 62, Attach. 3; Dkt. No. 62, Attach. 4; Dkt. No. 62, Attach. 5, at 16-23.) The Court therefore rejects Defendant's argument that the content of the Code amendments that will eventually be adopted is too speculative or unknowable to be the basis of Plaintiffs' assertion of an imminent future injury.

The fact that Code amendments have not yet been passed and the fossil-fuel equipment prohibition is not yet enforceable against Plaintiffs does not prevent a finding that Plaintiffs have standing to challenge the statutes. In cases involving pre-enforcement review, a plaintiff can be found to have an injury-in-fact "where he alleges 'an intention to engage in a course of conduct arguably

affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder.'" *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 [1979]). Here, the various Plaintiffs have clearly alleged a credible intention to continue to install fossil-fuel equipment in new buildings, because that activity is part of their businesses. Moreover, there has been no evidence presented that would give the Court any reason to believe that Defendant does not intend to enforce the prohibition to stop individuals or entities such as Plaintiffs from installing fossil-fuel equipment in new buildings once it is adopted into the Codes. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988) (finding standing in a pre-enforcement case where "[t]he State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise"). The fact that the Code amendments have not yet been adopted does not prevent a finding of an imminent and credible threat of future enforcement because, as already discussed, the Code Council must amend the Codes to implement the fossil-fuel prohibition by a certain date. To say that Plaintiffs cannot assert their right to sue at this stage merely because the date mandated by the Legislature for when the prohibition should be in the Codes is still six months away flies in the face of the longstanding ability of a plaintiff to sue for non-speculative and imminent future injuries. *See Susan B. Anthony List*, 573 U.S. at 158 ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm

will occur'") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5, 133 S. Ct. 1138, 185 L. Ed. 2d 264 [2013]).

Nor does the Court find that it is necessary to precisely define any and all specific injuries that the Plaintiffs might suffer in order to find that standing exists. As discussed above, Plaintiffs asserted a number of facts related to their motion for summary judgment regarding the injuries that have been or will be suffered by each Plaintiff, which variously include harm to business revenues and profits, disruption of long-term business strategy and asset planning, interference with ability to hire new technicians, and elimination or delay of planned investments (as to Plaintiff Mulhern Gas), harm to profits and business operations (as to Plaintiffs New York Propane Gas Association, National Propane Gas Association, New York State Builders Association, National Association of Home Builders), harm to business revenues and profits, disruption of long-term business strategies and asset planning, elimination of jobs, and interference with labor pools and hiring (as to Plaintiff Northeast Hearth, Patio, and Barbeque Association), loss of business and job opportunities (as to Plaintiff Plumbing Contractors of Long Island), loss of business revenues and profits (as to Plaintiff Holmes Mechanical), and loss of work and loss of employment (as to Plaintiffs International Brotherhood of Electrical Workers Local 1049 and Local Union 97, Plumbers Local Union No. 200, and Licensed Plumbing Association of New York City). Defendant has provided, as part of his Statement of Additional Material Facts in Dispute, evidence that could suggest that declining sales of propane and propane equipment are not related to New

York's statutory amendments that are the subject of this action. (Dkt. No. 48, Attach. 1, at 14-15.) As a result. there is an issue of fact regarding which of the specific harms the various Plaintiffs allege are, or will be, caused by the imminent codification of the prohibition on the installation of fossil-fuel equipment in new buildings. However, although those issues of fact obscure the specific extent of the injury Plaintiffs are suffering or will suffer when the Code Amendments are adopted and become enforceable, they do not prevent the Court from finding that Plaintiffs have shown that they will suffer an imminent concrete harm as a result of the impending Code Amendments. It cannot be logically disputed on the facts provided that a prohibition on the installation of fossil-fuel equipment in new buildings will have some tangible negative impact on Plaintiffs' businesses, regardless of whether a portion of such negative impacts might also be attributable to other factors, such as more consumers choosing to install heat pumps for reasons unrelated to the prohibition.

Beyond the existence of an injury, Defendant also argues that Plaintiffs have failed to show that their injury is traceable to him as opposed to the Legislature. Again, this argument is based on an overly reductive reliance on the fact that the statutes and the Codes are two separate things. While it is true that Plaintiffs have specifically alleged that the statutes (not the Codes) are preempted by the EPCA, and that the Secretary had nothing to do with the passing of the statutes, the Secretary's enforcement of the Codes is an extension of the injury that flows from the statutes; the injury cannot occur until the Secretary enforces the Codes, but that

enforcement was made possible by the Legislature's actions in passing the statutes. In other words, even though the statutes themselves are not enforceable, the Secretary, in enforcing the Code amendments implementing the statutory prohibition, would still be effecting the will of the Legislature as expressed through the statutes. Therefore, to the extent Plaintiffs' alleged injuries are based on the threat of future enforcement, they are sufficiently traceable to Defendant. Defendant's arguments about redressability fail for the same reason. He argues that there is nothing in the challenged statutes that can be enjoined because the statutes themselves are not enforceable, but this argument again ignores the fact that, even though the statutes are not enforceable, they impose a requirement to include a certain provision in the Codes. An injunction on the implementation and enforcement of the required Code amendments would have the effect of also enjoining the statutes from requiring such provisions be in the Codes. Again, the fact that the statutes are not enforceable does not mean that they have no practical effect.

Having found that Plaintiffs possess standing, the Court also finds that the issues presented are ripe for decision for many of the same reasons. "To be justiciable, a cause of action must be ripe - it must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *AMSAT Cable Ltd. v. Cablevision of Connecticut*, 6 F.3d 867, 872 [2d Cir. 1993]). "A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may

not occur at all.'" *Nat'l Org. for Marriage*, 6 F.3d at 687 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580, 105 S. Ct. 3325, 87 L. Ed. 2d 409 [1985]). As already discussed, although the Code amendments have not yet been finalized or adopted, there is no doubt that they will inevitably be adopted and contain the prohibition mandated by the statute - the Code Council has no discretion to refuse to do otherwise. There is also no evidence to suggest that adoption of the Code amendments will not be forthcoming within the timeline indicated within the challenged statutes. The imminent and non-speculative nature of the alleged harm therefore provides this Court with jurisdiction to consider Plaintiffs' claim. *See Nat'l Org. for Marriage*, 6 F.3d at 687 (noting that constitutional ripeness focuses on whether the claimed injury is sufficiently actual or imminent).

Further, as to the matter of prudential ripeness, the Court must "'evaluate both the fitness of the issues for judicial decision and the hardships to the parties of withholding court consideration.'" *Nat'l Org. for Marriage*, 6 F.3d at 691 (quoting *New York Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131-32 [2d Cir. 2008]). This involves assessing whether "the issues sought to be adjudicated are contingent on future events or may never occur," and "whether the challenged action creates a direct and immediate dilemma for the parties." *Nat'l Org. for Marriage*, 6 F.3d at 691. As already discussed, although the Code amendments have yet to be adopted, there is no question that they will be required to contain the relevant prohibition on fossil-fuel equipment given that it is mandated for inclusion by the challenged statutes.

Further, even if not yet enforceable, the matter of whether the prohibition would be preempted presents a legal question for which there is no reason to wait until after the Code amendments are adopted; what is true about the issue of preemption today will be true when those amendments are adopted in the near future.

For the above reasons, the Court finds that it has subject-matter jurisdiction to consider Plaintiffs' preemption claim.

**B. Whether Plaintiffs Are Entitled to Judgment as a Matter of Law on Their Preemption Claim**

After careful consideration, the Court answers this question in the negative for the reasons stated in Defendants' memoranda of law and the Intervenor Defendants' memorandum of law. *See, supra*, Parts I.D.2 and 3 of this Decision and Order. To those reasons, the Court adds the following analysis.

The preemption provision of the EPCA states that, except as provided in certain other sections and "effective on the effective date of an energy conservation standard established or prescribed . . . for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless" it meets certain exceptions that are not applicable here. 42 U.S.C. § 6297(c).

Key terms within this section are explicitly defined elsewhere in the EPCA. "Energy" is defined as electricity

or fossil fuels. 42 U.S.C. § 6291(3). The term "energy efficiency" is defined as "the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with the test procedures under section 6293 of this title." 42 U.S.C. § 6291(5). Most relevant to Plaintiffs' argument, the term "energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4). The EPCA does not directly define the term "point of use." Section 6293, referenced in the above-stated definitions, indicates what test procedures are in effect with respect to covered products, and what the procedures are for amending or implementing new test procedures; the Secretary of the relevant federal agency is the one responsible for managing such procedures and amendments. 42 U.S.C. § 6293.

Plaintiffs argue that the EPCA preempts the challenged statutes because the prohibition on the installation of fossil-fuel equipment and systems in new buildings effectively means that the energy use of such equipment or systems will necessarily be zero (given that they cannot be installed or used at all), and therefore the prohibition represents an indirect attempt to regulate the energy use of covered products. In making this interpretation, Plaintiffs rely heavily on the Ninth Circuit's recent decision in *California Restaurant Assoc. v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Interpreting the applicability of the EPCA's preemption provision to a similar ordinance passed by the City of Berkeley that

prohibited the installation of natural gas infrastructure (such as fuel gas piping) in newly constructed buildings, a panel of the Ninth Circuit held that such ordinance was preempted based on its interpretation of the terms "energy use" and "point of use." *California Restaurant Assoc.*, 89 F.4th at 1101-02. Specifically, the panel stated that the EPCA defines "energy use" "as 'the quantity of energy directly consumed by a consumer product at point of use.' § 6291(4)." *Id.* The panel further stated that, "as a matter of ordinary meaning, 'point of use' means the 'place where something is used.' Oxford English Dictionary Online (2022)." *Id.* The panel, using these interpretations and operating under the premise that "the EPCA is concerned with the end-user's ability to use installed covered products at their intended final destinations," concluded that the ordinance was a regulation concerning energy use because the effect of the ordinance is to regulate the energy use of natural gas products in those new buildings to zero. *Id.*

However, as both Defendant and Judge Friedland's dissenting opinion in *California Restaurant Assoc.* point out, there are multiple reasons to be skeptical of the conclusions reached by the Ninth Circuit panel. The Court agrees with Judge Friedland's reasoning, as well as with that of a recent decision from the Southern District of New York, *Ass'n of Contr. Plumbers of the City of New York, Inc. v. City of New York*, 23-CV-11292, 2025 U.S. Dist. LEXIS 49465, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025), in which that court assessed whether the EPCA preempted a law enacted by the City of New York that "generally prohibits the use of fossil fuels such as natural gas and heating fuel

in newly constructed residential buildings in New York City," and found that it did not because such regulation did not concern the energy use of a covered product. (Dkt. No. 61, Attach. 1, at 2.) Recognizing the flaws in the Ninth Circuit panel's reasoning, the Court declines to follow *California Restaurant Assoc.*, and instead is persuaded by the more reasoned analysis outlined in the dissent opinion for *California Restaurant Assoc.*, and in *Ass'n of Contracting Plumbers of the City of New York, Inc.*, and adopts that analysis here. Given the thorough analysis of preemption, the history and purpose of the EPCA, and how the terms "energy use" and "point of use" should be interpreted and applied related to laws that are highly similar to the ones involved in this litigation in both Judge Friedland's dissent and in *Ass'n of Contracting Plumbers of the City of New York, Inc.*, the Court will not reiterate all those points here in any detail. For those reasons, the Court rejects Plaintiffs' argument that the challenged statutes are regulations concerning energy use.

Plaintiffs expend a great many words arguing that the use of "concerning" in the EPCA preemption section means preemption applies to the challenged statutes. However, even adopting the broad meaning of "concerning" that Plaintiffs assert as covering "not only its subject but also matters related to that subject," the word "concerning" does not alter the Court's conclusion. (Dkt. No. 37, Attach. 1, at 13.) As even Plaintiffs acknowledge, Congress' use of the word "concerning" does not create a limitless preemption; the regulation at issue must still relate to or be about or regarding the "energy use" of a covered product for preemption to apply. (Dkt. No. 54, at 14-15.) Based on the definition of "energy use" contained

in the EPCA (which has been interpreted as explained above), the challenged statutes neither directly regulate energy use of any covered equipment, nor do they in any way concern the energy use of a covered product - rather, they merely prohibit the installation of *any* fossil-fuel equipment or system in new buildings, regardless of the energy use of such equipment or systems. This argument, like most of the arguments that Plaintiffs advance, suffers from the flaw that it is based upon Plaintiffs' own definition of "energy use," which is not the definition that is used in the EPCA and not the definition that this Court is now applying.

Plaintiffs further argue that relevant interpretation of "energy use" is irreconcilable with one of the exceptions included in Section 6297(f) related to building codes. Plaintiffs assert that

> Suppose a building code sets a maximum-building-wide energy consumption. § 6297(f)(3), that is calculated by adding up all the appliances' off-the-rack, lab-tested "estimated energy use" values, § 6297(f)(3)(G). So long as no appliance is required to exceed federal standards, § 6297(f)(3)(B), such a building code could qualify for the exemption. . . . But if the Secretary were right, the regulation would not be preempted in the first place because it does not change the lab-tested value for any appliance's energy use. That would make the building code exemption superfluous.

(Dkt. No. 54, at 13-14.)

This argument has no merit. The relevant exception makes clear that it is applicable in situations where the underlying building code regulation is one concerning energy efficiency or energy use, as such regulations are typically preempted. 42 U.S.C. § 6297(f)(3). Contrary to Plaintiffs' assertion, the hypothetical regulation outlined above would be clearly preempted even when applying the interpretation of "energy use" adopted here by the Court because it explicitly sets a maximum building-wide energy consumption limit, and therefore would be an indirect regulation concerning the energy use of the covered products that could be used in that building. Because the Court's interpretation does not preclude situations in which this exception could be found applicable to an otherwise preempted building code regulation, it does not render this exception superfluous as Plaintiffs attempt to argue.

Plaintiffs also argue that the Court's interpretation would conflict with the waiver provision in Section 6297, because it would result in the unavailability of certain fossil-fuel products in New York. However, the fact that the challenged statutes could decrease the availability of certain covered products in New York is irrelevant because, although burdens on manufacturers or others and availability of products are criteria the Secretary considers when determining whether to grant a waiver of preemption, New York does not need to show that it qualifies for a waiver from EPCA preemption, or that its regulation is consistent with the goals of the EPCA, because the Court has already found that the challenged statutes are simply not preempted. Because the statutes

here do not concern the energy use of covered products, they are outside the scope of the EPCA's preemption, and therefore the EPCA has nothing to say about what they can regulate, even if those regulations happen to impact the availability to New York consumers of certain covered products.

The Court notes that, like many of Plaintiffs' arguments, their assertion that the Court's interpretation would conflict with the waiver provision is based, at least in part, on the Ninth Circuit panel's interpretations in *California Restaurant Assoc.*, which this Court has declined to adopt. The Court notes in particular the panel's statement that the fact that the waiver petition process includes considering "the complete lifecycle of an appliance-from manufacturing to servicing" was persuasive evidence that preemption itself was not limited to only a measurement at "the factory floor." (Dkt. No. 54, at 18.) This is simply not a logical interpretation of the EPCA, under the circumstances. The fact that a validly preempted state regulation concerning energy efficiency or energy use as the Court has here interpreted the term "energy use" might have downstream effects on the marketing, distribution, sale, or servicing of certain covered products would not mean that "energy use" itself must be defined as how much energy a specific product actually uses at any given time in a real-world location. As already discussed, the Court disagrees with the panel's interpretations of both the statutory definition of "energy use" and the term "point of use," which is not explicitly defined in the statute, and it was the panel's interpretation of both of those terms that led to its understanding of energy use

as being a real-world, ever-changing measurement as opposed to a static assessment of the typical quantity of energy consumed by such a product. The panel uses the waiver provision as more evidence that its interpretation is correct, but there is simply no connection between what the Secretary is made to consider when assessing whether to grant a waiver for a regulation that is preempted and what actually renders a regulation preempted in the first place. If a provision is preempted, Congress can permit the Secretary to consider whatever factors it chooses when determining whether to grant a waiver. That such factors include a consideration of whether the preempted regulation would burden downstream activities such as marketing, distribution, sales, and servicing does not mean that those activities have anything to do with whether preemption is warranted in the first place. The language of the waiver provision does not change the fact that the panel ignored the portion of the definition of "energy use" that specifies the quantity of energy directly consumed must be determined in accordance with the relevant test procedures, or that it adopted a dictionary definition of "point of use" that was clearly contrary to the technical nature of the statute without explaining why it was rejecting the relevant technical definition discussed in detail by Judge Friedland. The panel's use of selected wording from the waiver provision to bolster its deficient interpretations is simply not persuasive. For these reasons, the Court finds no conflict between its interpretation of the relevant terms and the waiver provision.

Because the Court finds that the EPCA does not preempt the prohibition on fossil-fuel equipment and

systems in new buildings mandated by N.Y. Energy L. § 11-104(6)-(8) and N.Y. Exec. L. § 378(19), Plaintiffs' motion for summary judgment (seeking a declaratory judgment and permanent injunction) is denied.

Further, because the Court is considering *sua sponte* entering summary judgment against Plaintiffs under Fed. R. Civ. P. 56(f)(1) regarding the preemption issue that they raise in their motion, Plaintiffs are hereby respectfully given notice of that fact, and granted twenty-one (21) days from the entry of this Decision and Order by which to respond. If Plaintiffs do not provide a persuasive reason for not doing so, the Court will subsequently issue a Text Order entering judgment as a matter of law in Defendant's favor and dismissing Plaintiff's Complaint.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 38) is **DENIED**; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment (Dkt. No. 37) is **DENIED**; and it is further

**ORDERED** that Plaintiffs have **TWENTY-ONE (21)** days to show cause as to why the Court should not grant judgment as a matter of law to Defendant on the sole claim of preemption and dismiss Plaintiffs' Complaint.

Dated: July 23, 2025
Syracuse, New York

/s/ Glenn T. Suddaby
Glenn T. Suddaby
U.S. District Judge

**APPENDIX D — OPINION AND ORDER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, FILED MARCH 18, 2025**

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

23-CV-11292 (RA)

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.; PLUMBING-HEATING COOLING CONTRACTORS-NATIONAL ASSOCIATION; PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA; NEW YORK STATE ENERGY COALITION, INC.; THE PLUMBING FOUNDATION CITY OF NEW YORK, INC.; LICENSED PLUMBING ASSOCIATION NEW YORK CITY, INC., d/b/a MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; and BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC.,

*Plaintiffs,*

v.

CITY OF NEW YORK,

*Defendant.*

March 18, 2025, Decided; March 18, 2025, Filed

*Appendix D*

RONNIE ABRAMS, United States District Judge.

## OPINION & ORDER

Plaintiffs, a group of trade associations and a union whose members work in the construction, delivery, and servicing of fuel gas systems and appliances, bring this action against the City of New York, asserting that Local Law 154 of 2021, also known as the New York City Building Electrification Law, is preempted by the Energy Policy Conservation Act of 1975 ("EPCA"), *see* 42 U.S.C. §§ 6201-6422, and seeking a declaratory judgment and permanent injunction to that effect. Before the Court is Defendant's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion is granted.

## BACKGROUND[1]

On December 22, 2021, the City of New York enacted Local Law 154 of 2021 ("Local Law 154" or the "Law"), which generally prohibits the use of fossil fuels such as natural gas and heating fuel in newly constructed residential buildings in New York City. The City enacted the law as part of an effort to "meet [New York City's] carbon-neutrality goals, improve air quality, and create a city that is cleaner and greener." *Hearing on Intro. 2317-2021-A Before the N.Y. City Council Comm. on Env't*

1. The Court draws the following facts from the Complaint, accepting all "well-pleaded factual allegations" as true, as it must, for purposes of deciding a motion to dismiss. *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020).

*Protection* , Nov. 17, 2021 (Testimony of the Mayor's Office). It provides that "[n]o person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy, as determined by the United States [E]nergy [I]nformation [A]dministration," within buildings it covers. N.Y.C. Admin. Code § 24-177.1.[2] This category of substances includes all home and business fuel sources measured by the United States Energy Information Administration, *see Carbon Dioxide Emissions Coefficients*, U.S. Energy Info. Admin. (Sept. 18, 2024), https://www.eia.gov/environment/emissions/co2_vol_mass.php; Compl. ¶ 38-39, several of which are commonly used for home heating, cooking, and hot water, Compl. ¶ 3. After the Law's effective date, the Commissioner of the Department of Buildings may not approve a construction application for any non-compliant new building, although older buildings are exempted. N.Y.C. Admin. Code § 28-506.1.[3]

---

2. The Law provides an exception for, among other things, buildings where the combustion of prohibited substances is "necessary for a manufacturing use or purpose, or for the operation of a laboratory, laundromat, hospital, crematorium, commercial kitchen . . ., or where used for emergency or standby power, or other use allowed by rule of the [D]epartment [of Buildings], to the extent necessary for, and in the space occupied by such use or purpose." N.Y.C. Admin. Code § 28-506.1.

3. The Law took effect on January 1, 2024 for most new buildings of less than seven stories, and will take effect on July 2, 2027 for most new buildings of seven or more stories. N.Y.C. Admin. Code § 28-506.1.

*Appendix D*

Plaintiffs are six trade associations and a union whose members work in the construction, delivery, and servicing of fuel gas systems and appliances, and who rely on the availability of such systems for their livelihoods. Compl. ¶ 4. The Association of Contracting Plumbers of the City of New York, Inc. is a nonprofit trade association that represents union-affiliated licensed master plumbers in the City of New York. Compl. ¶ 11. The Plumbing-Heating-Cooling Contractors—National Association is a nonprofit trade association that represents the interests of plumbing and heating, ventilation, and air conditioning ("HVAC") contractors across the United States, *id.* ¶ 13, including approximately 212 plumbing and HVAC contractors in New York state, *id.* ¶ 14. The New York State Energy Coalition, Inc. is a nonprofit trade organization whose members include businesses in the heating oil industry. *Id.* ¶ 18. The Plumbing Foundation City of New York, Inc. is a nonprofit trade association whose members comprise approximately 195 union and non-union New York City licensed master plumbers. *Id.* ¶ 20. The Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York is a nonprofit trade association whose membership comprises licensed master plumbers and their affiliates in New York City. *Id.* ¶ 22. Building Industry Association of New York City, Inc. is a not-for-profit corporation whose members comprise builders, developers, architects, and related trades engaged primarily in the construction of one- and two-family houses and similar buildings in New York City. *Id.* ¶ 24. Finally, Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States

and Canada, is a labor union that represents the employees of New York City licensed plumbing contractors. *Id.* ¶ 16.

Plaintiffs assert that Local Law 154 is expressly preempted by EPCA, which prescribes energy conservation standards for various consumer and industrial products identified therein ("covered products"). The City has moved to dismiss the complaint, arguing that EPCA's preemption clause does not reach Local Law 154. *See* ECF No. 20 ("Mot."). Plaintiffs opposed the motion, *see* ECF No. 41 ("Opp'n"), and the City filed a reply, *see* ECF No. 43. The Court has received amicus curiae submissions from the Natural Resources Defense Council, *see* ECF No. 29-1, and WE ACT for Environmental Justice and the New York Geothermal Energy Organization, *see* ECF No. 47-1. The Court heard oral argument on the motion to dismiss on March 13, 2025.

## LEGAL STANDARDS

### I. Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "Threadbare recitals of the elements of a cause of action,"

which are "supported by mere conclusory statements, do not suffice." *Id.* In deciding a motion to dismiss, the Court construes "the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), although the court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555.[4]

## II. Preemption

The Supremacy Clause of the U.S. Constitution provides that the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Thus, state laws that interfere with, or are contrary to, federal law must be invalidated." *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 101 (2d Cir. 2009). "There are three types of preemption:" express, field, and conflict preemption. *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 428 (2d Cir. 2024). In this action, Plaintiffs contend that EPCA expressly preempts Local Law 154 .

"Preemption is a matter of statutory interpretation," and thus the Court must "ascertain the intent of Congress."

4. Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

*Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023). Accordingly, "[a]s with any question of statutory interpretation," the Court must "begin with the text of the statute," *Catskill Mts. Chptr. of Trout Unlimited, Inc. v. United States EPA*, 846 F.3d 492, 512 (2d Cir. 2017), and "move on, as need be, to the structure and purpose of the Act in which it occurs," *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). If "the statute's language is plain," then that is "where the inquiry should end." *Commonwealth Of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125, 136 S. Ct. 1938, 195 L. Ed. 2d 298 (2016).

The Court, "do[es] not invoke any presumption against pre-emption when a statute contains an express-preemption clause." *Buono*, 78 F.4th at 495. However, "if a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Id.* at 495-96. Thus, in interpreting a preemption clause, a court must "identify the domain expressly pre-empted." *Id.* at 496.

## DISCUSSION

This case turns on the scope of EPCA's preemption clause, which provides as follows:

> "[O]n the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the

> energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product."

42 U.S.C. § 6297(c).[5] Plaintiffs contend that this provision preempts Local Law 154 because the latter "concern[s]" the "energy use" of covered products, in that it "ban[s] an appliance from using any energy[,] . . . thus setting its maximum energy use to zero." Opp'n at 1. For the reasons that follow, the Court disagrees and concludes that EPCA's preemption clause does not apply. Plaintiffs have therefore failed to state a claim upon which relief can be granted.

## I. The Energy Policy Conservation Act

Congress enacted EPCA in 1975, "in the aftermath of the oil embargo imposed against the United States in 1973 and 1974 by certain petroleum-producing countries." *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364, 247 U.S. App. D.C. 340 (D.C. Cir. 1985). "EPCA was designed, in part, to reduce the United States' domestic energy consumption through the operation of specific voluntary and mandatory energy conservation

---

5. This provision pertains to consumer products, as opposed to industrial equipment. *See* 42 U.S.C. § 6292. However, EPCA also preempts state and local regulations "concerning the energy efficiency or energy use" of industrial equipment for which federal standards are prescribed. *See* 42 U.S.C. § 6316(b)(2)(A). Because the two preemption provisions function in the same manner, the Court considers them together. For simplicity, all citations are to the provisions governing consumer products unless otherwise noted.

programs." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498-99 (9th Cir. 2005). Initially, Congress pursued this goal by requiring manufacturers to label their appliances with measures of energy efficiency and energy use, as it "believed that better informed consumers and voluntary efforts by manufacturers would make energy efficiency standards unnecessary." *Id.* at 499.

"A few years later, Congress took EPCA a step further, establishing a nationwide conservation program for consumer appliances." *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1120 (9th Cir. 2024) (Friedland, J., dissenting from denial of rehearing en banc). The National Energy Conservation and Policy Act, Pub. L. No. 95-619, 92 Stat. 3206 (1978), "created a nationwide conservation program for appliances and required the [Department of Energy] to prescribe minimum energy efficiency standards for thirteen covered products," *Air Conditioning*, 410 F.3d at 499, such as kitchen ranges and ovens, clothes dryers, and furnaces, *Herrington*, 768 F.2d at 1362 n.1. The Department of Energy largely failed to prescribe such standards, however, and instead granted waivers that allowed states to establish their own standards. *Air Conditioning*, 410 F.3d at 499. This resulted in a "growing patchwork of differing State regulations" that complicated the "design, production, and marketing" of appliances. *Id.* at 500 (quoting S. Rep. No. 100-6, at 4 (1987)).

"Frustrated by the lack of uniformity, manufacturer trade associations negotiated with the Natural Resources

Defense Council to establish uniform national standards that would ease the burden on manufacturers while promoting energy conservation." *California Rest. Ass'n*, 89 F.4th at 1120 (Friedland, J.). Congress adopted those standards into the National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, 101 Stat. 103 (1987), which established federal energy efficiency standards for residential appliances and amended EPCA's preemption clause to "counteract the systems of separate state appliance standards." *Air Conditioning*, 410 F.3d at 499-500.

Thus, in its current iteration, EPCA requires that covered products meet statutorily and/or administratively prescribed energy conservation standards. *See* 42 U.S.C. §§ 6295, 6313. In general, before a manufacturer may distribute a covered product in commerce, it must (1) perform test procedures on the product, *see generally*, 42 U.S.C. §§ 6293, 6314; 10 C.F.R. §§ 430-31; (2) certify to the Department of Energy that the product meets the applicable energy conservation standard, *see* 10 C.F.R. § 429.12, i.e., a "performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" or a "design requirement" for the product, 42 U.S.C. § 6291(6); and (3) include on the product a label containing the energy efficiency and energy use information required by applicable regulations, *see* 42 U.S.C. §§ 6294, 6315; *see also, e.g.*, 16 C.F.R. § 305.17.

**II. Express Preemption under EPCA**

As relevant here, EPCA preempts state regulations "concerning the . . . energy use" of covered products. 42 U.S.C. § 6297(c). Accordingly, the Court must determine (1) the meaning of "energy use;" and (2) whether Local Law 154 "concern[s]" energy use within the meaning of EPCA. The City contends that "energy use" refers to a fixed value—determined through premarket testing—that is used to measure a product's compliance with energy conservation standards. Thus, the City argues, EPCA's preemption clause reaches only state regulations that "directly or indirectly establish energy conservation standards." Mot. at 12. Plaintiffs respond, first, that "energy use" includes the actual ability of covered products to consume energy, and second, that Local Law 154 sets fossil-fuel-powered appliances' maximum energy use to zero by prohibiting them from using any energy. *See* Opp'n at 1. Accordingly, they argue that Local Law 154 "concern[s]" the energy use of covered products, and that the City is prohibited from "doing indirectly what Congress says [it] can't do directly." *Id.*; *see also id.* at 19-20. Although Plaintiffs are generally correct that a state may not indirectly regulate subject matter that it is preempted from directly regulating, *see, e.g, Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 371-73, 128 S. Ct. 989, 169 L. Ed. 2d 933 (2008); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 385-86, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992), the Court concludes that EPCA does not preempt Local Law 154 because it does not concern energy use as EPCA defines that term.

*Appendix D*

**A. The Meaning of "Energy Use"**

"When a statute includes an explicit definition of a term," a court "must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 593 U.S. 374, 387, 141 S. Ct. 1648, 210 L. Ed. 2d 26 (2021). EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4).[6] Section 6293 requires that such test procedures be "reasonably designed to produce test results which measure [the] . . . energy use . . . of a covered product during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3). Considered together, these provisions indicate that "energy use" is a fixed value, determined using administratively prescribed testing procedures, *see* 10 C.F.R. § 429.13, that represents the amount of energy a product consumes under typical conditions.

The Court therefore declines to adopt the interpretation of "energy use" employed by the Ninth Circuit in *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), which, in this Court's view, rested on a flawed reading of the term "point of use." In that case, which involved a challenge to a municipal regulation prohibiting the installation of natural gas piping within newly constructed buildings, the court interpreted "point of use" to mean

6. EPCA uses a substantively identical definition of "energy use" for provisions pertaining to industrial equipment. *See* 42 U.S.C. § 6311(4).

the "place where something is used." *Id.* at 1101. Based on that interpretation, the court concluded that "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations." *Id.* at 1102. But as Judge Friedland persuasively explained in dissent, "EPCA is a technical statute," and thus "key terms" must be interpreted in accordance with their "specialized meanings." *Id.* at 1121 (Friedland, J.). "Point of use" is one such term; it means only that a covered product's energy use—when determined in accordance with prescribed test procedures—should be measured "without adjustment for any energy loss in the generation, transmission, and distribution of that energy." *Energy Intensity Indicators: Terminology and Definitions*, U.S. Dep't of Energy, https://www.energy.gov/eere/analysis/energy-intensity-indicators-terminology-and-definitions. *See also, California Rest. Ass'n*, 89 F.4th at 1123-25 (Friedland, J.) (discussing technical definition of "point of use"). It does not, however, expand EPCA's scope to reach the actual use of covered products, nor does it grant consumers an absolute right to use such products. Rather, it fits neatly into the statutory definition of "energy use," which refers to a covered product's characteristics as manufactured.

This conclusion finds support in EPCA's structure, as well as in the context of its implementing regulations, which are incompatible with Plaintiffs' interpretation of "energy use." First, the energy conservation standard applicable to a covered product sets either a maximum energy use or a minimum energy efficiency, *see id.* § 6291(6), the latter of which is calculated based on the

product's energy use, *see* 42 U.S.C. § 6291(5) ("'Energy efficiency' means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title."). A covered product may not enter commerce if it does not meet these standards. *See* 10 C.F.R. § 429.12. If, as Plaintiffs contend, "energy use" refers to the amount of energy a product actually consumes in the hands of a consumer, then this rule would be impossible to implement. Second, and relatedly, EPCA "permits [the Department of Energy] to require that manufacturers submit information or reports with respect to the energy use of covered products to demonstrate their compliance with EPCA's standards and to facilitate DOE's administration of the statute." *California Rest. Ass'n*, 89 F.4th at 1122-23 (Friedland, J.) (citing 42 U.S.C. § 6296(d)(1)). "This provision does not require manufacturers to somehow monitor consumers' use of appliances after installation." *Id.* at 1123. Third, energy use and energy efficiency information are used to populate blank fields on a standardized label, *see, e.g.*, 16 C.F.R. § 305.17(a)(9) (requiring that labels for water heaters contain the text: "Estimated yearly energy use: [kWh or therms]"), which must be affixed to a product *before* it enters commerce, *see generally* 42 U.S.C. § 6294. In sum, none of these applications of "energy use" would function effectively if that term accounted for the quantity of energy actually used by covered products in the hands of consumers.

Accordingly, considering EPCA's text, structure, and context, the Court concludes that "energy use" refers to a predetermined fixed value that measures the characteristics of a covered product as manufactured.

**B. Local Law 154 Does Not Concern Energy Use**

With the statutory definition of "energy use" in mind, the Court next considers whether Local Law 154 "concern[s] . . . energy use" such that it is preempted by EPCA. 42 U.S.C. § 6297(c). As an initial matter, it notes that the binding authority addressing express preemption of indirect state regulation largely involves federal statutes preempting state laws that "relate to" the subject matter of the federal statute. *See, e.g., Rowe*, 552 U.S. at 368; *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252, 124 S. Ct. 1756, 158 L. Ed. 2d 529 (2004); *Morales*, 504 U.S. at 378-79; *Metro. Taxicab*, 615 F.3d at 156. The Supreme Court has described the phrase "related to" as "express[ing] a broad pre-emptive purpose," *Morales*, 504 U.S. at 383, that "reach[es] any subject that has a connection with, or reference to, the topics the statute enumerates," *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 96, 137 S. Ct. 1190, 197 L. Ed. 2d 572 (2017). By contrast, here, EPCA preempts state regulations "*concerning* the . . .energy use" of covered products. 42 U.S.C. § 6297(c) (emphasis added). "As with any preemption provision," the Court must "construe [EPCA] fairly but narrowly, mindful in the appropriate case that each phrase within the provision limits the universe of state action pre-empted by the statute." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 445 (2d Cir. 2015). The Supreme Court has, in some instances, suggested that "concerning" and "related to" carry the same meaning, *see, e.g, Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 717, 138 S. Ct. 1752, 201 L. Ed. 2d 102 (2018) ("The Court finds no basis to conclude, however, at least in this [non-preemption]

context, that 'related to' has a materially different meaning than 'about,' 'concerning,' 'with reference to,' and 'as regards.'"); *Morales*, 504 U.S. at 383 (defining "related to" as, among other things, "to have bearing or concern"), and the parties urge the Court to adopt that interpretation here. However, both the Second Circuit and the Supreme Court have also suggested that, at least in the context of preemption, the word "concerning" is analogous to the term "with respect to," both of which convey a "preemptive scope" that is "narrower than the broad form of 'relating to' preemption." *Galper*, 802 F.3d at 446, 447 n.8; *see also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261, 133 S. Ct. 1769, 185 L. Ed. 2d 909 (2013) (using "concern" and "with respect to" interchangeably, and noting that "the addition of the words 'with respect to the transportation of property' . . . massively limits the scope of preemption"). Congress may therefore have intended EPCA to have a narrower preemptive scope than statutes that use "related to."

The Court need not rely on this interpretive distinction, however, because Local Law 154 does not "relate to" the subject matter of EPCA any more than it "concern[s]" it. A state regulation "relates to" preempted subject matter if it has a (1) "connection with;" or (2) "reference to" that subject matter. *Morales*, 504 U.S. at 384. "[T]o determine whether a state law has the forbidden connection," a court must "look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law" on the subject matter of the federal statute. *California Div. of Lab. Standards*

*Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325, 117 S. Ct. 832, 136 L. Ed. 2d 791 (1997). Relatedly, "[w]here a State's law acts immediately and exclusively upon" the subject matter of the federal statute, "or where the existence of [that subject matter] is essential to the law's operation, . . . that 'reference' will result in pre-emption." *Id.* In conducting this analysis, the Court is mindful that, although the words "related to" have an "expansive sweep," *Morales*, 504 U.S. at 384, that breadth "does not mean the sky is the limit," *Dan's City*, 569 U.S. at 260.

As discussed above, with respect to the statutory scheme at issue here, EPCA sets energy conservation standards for covered products and requires that they be tested for compliance with such standards and labeled accordingly. A covered product's "energy use" is a component of that scheme; it represents the amount of energy a covered product consumes under typical conditions. Once a federal energy conservation standard takes effect for a covered product, state regulations concerning the product's energy efficiency or energy use—the bases upon which energy conservation standards are determined, *see* 42 U.S.C. § 6291(6)—are preempted. Moreover, Section 6297(c) is titled "General rule of preemption for energy conservation standards when Federal standard becomes effective for product," which suggests that Congress intended to preempt state regulations that act as energy conservation standards, i.e., requirements that bear on the performance of a product as manufactured. *See Yates v. United States*, 574 U.S. 528, 552, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015) (Alito, J., concurring) ("Titles can be useful devices to resolve doubt

about the meaning of a statute[,] . . . especially [where they] reinforce[] what the text's nouns and verbs independently suggest."). EPCA's text and structure thus make clear that its objective is "the establishment of national energy conservation standards for major residential appliances," S. Rep. 100-6, at 2 (1987), to "avoid the burdens of a patchwork of conflicting and unpredictable State regulations," *id.* at 12. The preemption clause ensures that state regulations do not frustrate that purpose.

Local Law 154 does not have a connection with EPCA's subject matter because it does not "focus[] on" the performance standards applicable to covered products. *Rowe*, 552 U.S. at 371. Indeed, the Law does not draw any distinction between products based on their energy efficiency or energy use as manufactured. It instead regulates, indirectly, the type of fuel that a covered product may consume in certain settings, irrespective of that product's energy efficiency or use. Regulations prohibiting the use of certain types of fuels and appliances in residential, commercial, and industrial settings are integral to municipal construction and fire codes. *See, e.g.*, N.Y.C. Admin. Code, Fuel Gas Code § 623.1.1 (prohibiting cooking appliances from using liquefied petroleum gas); *id.*, Mechanical Code § 922.1 (prohibiting the installation of kerosene and oil-fired stoves); *id.* § 918.1 (prohibiting unvented fuel-fired furnaces); *id.*, Fire Code § 313.3 (prohibiting the indoor use of kerosene space heaters); *id.*, Mechanical Code § 917.2 (prohibiting the installation of commercial cooking appliances in domestic dwelling units). Were Plaintiffs correct about the scope of EPCA, these vital safety regulations would likewise be preempted—

an absurd result that the Court must avoid. *See Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007). For example, if EPCA preempts a regulation effectively banning the use of fossil fuel powered appliances in a subset of new residential buildings, then by the same logic it might preempt a regulation that effectively prohibits the use of such appliances in close proximity to gas station pumps, *see, e.g.*, N.Y.C. Admin. Code, Fire Code § 2304.1.1, or in "sleeping rooms, bathrooms, toilet rooms, storage closets or surgical rooms," *see id.*, Fuel Gas Code § 303.3. Nothing in EPCA's text, structure, or legislative history suggests that Congress did not expect such regulations to survive preemption. To the contrary, regulations of that sort are "peculiarly within the province of state and local legislative authorities," and thus it is "hardly doubtful that [they] . . . fall[] outside the preemptive sweep" of EPCA. *Dan's City*, 569 U.S. at 264.

Nor does Local Law 154 have a "significant impact" on "Congress' deregulatory and pre-emption-related objectives," *Rowe*, 552 U.S. at 371, which in EPCA focus on eliminating the "burdens" imposed on manufacturers by "a patchwork of conflicting and unpredictable State regulations." S. Rep. 100-6, at 12, (1987). Unlike "differing State regulations," which "complicate [manufacturers'] design, production and marketing plans," *id.* at 4, state laws like Local Law 154 do not risk creating a patchwork of conflicting standards because they neither require anything of manufacturers nor constrain their activities, *see Dan's City*, 569 U.S. at 263-64. Manufacturers may see reduced demand for certain products as a result of the Law, but they remain subject to a single, nationally

uniform set of energy conservation standards. Local Law 154 is therefore "not the kind of burdensome state . . . regulation Congress sought to preempt." *Id.* at 264.

Further, as discussed, the Law affects the type of fuel that covered products may use in certain settings, not the performance standards applicable to covered products, and thus it neither "acts immediately and exclusively upon" EPCA's regime of uniform national standards, nor makes "the existence of" such standards "essential to [its] operation." *Dillingham*, 519 U.S. at 325. Plaintiffs' reliance on *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152 (2d Cir. 2010), is therefore misplaced. That case involved City rules that favored hybrid and clean diesel taxis and penalized non-hybrid, non-clean diesel taxis. *Id.* at 155. Interpreting a provision of EPCA that preempts state laws "related to fuel economy standards," *see* 49 U.S.C. § 32919(a), the Second Circuit held that the City rules "reference[d]" fuel economy standards because the rules' distinction between hybrid and non-hybrid vehicles was "equivalen[t]" to distinguishing between "vehicles with greater or lesser fuel efficiency." *Id.* at 157. Here, by contrast, prohibiting certain fuel types in certain settings does not impose performance standards by proxy. Indeed, "some gas appliances are more efficient than electric appliances, so [the Law] may have the indirect effect of *increasing* energy consumption in new buildings in some circumstances." *California Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J.) (citing 10 C.F.R. § 430.32(e)(1)(ii) (setting a more stringent standard for gas furnaces than for electric furnaces)). Accordingly, Local Law 154 does not "reference" the subject matter of EPCA.

In sum, the Court concludes that Local Law 154 does not "relate to," and thus does not "concern," "energy use" within the meaning of EPCA.[7] It is therefore not preempted.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted. Because "an amended complaint could not cure the substantive deficiencies of these claims," the complaint is dismissed with prejudice. *Peralta v. New York City Dep't of Educ.*, No. 21-CV-6833, 2023 U.S. Dist. LEXIS 169529, 2023 WL 6201507, at *6 (E.D.N.Y. Sept. 22, 2023). The Clerk of Court is respectfully directed to terminate all pending motions and close this case.

SO ORDERED.

Dated: March 18, 2025
New York, New York

/s/ Ronnie Abrams
Ronnie Abrams
United States District Judge

---

7. To the extent those terms do not carry the same meaning, the Court interprets EPCA's use of "concerning" to indicate Congress's intent that the statute's preemptive reach be no greater than that of statutes that use "related to." *See Galper*, 802 F.3d at 446, 447 n.8.

## APPENDIX E — DENIAL OF REHEARING OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, DATED AUGUST 26, 2026

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

Docket No: 25-977

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 26th day of August, two thousand twenty-six.

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC., PLUMBING-HEATING-COOLING CONTRACTORS-NATIONAL ASSOCIATION, PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, NEW YORK STATE ENERGY COALITION, INC., PLUMBING FOUNDATION CITY OF NEW YORK, INC., LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., DBA MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK, BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC.,

*Plaintiffs-Appellants,*

v.

*Appendix E*

CITY OF NEW YORK,

*Defendant-Appellee.*

**ORDER**

Appellants filed a petition for rehearing *en banc*. The active members of the Court have considered the request for rehearing *en banc*.

IT IS HEREBY ORDERED that the petition is denied.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

/s/ Catherine O'Hagan Wolfe, Clerk

**APPENDIX F — DENIAL OF REHEARING OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, DATED AUGUST 26, 2026**

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

Docket No: 25-2041

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 26th day of August, two thousand twenty-six.

MULHERN GAS CO., INC., *et al.*,

*Plaintiffs-Appellants,*

v.

WALTER T. MOSLEY, IN HIS OFFICIAL CAPACITY AS NEW YORK SECRETARY OF STATE AND MEMBER OF THE STATE FIRE PREVENTION AND BUILDING CODE COUNCIL, FORMERLY KNOWN AS ROBERT J. RODRIGUEZ,

*Defendant-Appellee,*

NEW YORK GEOTHERMAL ENERGY ORGANIZATION, PUSH BUFFALO,

*Intervenor-Defendants-Appellees.*

*Appendix F*

**ORDER**

Appellants filed a petition for rehearing *en banc*. The active members of the Court have considered the request for rehearing *en banc*.

IT IS HEREBY ORDERED that the petition is denied.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

/s/ Catherine O'Hagan Wolfe, Clerk

## APPENDIX G — RELEVANT STATUTORY PROVISIONS

### FEDERAL STATUTES

### 42 U.S.C. §6291

**§6291. Definitions**

For purposes of this part:

(1) The term "consumer product" means any article (other than an automobile, as defined in section 32901(a)(3) of title 49) of a type—

(A) which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and

(B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals;

without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual, except that such term includes fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, showerheads, faucets, water closets, and urinals distributed in commerce for personal or commercial use or consumption.

(2) The term "covered product" means a consumer product of a type specified in section 6292 of this title.

(3) The term “energy” means electricity, or fossil fuels. The Secretary may, by rule, include other fuels within the meaning of the term “energy” if he determines that such inclusion is necessary or appropriate to carry out the purposes of this chapter.

(4) The term “energy use” means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title.

(5) The term “energy efficiency” means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title.

(6) The term “energy conservation standard” means—

(A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or, in the case of showerheads, faucets, water closets, and urinals, water use, for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title; or

(B) a design requirement for the products specified in paragraphs (6), (7), (8), (10), (15), (16), (17), and (20) of section 6292(a) of this title; and

includes any other requirements which the Secretary may prescribe under section 6295(r) of this title.

(7) The term "estimated annual operating cost" means the aggregate retail cost of the energy which is likely to be consumed annually, and in the case of showerheads, faucets, water closets, and urinals, the aggregate retail cost of water and wastewater treatment services likely to be incurred annually, in representative use of a consumer product, determined in accordance with section 6293 of this title.

(8) The term "measure of energy consumption" means energy use, energy efficiency, estimated annual operating cost, or other measure of energy consumption.

(9) The term "class of covered products" means a group of covered products, the functions or intended uses of which are similar (as determined by the Secretary).

[…]

*Appendix G*

**42 U.S.C. §6292**

**§6292. Coverage**

**(a) In general**

The following consumer products, excluding those consumer products designed solely for use in recreational vehicles and other mobile equipment, are covered products:

(1) Refrigerators, refrigerator-freezers, and freezers which can be operated by alternating current electricity, excluding—

(A) any type designed to be used without doors; and

(B) any type which does not include a compressor and condenser unit as an integral part of the cabinet assembly.

(2) Room air conditioners.

(3) Central air conditioners and central air conditioning heat pumps.

(4) Water heaters.

(5) Furnaces.

(6) Dishwashers.

(7) Clothes washers.

(8) Clothes dryers.

(9) Direct heating equipment.

(10) Kitchen ranges and ovens.

(11) Pool heaters.

(12) Television sets.

(13) Fluorescent lamp ballasts.

(14) General service fluorescent lamps, general service incandescent lamps, and incandescent reflector lamps.

(15) Showerheads, except safety shower showerheads.

(16) Faucets.

(17) Water closets.

(18) Urinals.

(19) Metal halide lamp fixtures.

(20) Any other type of consumer product which the Secretary classifies as a covered product under subsection (b).

**(b) Special classification of consumer product**

(1) The Secretary may classify a type of consumer product as a covered product if he determines that—

(A) classifying products of such type as covered products is necessary or appropriate to carry out the purposes of this chapter, and

(B) average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year.

(2) For purposes of this subsection:

(A) The term "average annual per-household energy use with respect to a type of product" means the estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type.

(B) The Btu equivalent of one kilowatt-hour is 3,412 British thermal units.

(C) The term "household" shall be defined under rules of the Secretary.

*Appendix G*

**42 U.S.C. §6293**

**§6293. Test procedures**

[…]

**(b) Amended and new procedures**

[…]

(3) Any test procedures prescribed or amended under this section shall be reasonably designed to produce test results which measure energy efficiency, energy use, water use (in the case of showerheads, faucets, water closets and urinals), or estimated annual operating cost of a covered product during a representative average use cycle or period of use, as determined by the Secretary, and shall not be unduly burdensome to conduct.

[…]

*Appendix G*

**42 U.S.C. §6295**

**§6295. Energy conservation standards**

[…]

**(l) Standards for other covered products**

(1) The Secretary may prescribe an energy conservation standard for any type (or class) of covered products of a type specified in paragraph (20) of section 6292(a) of this title if the requirements of subsections (*o*) and (p) are met and the Secretary determines that—

(A) the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt-hours (or its Btu equivalent) for any 12-month period ending before such determination;

(B) the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period;

(C) substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and

(D) the application of a labeling rule under section 6294 of this title to such type (or class) is not likely to

be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible and economically justified.

[…]

[…]

**(o) Criteria for prescribing new or amended standards**

(1) The Secretary may not prescribe any amended standard which increases the maximum allowable energy use, or, in the case of showerheads, faucets, water closets, or urinals, water use, or decreases the minimum required energy efficiency, of a covered product.

(2)(A) Any new or amended energy conservation standard prescribed by the Secretary under this section for any type (or class) of covered product shall be designed to achieve the maximum improvement in energy efficiency, or, in the case of showerheads, faucets, water closets, or urinals, water efficiency, which the Secretary determines is technologically feasible and economically justified.

(B)(i) In determining whether a standard is economically justified, the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the

benefits of the standard exceed its burdens by, to the greatest extent practicable, considering—

(I) the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard;

(II) the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;

(III) the total projected amount of energy, or as applicable, water, savings likely to result directly from the imposition of the standard;

(IV) any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;

(V) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

(VI) the need for national energy and water conservation; and

(VII) other factors the Secretary considers relevant.

(ii) For purposes of clause (i)(V), the Attorney General shall make a determination of the impact, if any, of any lessening of competition likely to result from such standard and shall transmit such determination, not later than 60 days after the publication of a proposed rule prescribing or amending an energy conservation standard, in writing to the Secretary, together with an analysis of the nature and extent of such impact. Any such determination and analysis shall be published by the Secretary in the Federal Register.

(iii) If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard level will be less than three times the value of the energy, and as applicable, water, savings during the first year that the consumer will receive as a result of the standard, as calculated under the applicable test procedure, there shall be a rebuttable presumption that such standard level is economically justified. A determination by the Secretary that such criterion is not met shall not be taken into consideration in the Secretary's determination of whether a standard is economically justified.

(3) The Secretary may not prescribe an amended or new standard under this section for a type (or class) of covered product if—

(A) for products other than dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens, a test procedure has not been prescribed

pursuant to section 6293 of this title with respect to that type (or class) of product; or

(B) the Secretary determines, by rule, that the establishment of such standard will not result in significant conservation of energy or, in the case of showerheads, faucets, water closets, or urinals, water, or that the establishment of such standard is not technologically feasible or economically justified.

For purposes of section 6297 of this title, a determination under subparagraph (B) with respect to any type (or class) of covered products shall have the same effect as would a standard prescribed for such type (or class).

(4) The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some types (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

[…]

[…]

**(q) Special rule for certain types or classes of products**

(1) A rule prescribing an energy conservation standard for a type (or class) of covered products shall specify a level of energy use or efficiency higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products which have the same function or intended use, if the Secretary determines that covered products within such group—

(A) consume a different kind of energy from that consumed by other covered products within such type (or class); or

(B) have a capacity or other performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard from that which applies (or will apply) to other products within such type (or class).

In making a determination under this paragraph concerning whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors as the utility to the consumer of such a feature, and such other factors as the Secretary deems appropriate.

(2) Any rule prescribing a higher or lower level of energy use or efficiency under paragraph (1) shall include an explanation of the basis on which such higher or lower level was established.

[…]

*Appendix G*

**42 U.S.C. §6297**

**§6297. Effect on other law**

**(a) Preemption of testing and labeling requirements**

(1) Effective on March 17, 1987, this part supersedes any State regulation insofar as such State regulation provides at any time for the disclosure of information with respect to any measure of energy consumption or water use of any covered product if—

(A) such State regulation requires testing or the use of any measure of energy consumption, water use, or energy descriptor in any manner other than that provided under section 6293 of this title; or

(B) such State regulation requires disclosure of information with respect to the energy use, energy efficiency, or water use of any covered product other than information required under section 6294 of this title.

(2) For purposes of this section, the following definitions apply:

(A) The term "State regulation" means a law, regulation, or other requirement of a State or its political subdivisions. With respect to showerheads, faucets, water closets, and urinals, such term shall also mean a law, regulation, or other requirement of a river basin commission that has jurisdiction within a State.

(B) The term "river basin commission" means—

(i) a commission established by interstate compact to apportion, store, regulate, or otherwise manage or coordinate the management of the waters of a river basin; and

(ii) a commission established under section 1962b(a) of this title.

**(b) General rule of preemption for energy conservation standards before Federal standard becomes effective for product**

Effective on March 17, 1987, and ending on the effective date of an energy conservation standard established under section 6295 of this title for any covered product, no State regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered product shall be effective with respect to such covered product, unless the State regulation or revision—

(1)(A) was prescribed or enacted before January 8, 1987, and is applicable to products before January 3, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent lamp ballasts, was prescribed or enacted before June 28, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent or incandescent lamps, flow rate requirements for showerheads or faucets, or water use requirements for water closets or urinals, was prescribed or enacted before October 24, 1992; or

(B) in the case of any portion of any regulation that establishes requirements for general service incandescent lamps, intermediate base incandescent lamps, or candelabra base lamps, was enacted or adopted by the State of California or Nevada before December 4, 2007, except that—

(i) the regulation adopted by the California Energy Commission with an effective date of January 1, 2008, shall only be effective until the effective date of the Federal standard for the applicable lamp category under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title; and

(ii) the States of California and Nevada may, at any time, modify or adopt a State standard for general service lamps to conform with Federal standards with effective dates no earlier than 12 months prior to the Federal effective dates prescribed under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title, at which time any prior regulations adopted by the State of California or Nevada shall no longer be effective.

(2) is a State procurement regulation described in subsection (e);

(3) is a regulation described in subsection (f)(1) or is prescribed or enacted in a building code for new construction described in subsection (f)(2);

(4) is a regulation prohibiting the use in pool heaters of a constant burning pilot, or is a regulation (or portion

thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable, or is a regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those to which section 6295(i) of this title is applicable, or is a regulation (or portion thereof) regulating showerheads or faucets other than those to which section 6295(j) of this title is applicable or regulating lavatory faucets (other than metering faucets) for installation in public places, or is a regulation (or portion thereof) regulating water closets or urinals other than those to which section 6295(k) of this title is applicable;

(5) is a regulation described in subsection (d)(5)(B) for which a waiver has been granted under subsection (d);

(6) is a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets; or

(7) is a regulation (or portion thereof) concerning the water efficiency or water use of low consumption flushometer valve water closets.

**(c) General rule of preemption for energy conservation standards when Federal standard becomes effective for product**

Except as provided in section 6295(b)(3)(A)(ii) of this title, subparagraphs (B) and (C) of section 6295(j)(3) of this title, and subparagraphs (B) and (C) of section 6295(k)(3) of this title and effective on the effective date of an energy conservation standard established in or prescribed under

section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation—

(1) is a regulation described in paragraph (2) or (4) of subsection (b), except that a State regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary under paragraph (7) of such section and is applicable to such ballasts, except that a State regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those for which section 6295(i) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary and is applicable to such lamps;

(2) is a regulation which has been granted a waiver under subsection (d);

(3) is in a building code for new construction described in subsection (f)(3);

(4) is a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992;

(5) is a regulation concerning the water use of lavatory or kitchen faucets adopted by the State of Rhode Island prior to October 24, 1992;

(6) is a regulation (or portion thereof) concerning the water efficiency or water use of gravity tank-type low consumption water closets for installation in public places, except that such a regulation shall be effective only until January 1, 1997; or

(7)(A) is a regulation concerning standards for commercial prerinse spray valves adopted by the California Energy Commission before January 1, 2005; or

(B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations with changes in American Society for Testing and Materials Standard F2324;

(8)(A) is a regulation concerning standards for pedestrian modules adopted by the California Energy Commission before January 1, 2005; or

(B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations to changes in the Institute for Transportation Engineers standards, entitled "Performance Specification: Pedestrian Traffic Control Signal Indications"; and

(9) is a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission on or before January 1, 2011, except that—

(A) if the Secretary fails to issue a final rule within 180 days after the deadlines for rulemakings in

section 6295(hh) of this title, notwithstanding any other provision of this section, preemption shall not apply to a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission—

(i) on or before July 1, 2015, if the Secretary fails to meet the deadline specified in section 6295 (hh)(2) of this title; or

(ii) on or before July 1, 2022, if the Secretary fails to meet the deadline specified in section 6295 (hh)(3) of this title.

**(d) Waiver of Federal preemption**

(1)(A) Any State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product for which there is a Federal energy conservation standard under section 6295 of this title may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.

(B) Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary finds (and publishes such finding) that the State or river basin commission has established by a preponderance of the evidence that

such State regulation is needed to meet unusual and compelling State or local energy or water interests.

(C) For purposes of this subsection, the term "unusual and compelling State or local energy or water interests" means interests which—

(i) are substantially different in nature or magnitude than those prevailing in the United States generally; and

(ii) are such that the costs, benefits, burdens, and reliability of energy or water savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy or water savings or production, including reliance on reasonably predictable market-induced improvements in efficiency of all products subject to the State regulation.

The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast, and, with respect to a State regulation for which a petition has been submitted to the Secretary which provides for any energy conservation standard or requirement with respect to water use of a covered product, within the context of the water supply and groundwater management plan, water quality program, and comprehensive plan (if any) of the State or river basin commission for improving, developing,

or conserving a waterway affected by water supply development.

(2) The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.

(3) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In determining whether to make such finding, the Secretary shall evaluate all relevant factors, including—

(A) the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;

(B) the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;

(C) the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class), taking into consideration the extent to which the regulation would result in a reduction—

(i) in the current models, or in the projected availability of models, that could be shipped on the effective date of the regulation to the State and within the United States; or

(ii) in the current or projected sales volume of the covered product type (or class) in the State and the United States; and

(D) the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have.

(4) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same

as those generally available in the State at the time of the Secretary's finding, except that the failure of some classes (or types) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a rule for other classes (or types).

(5) No final rule prescribed by the Secretary under this subsection may—

(A) permit any State regulation to become effective with respect to any covered product manufactured within three years after such rule is published in the Federal Register or within five years if the Secretary finds that such additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation; or

(B) become effective with respect to a covered product manufactured before the earliest possible effective date specified in section 6295 of this title for the initial amendment of the energy conservation standard established in such section for the covered product; except that such rule may become effective before such date if the Secretary finds (and publishes such finding) that, in addition to the other requirements of this subsection the State has established, by a preponderance of the evidence, that—

(i) there exists within the State an energy emergency condition or, if the State regulation provides for an energy conservation standard or

other requirement with respect to the water use of a covered product for which there is a Federal energy conservation standard under subsection (j) or (k) of section 6295 of this title, a water emergency condition, which—

(I) imperils the health, safety, and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of gas or electric energy or, in the case of a water emergency condition, water or wastewater treatment, to its residents at less than prohibitive costs; and

(II) cannot be substantially alleviated by the importation of energy or, in the case of a water emergency condition, by the importation of water, or by the use of interconnection agreements; and

(ii) the State regulation is necessary to alleviate substantially such condition.

(6) In any case in which a State is issued a rule under paragraph (1) with respect to a covered product and subsequently a Federal energy conservation standard concerning such product is amended pursuant to section 6295 of this title, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition

in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a preponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so withdrawn, the Secretary shall withdraw it.

**(e) Exception for certain State procurement standards**

Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such standards are more stringent than the corresponding Federal energy conservation standards.

**(f) Exception for certain building code requirements**

(1) A regulation or other requirement enacted or prescribed before January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product.

(2) A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code

for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product if the code does not require that the energy efficiency of such covered product exceed—

(A) the applicable minimum efficiency requirement in a national voluntary consensus standard; or

(B) the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of subsection (b)(1) or (b)(5),

whichever is higher.

(3) Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 6295 of this title, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

(B) The code does not require that the covered product have an energy efficiency exceeding the

applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the

efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

(4)(A) Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.

(B) If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 6295 of this title and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the building code shall not be applicable unless the Secretary has granted a waiver for such requirement under subsection (d).

**(g) No warranty**

Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.

*Appendix G*

## NEW YORK STATUTES

### N.Y. Energy §11-104

**§11-104. State energy conservation construction code**

In addition to meeting the purposes set forth in section 11-101 of this article, the code shall be designed to satisfy the following specific criteria:

[…]

6. (a) To the fullest extent feasible, the standards for construction of buildings in the code shall be designed to help achieve the state's clean energy and climate agenda, including but not limited to greenhouse gas reduction, set forth within chapter one hundred six of the laws of two thousand nineteen, also known as the New York state climate leadership and community protection act, and as further identified by the New York state climate action council established pursuant to section 75-0103 of the environmental conservation law.

(b) In addition to the foregoing, to support the goal of zero on-site greenhouse gas emissions and help achieve the state's clean energy and climate agenda, including but not limited to greenhouse gas reduction requirements set forth within chapter one hundred six of the laws of two thousand nineteen, also known as the New York state climate leadership and community protection act, the code shall prohibit the installation of fossil-fuel equipment and building systems, in any new building not more than seven stories in height, except

for a new commercial or industrial building greater than one hundred thousand square feet in conditioned floor area, on or after December thirty-first, two thousand twenty-five, and the code shall prohibit the installation of fossil-fuel equipment and building systems, in all new buildings after December thirty-first, two thousand twenty-eight.

7. (a) The provisions set forth in paragraph (b) of subdivision six of this section shall not be construed as applying to buildings existing prior to the effective date of the applicable prohibition, including to:

(i) the repair, alteration, addition, relocation, or change of occupancy or use of such buildings; and

(ii) the installation or continued use and maintenance of fossil-fuel equipment and building systems, including as related to cooking equipment, in any such buildings.

(b) In addition, in effectuating the provisions set forth in paragraph (b) of subdivision six of this section the code shall include exemptions for the purposes of allowing the installation and use of fossil-fuel equipment and building systems where such are installed and used:

(i) for generation of emergency back-up power and standby power systems;

(ii) in a manufactured home as defined in subdivision seven of section six hundred one of the executive law; or

(iii) in a building or part of a building that is used as a manufacturing facility, commercial food establishment, laboratory, car wash, laundromat, hospital, other medical facility, critical infrastructure, including but not limited to emergency management facilities, wastewater treatment facilities, and water treatment and pumping facilities, agricultural building, fuel cell system, or crematorium, as such terms are defined by the code council.

(c) Where the code includes an allowed exemption pursuant to subparagraph (i) or (iii) of paragraph (b) of this subdivision, other than agricultural buildings as defined by the council, such exemption shall include provisions that, to the fullest extent feasible, limit the use of fossil-fuel equipment and building systems to the system and area of the building for which a prohibition on fossil-fuel equipment and building systems is infeasible; require the area or service within a new building where fossil-fuel equipment and building systems are installed be electrification ready, except with respect to servicing manufacturing or industrial processes; and minimize emissions from the fossil-fuel equipment and building systems that are allowed to be used, provided that the provisions set forth in this paragraph do not adversely affect health, safety, security, or fire protection. Financial considerations shall not be sufficient basis to determine physical or technical infeasibility.

(d) Exemptions included in the code pursuant to this subdivision shall be periodically reviewed by the state fire prevention and building code council to assure that

they continue to effectuate the purposes of subdivision six of this section to the fullest extent feasible.

(e) The code shall allow for exemption of a new building construction project that requires an application for new or expanded electric service, pursuant to subdivision one of section thirty-one of the public service law and/or section twelve of the transportation corporations law, when electric service cannot be reasonably provided by the grid as operated by the local electric corporation or municipality pursuant to subdivision one of section sixty-five of the public service law; provided, however, that the public service commission shall determine reasonableness for purposes of this exemption. For the purposes of this paragraph, "grid" shall have the same meaning as electric plant, as defined in subdivision twelve of section two of the public service law.

8. For the purposes of this section:

(a) "Fossil-fuel equipment and building systems" shall mean (i) equipment, as such term is defined in section 11-102 of this article, that uses fossil-fuel for combustion; or (ii) systems, other than items supporting an industrial or commercial process as referred to in the definition of equipment in section 11-102 of the energy law, associated with a building that will be used for or to support the supply, distribution, or delivery of fossil-fuel for any purpose, other than for use by motor vehicles.

(b) "Electrification ready" means the new building or portion thereof where fossil-fuel equipment and building systems are allowed to be used which contains electrical

systems and designs that provide sufficient capacity for a future replacement of such fossil-fuel equipment and building systems with electric-powered equipment, including but not limited to sufficient space, drainage, electrical conductors or raceways, bus bar capacity, and overcurrent protective devices for such electric-powered equipment.

[…]

*Appendix G*

**N.Y. Exec. §378**

**§378. Standards for New York state uniform fire prevention and building code**

The uniform code shall address the following subjects:

[…]

19. a. To support the goal of zero on-site greenhouse gas emissions and help achieve the state's clean energy and climate agenda, including but not limited to greenhouse gas reduction requirements set forth within chapter one hundred six of the laws of two thousand nineteen, also known as the New York state climate leadership and community protection act, the uniform code shall prohibit the installation of fossil-fuel equipment and building systems, in any new building not more than seven stories in height, except for a new commercial or industrial building greater than one hundred thousand square feet in conditioned floor area, on or after December thirty-first, two thousand twenty-five, and the uniform code shall prohibit the installation of fossil-fuel equipment and building systems, in all new buildings on or after December thirty-first, two thousand twenty-eight.

b. The provisions set forth in paragraph a of this subdivision shall not be construed as applying to buildings existing prior to the effective date of the applicable prohibition, including to:

(i) the repair, alteration, addition, relocation, or change of occupancy or use of such buildings; and

(ii) the installation or continued use and maintenance of fossil-fuel equipment and building systems, including as related to cooking equipment, in any such buildings.

c. In addition, in effectuating the provisions set forth in paragraph a of this subdivision the code shall include exemptions for the purposes of allowing the installation and use of fossil-fuel equipment and building systems where such systems are installed and used:

(i) for generation of emergency back-up power and standby power systems;

(ii) in a manufactured home as defined in subdivision seven of section six hundred one of the executive law; or

(iii) in a building or part of a building that is used as a manufacturing facility, commercial food establishment, laboratory, car wash, laundromat, hospital, other medical facility, critical infrastructure, including but not limited to emergency management facilities, wastewater treatment facilities, and water treatment and pumping facilities, agricultural building, fuel cell system, or crematorium, as such terms are defined by the code council.

d. Where the uniform code includes an allowed exemption pursuant to subparagraph (i) or (iii) of paragraph c of this subdivision, other than agricultural buildings as defined by the council, such exemption shall

include provisions that, to the fullest extent feasible, limit the use of fossil-fuel equipment and building systems to the system and area of the building for which a prohibition on fossil-fuel equipment and building systems is infeasible; except with respect to servicing manufacturing or industrial processes, require the area or service within a new building where fossil-fuel equipment and building systems are installed be electrification ready; and minimize emissions from the fossil-fuel equipment and building systems that are allowed to be used, provided that such provisions do not adversely affect health, safety, security, or fire protection. Financial considerations shall not be sufficient basis to determine physical or technical infeasibility.

e. Exemptions included in the uniform code pursuant to this subdivision shall be periodically reviewed by the code council to assure that they continue to effectuate the purposes of paragraph a of this subdivision and subparagraph three of paragraph b of subdivision two of section three hundred seventy-one of this article to the fullest extent feasible.

f. The code shall allow for exemption of a new building construction project that requires an application for new or expanded electric service, pursuant to subdivision one of section thirty-one of the public service law and/or section twelve of the transportation corporations law, when electric service cannot be reasonably provided by the grid as operated by the local electric corporation or municipality pursuant to subdivision one of section

sixty-five of the public service law; provided, however, that the public service commission shall determine reasonableness for purposes of this exemption. For the purposes of this paragraph, "grid" shall have the same meaning as electric plant, as defined in subdivision twelve of section two of the public service law.

g. For the purposes of this subdivision:

(i) "Fossil-fuel equipment and building systems" shall mean (A) equipment, as such term is defined in section 11-102 of the energy law, that uses fossil-fuel for combustion; or (B) systems, other than items supporting an industrial or commercial process as referred to in the definition of equipment in section 11-102 of the energy law, associated with a building that will be used for or to support the supply, distribution, or delivery of fossil-fuel for any purpose, other than for use by motor vehicles.

(ii) "Electrification ready" means the new building or portion thereof where fossil-fuel equipment and building systems are allowed to be used which contains electrical systems and designs that provide sufficient capacity for a future replacement of such fossil-fuel equipment and building systems with electric-powered equipment, including but not limited to sufficient space, drainage, electrical conductors or raceways, bus bar capacity, and overcurrent protective devices for such electric-powered equipment.

[…]

*Appendix G*

## NEW YORK CITY ADMINISTRATIVE CODE

## N.Y.C. Admin. Code §24-177.1

### §24-177.1 Prohibited emissions.

a. Buildings shall be subject to the emission limits set forth in this section in accordance with section 28-506.1.

b. No person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy, as determined by the United States energy information administration, within such building.

c. Notwithstanding the prohibition in subdivision b, combustion of a substance that emits 25 kilograms of carbon dioxide per million British thermal units of energy or more shall be permitted for use within such a building where the combustion of such substance occurs in connection with a device that contains no connection to a building's gas supply line or fuel oil piping system, is used on an intermittent basis, and is not used to supply a building with heat or hot water.

d. This section may be enforced by the department [of environmental protection[1]] or the department of buildings.

1. N.Y.C. Admin. Code §24-104 ("'Department' means the department of environmental protection.").

*Appendix G*

## N.Y.C. ADMIN. CODE §28-506.1

New buildings shall be subject to the emissions limits set forth in section 24-177.1. The commissioner shall not approve an application for the approval of construction documents, nor issue any permit in connection therewith, for a new building that does not comply with section 24-177.1.

**Exceptions:**

1. A building that is seven stories or more where an application for the approval of construction documents is submitted on or before July 1, 2027.

2. A building that is less than seven stories where an application for the approval of construction documents is submitted on or before December 31, 2023.

3. A building, other than a building, that is classified as group R-3, where such emissions are in connection with the provision of hot water and an application for the approval of construction documents is submitted on or before July 1, 2027.

4. A building that is less than seven stories where the building owner demonstrates in accordance with rules promulgated by the department that 50 percent or more of the dwelling units in such building are subject to a regulatory agreement, restrictive declaration, or similar instrument with a federal, state, or local governmental entity or instrumentality for the creation

or preservation of affordable housing, and an application for the approval of construction documents is submitted before December 31, 2025.

5. A building that is seven stories or more where the building owner demonstrates in accordance with rules promulgated by the department that 50 percent or more of the dwelling units in such building are subject to a regulatory agreement, restrictive declaration, or similar instrument with a federal, state, or local governmental entity or instrumentality for the creation or preservation of affordable housing, and an application for the approval of construction documents is submitted before December 31, 2027.

6. A building that will be primarily used by a utility regulated by the public service commission for the generation of electric power or steam.

7. A building within a facility operated by the department of environmental protection that treats sewage or food waste.

8. An application filed by or on behalf of the school construction authority submitted before December 31, 2024.

9. A building where it would not be required to comply with section 24-177.1 because the combustion of a substance that emits 25 kg or more of carbon dioxide per million British thermal units of energy is necessary for a manufacturing use or purpose, or for the operation

of a laboratory, laundromat, hospital, crematorium, commercial kitchen as defined in section 602 of the New York city fire code, or where used for emergency or standby power, or other use allowed by rule of the department, to the extent necessary for, and in the space occupied by such use or purpose.